**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MYRON CORP., | : |
| Plaintiff, | : |
| v. | : Civil Action No. |
| | : 07-CV-6877 (PAC) |
| HOLLAND USA, INC. D/B/A | : |
| AMSTERDAM PRINTING | : |
| Defendant. | : |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
## OF ITS MOTION FOR A PRELIMINARY INJUNCTION

Frank J. Colucci (FC-8441)
Richard P. Jacobson (RJ-2843)
Colucci & Umans
218 East 50th Street
New York, New York 10022
Telephone: (212) 935-5700
Facsimile: (212) 935-5728
Email: email@colucci-umans.com

*Attorneys for Plaintiff, Myron Corp.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES........................................................................iii

I.    PRELIMINARY STATEMENT.......................................................1

II.   STATEMENT OF FACTS............................................................2

III.  MYRON IS ENTITLED TO A PRELIMINARY INJUNCTION

      A.    Standard For Issuance Of A Preliminary Injunction....................7

      B.    Myron Is Likely To Succeed On The
            Merits Of Its Trade Dress Infringement Claim.............................7

            1.    The Myron Trade Dress Is Inherently Distinctive
                  And Has Acquired Secondary Meaning.........................7

                  a.    The Myron Trade Dress Is Inherently
                        Distinctive...........................................................8

                  b.    The Myron Trade Dress Has Acquired
                        Secondary Meaning..........................................10

            2.    The Myron Trade Dress Is Not Essential For Effective
                  Competition And Is Therefore Non-Functional....................12

            3.    Consumers Are Likely To Be
                  Confused by Defendant's Infringing Trade Dress
                  Under The *Polaroid* Factors........................................13

                  a.    The Myron Trade Dress Is A Strong Indicator
                         Of Source...........................................................14

                  b.    Defendant's Infringing Trade Dress Creates
                        A Commercial Impression That is Confusingly
                        Similar To The Myron Trade Dress........................15

                  c.    Myron's And Defendant's Product Lines
                        Are Identical......................................................17

                  d.    Actual Confusion Is Not Necessary To Prevail
                        On An Infringement Claim....................................17

                  e.    There Is No Gap To Be Bridged By Myron................18

i

f. Defendant's Adoption Of The Myron Trade Dress Indicates Bad Faith……………………………….........18

g. Myron Is Unable To Control The Quality Of Defendant's Products.........................................................20

h. The Sophistication Of The Consumers Weighs In Myron's Favor...................................................20

i. Summary Of The *Polaroid* Factors....................................21

C. Defendant's Sale Of Its Infringing Products Is Irreparably Harming The Myron Trade Dress And The Goodwill Associated Therewith..................................................21

D. Myron's Claims Raise Sufficiently Serious Questions Going To The Merits, And The Balance Of Hardships Tips Decidedly In Myron's Favor.........................22

IV. **CONCLUSION**........................................................................................24

## TABLE OF AUTHORITIES

### CASES

*Abercrombie & Fitch Co. v. Hunting World, Inc.,*
537 F.2d 4 (2d Cir. 1976)............................................................. 8

*Beer Nuts, Inc. v. Clover Club Foods Co.,*
805 F.2d 920 (10th Cir. 1986)..................................................... 18

*Best Cellars, Inc. v. Grape Finds at Dupont, Inc.,*
90 F.Supp.2d 431 (S.D.N.Y. 2000) ........................................ 14, 17, 18

*Cadbury Beverages, Inc. v. Cott Corp.,*
73 F.3d 474 (2d Cir. 1996) ........................................................ 17

*Centaur Communications, Ltd. v. A/S/M Communications, Inc.,*
830 F.2d 1217 (2d Cir. 1987) ..................................................... 17

*Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.,*
659 F.2d 695 (5th Cir. 1981) ...................................................... 10

*Clinique Labs, Inc. v. Dep Corp.,*
945 F. Supp. 547 (S.D.N.Y. 1996) ......................................... 15, 19, 20

*Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,*
933 F.2d 162 (2d Cir. 1991) ........................................................ 7

*Corning Glass Works v. Jeanette Glass Co.,*
308 F. Supp. 1321 (S.D.N.Y. 1970), *aff'd*, 432 F.2d 784 (2d Cir. 1970).. 23

*Fruit-Ices Corp. v. Coolbrands Int'l Inc.,*
334 F. Supp.2d 412 (S.D.N.Y. 2004) ........................... 7-9, 11-13, 22

*Fun-Damental Too v. Gemmy Indus. Corp.,*
111 F.3d 993 (2d Cir. 1997) ..................................... 7, 8, 12, 14

*George Basch Co. v. Blue Coral, Inc.,*
968 F.2d 1532 (2d Cir. 1992)................................................. 10, 11

*Gruner + Jaher USA Pub. v. Meredith Corp.,*
991 F.2d 1072 (2d Cir. 1993) .................................................... 15

*Harlequin Enters. Ltd. v. Gulf & W. Corp.,*
644 F.2d 946 (2d Cir. 1981)...................................................... 11

*Kraft Gen. Foods, Inc. v. Allied Old English, Inc.,*
831 F. Supp. 123 (S.D.N.Y. 1993)................................................................ 14, 20

*Kurt S. Adler, Inc. v. World Bazaars, Inc.,*
897 F. Supp. 92 (S.D.N.Y. 1995) ................................................................ 21

*Lang v. Retirement Living Publ'g Co.,*
949 F.2d 576 (2d Cir. 1991) ........................................................................ 18

*Lisa Frank, Inc. v. Impact Int'l Inc.,*
799 F. Supp. 980 (D. Ariz. 1992) ................................................................ 10

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,*
799 F.2d 867 (2d Cir. 1986)........................................................................ 17, 18

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.,*
426 F.3d 532 (2d Cir. 2005) ........................................................................ 7, 15

*Major League Baseball Properties, Inc. v. Salvino, Inc.,*
420 F.Supp.2d 212 (S.D.N.Y. 2005) .......................................................... 11

*Metlife, Inc. v. Metro. Nat'l Bank,*
388 F. Supp.2d 223 (S.D.N.Y. 2005) .......................................................... 18, 20

*Mobil Oil Corp. v. Pegasus Petroleum Corp.,*
818 F.2d 254 (2d Cir. 1987) ........................................................................ 19

*Paco Rabanne Parfums, S.A. v. Norco Enterps.,*
680 F.2d 891 (2d Cir. 1982) ........................................................................ 22

*Paddington Corp. v. Attiki Importers & Distributors, Inc.,*
996 F.2d 577 (2d Cir. 1993) ........................................................................ 8-10, 16, 20

*PAF S.r.l. v. Lisa Lighting Co.,*
712 F. Supp. 394 (S.D.N.Y. 1989)............................................................... 10

*Polaroid Corp. v. Polarad Electronics Corp.,*
287 F.2d 492 (2d Cir. 1961)........................................................................ 13

*TCPIP Holdings Co. Inc. v. Haar Communications, Inc.,*
244 F.3d 88 (2d Cir. 2001)........................................................................... 18

*Two Pesos, Inc. v. Taco Cabana, Inc.,*
505 U.S. 763 (1992)..................................................................................... 7, 8, 14

## **STATUTE**

15 U.S.C. § 1125(a) ...........................................................................................................1

## **SUPPLEMENTAL AUTHORITY**

3 J. Thomas McCarthy, *McCarthy on Trademarks and
Unfair Competition* § 23:12 (4th ed. 2001)...............……………………………...........18

I.          **PRELIMINARY STATEMENT**

Plaintiff, Myron Corp. ("Myron" or "plaintiff"), respectfully moves for a preliminary injunction enjoining defendant, Holland USA, Inc., d/b/a Amsterdam Printing ("defendant"), from blatant acts of intentional trade dress infringement.[1]

Since long prior to the acts of defendant alleged herein, Myron created and has used a protectable trade dress in its personalized business products, namely calendars and diaries, by which consumers identify Myron, as exemplified below (the "Myron Trade Dress"):[2]



Defendant, who is an admitted direct competitor of Myron in the field of personalized business products has, without Myron's permission or authorization, reproduced virtually every element of the Myron Trade Dress in an identical product, namely calendars and diaries  (the "Infringing Trade Dress"):

---

[1]      While the complaint sets forth various iterations of trade dress and trademarks used by defendant that infringes Myron's rights, Myron moves for preliminary injunctive relief solely with respect to the most egregious and damaging of the infringements as depicted in Exhibit E to the Complaint and Exhibit 10 of the Declaration of Patrick Caillat in Support of Plaintiff's Motion for a Preliminary Injunction ("Caillat Decl."). Moreover, while Myron asserts six claims for relief, this motion for a preliminary injunction rests upon Myron's First and Third counts for relief for Trade Dress Infringement and Federal Unfair Competition respectively, both of which fall under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).
[2]      The constituent elements of the Myron Trade Dress are described in detail at page 9 herein and in Paragraph 21 of the Complaint.



The virtually identical nature of the parties' products is amply demonstrated by even a cursory examination of the parties' products.   The Infringing Trade Dress represents a calculated and deliberate effort by defendant to trade upon the goodwill inherent in the Myron Trade Dress, confuse consumers and divert Myron's customers to defendant.   Consequently, unless preliminarily enjoined by the Court, Myron stands to suffer irreparable and permanent harm to its business.  As demonstrated herein, all the applicable legal standards for the issuance of an injunction have been fully satisfied.  There is a clear likelihood of success on the merits, the failure to grant an injunction will severely and irreparably harm Myron, and the balance of equities weighs heavily in favor of Myron.  Accordingly, the Court should grant Myron's application for a preliminary injunction in its entirety.

## II.         **STATEMENT OF FACTS**

Myron is a leading direct seller of promotional products and personalized business gifts, such as calendars, pens, calculators and key rings.  (Caillat Decl., ¶ 4). Myron generates sales through various direct marketing vehicles, which include product

-2-

sample mailings, its printed catalog, website and telephone sales team.  (Caillat Decl., ¶ 4).

In addition, Myron actively solicits new customers and orders by prospecting, which is the industry term for unsolicited mailings of a product sample, such as a calendar, to a potential customer, often with the customer's name printed on the product.  (Caillat Decl., ¶ 5).  Myron frequently engages in prospecting, and it is a critical component of its success.  (Caillat Decl., ¶ 5).

Defendant also sells the same kinds of calendars that Myron sells. Defendant and Myron are direct competitors.[3]  (Jacobson Decl. Ex. 21, p. 14).

Calendars, as dated products with a finite end to their usefulness, yield a high rate of repeat business.  (Caillat Decl., ¶ 7).  Capitalizing on the tendency of existing customers to renew their calendar orders is vital to the continued success of Myron. (Caillat Decl., ¶ 7).

Because calendars are fairly standardized products, Myron created a distinct TEAMWORK brand to differentiate its dated products and generate consumer interest through attractive designs and compelling trademarks on the covers of its calendars.  (Caillat Decl., ¶ 9).  One of Myron's most successful branded product is its line of TEAMWORK calendars that embody the Myron Trade Dress, which includes more than thirty SKUs.  (Caillat Decl., ¶¶ 19, 12).

At least as early 1995, Myron launched its TEAMWORK calendar featuring a distinctive mountain climbing motif bearing the word TEAMWORK above the tag line and registered trademark TOGETHER WE ACHIEVE THE

---

[3]     The deposition transcript of Kevin Kirbey, president of Holland USA, Inc. is attached as Exhibit 21 of the Declaration of Richard P. Jacobson in Support of Plaintiff's Motion for a Preliminary Injunction ("Jacobson Decl.").

EXTRAORDINARY, which is the subject of United States Registration No. 2,297,367.[4] (Caillat Decl., ¶ 10).

Long prior to defendant, Myron has continuously used the Myron Trade Dress comprised of a mountain climbing design along with the words TEAMWORK and TOGETHER WE ACHIEVE THE EXTRAORDINARY. (Caillat Decl., ¶ 11). The Myron Trade Dress has continuously been used on and in connection with the manufacture and sale in interstate commerce of high-quality, personalized business products, including calendars and diaries. (Caillat Decl., ¶ 12).

Between 2002 and 2006, Myron distributed millions of sample calendars to prospective and actual customers featuring the Trade Dress, at a cost of more than $19 million. (Caillat Decl., ¶ 13). Since 2002, Myron has also expended another $153,000 to advertise and promote its products bearing the Myron Trade Dress through its catalogs. (Caillat Decl., ¶ 14). Thus, total advertising and promotional expenditures between 2002 and 2006 were in excess of $19 million. (Caillat Decl., ¶ 14).

Since 1998, Myron has sold more than 38 million units of dated products featuring the Myron Trade Dress, earning revenues exceeding $77 million from the sale of all such products. (Caillat Decl., ¶ 15).

On or around June 18, 2007, Myron became aware that defendant had recently introduced a new line of calendars bearing the TEAMWORK name and a design of flying geese in a V-formation, which is identical in form and presentation to the TEAMWORK line of dated products that Myron has used since as least as early as 1995.

---

[4]    In addition to claims based on its registered trademark TOGETHER WE ACHIEVE THE EXTRAORDINARY, Myron's Complaint asserts common law rights to the word TEAMWORK, alone and in combination with TOGETHER WE ACHIEVE THE EXTRAORDINARY, which are the subjects of pending United States trademark applications, respectively, for calendars and other goods. (Jacobson Decl. Exs. 12, 13) (Compl., ¶¶ 53–64).

(Caillat Decl., ¶ 16). Thereafter, Myron learned that Defendant was advertising and selling pocket calendars bearing the words TEAMWORK and TOGETHER WE CAN ACHIEVE THE IMPOSSIBLE along with a design depicting two silhouetted mountain climbers, which Defendant calls "Achieve Teamwork". (Caillat Decl., ¶ 17). Defendant's products are virtually identical to Myron's. (Caillat Decl., ¶ 17). Defendant's "Achieve Teamwork" products also feature on the front cover a slogan— TOGETHER WE CAN ACHIEVE THE IMPOSSIBLE—that is confusingly similar to Myron's TOGETHER WE ACHIEVE THE EXTRAORDINARY registered trademark. (Caillat Decl., ¶ 17). Five of the seven words that appear on defendant's calendars are identical to five of the six words in the Myron Trade Dress. In addition, defendant's products copy the overall trade dress of Myron's calendars, including the artwork depicting two silhouetted mountain climbers ascending a peak. (Caillat Decl., ¶ 17). The similarities between the parties' products are striking.

The similarities between the parties' trade dresses should not be surprising, however, because defendant admits that it actually designed its product as a means to compete with Myron. (Jacobson Decl. Ex. 21, pp. 27–28). Defendant obtained a sample of Myron's calendar featuring the Myron Trade Dress and referred to it during the design process. (Jacobson Decl. Ex. 21, pp. 32, 53, 57). Defendant's creative director also referred to the Myron Trade Dress in selecting the words that appear on the cover of its calendar. (Jacobson Decl. Ex. 21, p. 41). These words, of course, are the exact same as five of the six words embodied in the Myron Trade Dress.

As a result, customers are likely to be confused or deceived into believing that defendant and defendant's products are somehow connected or associated with

Myron and its products that use the Myron Trade Dress.  (Caillat Decl., ¶ 18).  Defendant invites such confusion by slavishly copying the Myron Trade Dress on its identical goods.

Myron filed its complaint on July 31, 2007,[5] and notified the Court on September 10, 2007 during initial pretrial conference of its intention to move for a preliminary injunction.  The Court issued a briefing schedule and set a hearing for September 27, 2007.

As long as defendant is permitted to advertise and sell its infringing calendars, Myron is likely to lose not only a one-time sale, but given the high rate of repeat business for dated products, it is likely Myron will lose that customer for years, if not forever.  (Caillat Decl., ¶ 19).  Defendant has misappropriated one of Myron's most successful and best selling line of calendars by misappropriating the very names and design by which Myron conducts business and through which customers know Myron's products.  (Caillat Decl., ¶ 19).

Myron also is in need of immediate injunctive relief because its peak selling season is drawing to a close.  (Caillat Decl., ¶ 20).  If relief is denied until after October, Myron will suffer irreparable harm.  (Caillat Decl., ¶ 20).

As a result of Defendant's deliberate and intentional acts, Myron has lost all control over the Myron Trade Dress and accordingly, Myron has suffered—and will continue to suffer until abated—extreme harm to its goodwill.

---

[5]        Since the filing of its complaint, plaintiff has learned that Holland USA, Inc. operates another business under the assumed name "Union Pen Company" that sells products bearing the Infringing Trade Dress, as further defined at pages 15–16 herein.  In addition, a former affiliate of Holland USA, Inc. doing business as Windmill Press has been found offering the infringing products as well.  Accordingly, plaintiff will amend its complaint to include Holland USA, Inc., d/b/a Union Pen Company, and AdGraphics (US), Inc., d/b/a Windmill Press, as defendants.

**III.**    **MYRON IS ENTITLED TO A PRELIMINARY INJUNCTION**

**A.**    **STANDARD FOR ISSUANCE OF
A PRELIMINARY INJUNCTION**

In order to obtain a preliminary injunction, Myron must establish: (1) that

it is likely to succeed on the merits of its claims of trade dress infringement, or

sufficiently serious questions exist regarding the merits of the claim to make them a fair

ground for trial, with the balance of hardships tipping decidedly in the plaintiff's favor;

and (2) that it will suffer irreparable harm absent injunctive relief. *Louis Vuitton*

*Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005)

(citation omitted).  As shown below, Myron clearly satisfies all of the requisite criteria

for the issuance of preliminary injunctive relief.

**B.**    **MYRON IS LIKELY TO SUCCEED ON THE MERITS OF ITS
TRADE DRESS INFRINGEMENT CLAIM**

**1.**    **The Myron Trade Dress Is Inherently Distinctive And
Has Acquired Secondary Meaning**

Trade dress is "essentially [a product's] total image and overall

appearance." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992).  Thus,

a product's trade dress "encompasses the design and appearance of the product together

with all the elements making up the overall image that serves to identify the product

presented to the consumer." *Fruit-Ices Corp. v. Coolbrands Int'l Inc.*, 335 F. Supp. 2d

412, 419 (S.D.N.Y. 2004) (quoting *Fun-Damental Too, Ltd.  v. Gemmy Indus. Corp.*, 111

F.3d 993, 999 (2d Cir. 1997)).  The elements comprising trade dress can include, *inter*

*alia*, "overall composition and design, including size, shape, color, texture, and graphics."

*Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir. 1991).

In order to establish a claim for trade dress infringement, Myron must first establish that the Myron Trade Dress is protectable under Section 43(a) of the Lanham Act by demonstrating that the "total image and overall appearance" of its trade dress: (1) is either inherently distinctive or has acquired a secondary meaning; and, (2) that it is not functional. *Fruit-Ices Corp.*, 334 F. Supp.2d at 418–19 (citing *Fun-Damental*, 111 F.3d at 999); *see also, Two Pesos*, 505 U.S. at 769–70 (1992).[6] The Myron Trade Dress plainly satisfies these requisites.

### a.     The Myron Trade Dress is Inherently Distinctive

The inherent distinctiveness of a trade dress is evaluated under the test set forth in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, that classifies distinctiveness as either generic, descriptive, suggestive, or arbitrary/fanciful. 537 F.2d 4, 9 (2d Cir. 1976). *See Fun-Damental*, 111 F.3d at 999–1000. The Second Circuit has noted that a product's trade dress will typically be arbitrary or fanciful, and thus inherently distinctive, because of the endless variety of labels and packaging available to manufacturers and wholesalers. *See Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 583 (2d Cir. 1993).

It is axiomatic that a product's trade dress must be assessed "by looking at all its elements and considering the total impression given to the observer," rather than viewing each element separately for distinctiveness. *Fruit-Ices*, 335 F. Supp. 2d at 419 (citing *Fun-Damental*, 111 F.3d at 1001). Given this mandate to focus on the total

---

[6]     Section 43(a) provides a cause of action against any person who "in connection with any goods ... or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person...." 15 U.S.C. § 1125(a). Section 43(a) expressly applies to product trade dress as well as trademarks. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992) ("§ 43(a) provides no basis for distinguishing between trademark and trade dress.").

impression of all of the elements of a trade dress, it is a corollary to this axiom that a

protectable trade dress may incorporate elements that, by themselves, are not inherently

distinctive. *Id.* (citing *Paddington*, 996 F.2d at 584). This does not, however, preclude a

trade dress from qualifying as inherently distinctive since the combination of elements is

the heart of the distinctiveness inquiry. *Id.* ("[I]f the overall dress is arbitrary, fanciful,

or suggestive, it is inherently distinctive despite its incorporation of generic or descriptive

elements.") (quoting *Paddington*, 996 F.2d at 584).

> The Myron Trade Dress is comprised of the following elements:

> (1)    The word TEAMWORK in large capital letters with a noticeable space
>        between each letter rendering prominence to the mark;

> (2)    above the registered trademark TOGETHER WE ACHIEVE THE
>        EXTRAORDINARY printed in a smaller font in sentence case;

> (3)    artwork depicting two silhouetted mountain climbers (a) connected by
>        climbing ropes; (b) one higher than the other; (c) facing each other, with
>        the climber in the higher position assisting the other climber; (d) standing
>        on a silhouetted peak in the foreground; (e) with lighter-colored, mountain
>        peaks in the background that highlight the silhouette of one or both
>        climbers; and (f) the overall scene depicted in two tones with the bottom
>        and foreground printed in black.

(Compl., ¶ 21).

> Given the sheer variety of images and graphics that can be depicted in

print, Myron's composition of these elements is completely arbitrary and bears no

relationship to the nature or intended use of its products, *i.e.*, they are not essential to

creating the cover of a calendar. Courts routinely grant trade dress protection to similar

product layouts that incorporate a juxtaposition of unique graphics, colors, fonts (and, in

this case, Myron's registered trademark) that create a distinct overall impression, as the

Myron Trade Dress does. *See, e.g., Paddington Corp. v. Attiki Importers & Distribs.,*

*Inc.*, 996 F.2d 577, 584 (2d Cir. 1993) (plaintiff's liquor bottles held distinctive based on "[t]he tone and layout of the colors, the style and size of the lettering, and, most important, the overall appearance of the bottle's labeling"); *see also Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F. Supp. 980, 989 (D. Ariz. 1992) (combination of certain colors and designs on novelty stationary items created distinctive trade dress; preliminary injunction issued against similar stationary); *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 703 (5th Cir. 1981) (trade dress of plaintiff's lawn and garden products held arbitrary based on "combination of particular hues of [yellow and red], arranged in certain geometric designs, presented in conjunction with a particular style of printing").

> **b.**    ***The Myron Trade Dress Has Acquired Secondary Meaning***

While plaintiff respectfully submits that the Myron Trade Dress is inherently distinctive, it is alternatively entitled to protection under the Lanham Act through acquired secondary meaning.  A mark or trade dress has acquired secondary meaning when "the purchasing public has come to associate [its trade dress's] words, symbols, collocations of colors and designs, or other advertising materials ... with goods from a single source." *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1536 (2d Cir. 1992) (citation omitted).  "[T]he crux of the doctrine of secondary meaning 'is that the mark comes to identify not only the goods but the source of those goods,' even though the relevant consuming public might not know the name of the producer." *PAF S.r.l. v. Lisa Lighting Co., Ltd.*, 712 F. Supp. 394, 402 (S.D.N.Y. 1989) (citations omitted).

Courts look to the following factors to determine whether a trade dress has acquired secondary meaning: "(1) advertising expenditures, (2) consumer studies linking the [trade dress] to the source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the [trade dress], and (6) the length and exclusivity of the [trade dress'] use." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 420 F. Supp. 2d 212, 222 (S.D.N.Y. 2005) (citation omitted); *see also Fruit-Ices*, 335 F. Supp. 2d at 423; *George Basch*, 968 F.2d at 1536. "Each *Polaroid* factor must be considered in the context of the other factors, and no single factor is dispositive." *Fruit-Ices*, 335 F. Supp. 2d at 419.

With a history that dates back more than fifty years, Myron has enjoyed much success and prominence as a leader in personalized business gifts. Myron has been using the Myron Trade Dress since at least 1998. (Caillat Decl., ¶ 12). For the years between 2002 and 2006, total advertising and promotional expenditures of the Myron Trade Dress amounted to over $19 million. (Caillat Decl., ¶ 13). Since 1998, Myron has sold more than 38 million units of products featuring the Myron Trade Dress, resulting in earned revenues exceeding $77 million. (Caillat Decl., ¶ 15).

These significant marketing expenditures and sales, combined with defendant's unabashed copying of the Myron Trade Dress, indicate that the consuming public identifies the Myron Trade Dress as originating from a single source. *Major League Baseball Props., Inc.*, 420 F. Supp. 2d at 223 (defendant's own actions demonstrating that plaintiff's trade dress is subject to intentional imitation supports finding of secondary meaning); *see Harlequin Enters. Ltd. v. Gulf & W. Corp.*, 644 F.2d 946, 950 (2d Cir. 1981) ("Perhaps the most significant evidence of secondary meaning in

this case ... was the attempt by [defendant] to capitalize on [plaintiff's trade dress] when [defendant] introduced its own [product line].") (citation omitted). Accordingly, a review of the guiding factors strongly demonstrates that the Myron Trade Dress has acquired secondary meaning in the marketplace.

**2.     The Myron Trade Dress Is Not Essential For Effective Competition And Is Therefore Non-Functional**

The Myron Trade Dress clearly qualifies for protection because it is non-functional. Functionality of a trade dress is analyzed by reviewing "the degree of usefulness of the similar features on the competing dress, the degree of similarity between the non-useful, ornamental features of the packaging, and the feasibility of alternatives to the useful features." *Fruit-Ices Corp. v. Coolbrands Int'l Inc.*, 335 F. Supp. 2d 412, 422 (S.D.N.Y. 2004) (quoting *Fun-Damental*, 111 F.3d at 1002).

As set forth above, although common elements may be found among competitive products, it is the specific combination and orientation of these elements in relation to one another that serve as the basis for trade dress protection. *See Fruit Ices*, 335 F. Supp. 2d at 422. For example, in *Fruit Ices,* the court emphasized that the plaintiff's trade dress was entitled to protection because the common components found on other products (i.e., rainbow text, realistic fruit images, text announcing "Real Fruit" or "Chunks of Fruit") were not all used in combination with one another, nor exploited in the same manner, to create the same overall impression. *Id.* at 421.

Here, the Myron Trade Dress is non-functional because the combination of elements depicted in its trade dress is "not essential to the use of the product, its quality or its purpose" as calendars or planners. *Fruit-Ices*, 335 F. Supp. 2d at 423. Nor would protection of the Myron Trade Dress hinder competition by limiting the range of

available product designs, as evidenced by the wide variety of calendars produced by defendant itself, as well as other competitors who do not resort to copying the Myron Trade Dress. *Id.* Moreover, although defendant has long offered a "motivational" line of pocket calendars, including a version featuring a single mountain climber and a longer saying on the cover, it was only after defendant carefully studied and copied the Myron Trade Dress that defendant radically altered its design to create the Infringing Trade Dress. (Jacobson Decl. Ex. 21, pp. 27-32). Defendant's president admitted that its desire to compete with Myron did not require use of a mountain scene, TEAMWORK or the phrase TOGETHER WE CAN ACHIEVE THE IMPOSSIBLE. (Jacobson Decl. Ex. 21, p. 29). Therefore, it is evident that the Myron Trade Dress is non-functional.

### 3. Consumers Are Likely To Be Confused By Defendant's Infringing Trade Dress Under The *Polaroid* Factors

Having established the protectability of the Myron Trade Dress, Myron can establish that it is entitled to a preliminary injunction by demonstrating that it is likely to succeed on the merits of its trade dress infringement claim. Thus, the next step in the inquiry is whether there is a likelihood of confusion between the trade dresses at issue. *Fruit-Ices*, 335 F. Supp. 2d at 418. The longstanding test for likelihood of confusion in this Circuit requires an analysis of the eight "*Polaroid* Factors": (1) the strength of the mark; (2) the similarity of the two marks; (3) the proximity of the products; (4) actual confusion; (5) likelihood of plaintiff bridging the gap; (6) defendant's good faith in adopting its mark; (7) the quality of defendant's products; and (8) the sophistication of the consumers. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). No single factor is dispositive, nor is a court limited to consideration of only these factors. *See Polaroid*, 287 F.2d at 495. In applying the octet of *Polaroid*

Factors, a Court should "weigh each factor in the context of the others to determine if, on balance, a likelihood of confusion exists." *Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 128 (S.D.N.Y. 1993). In the present case, the *Polaroid* Factors unquestionably weigh in favor of Myron, thus establishing a likelihood of confusion.

### a.    The Myron Trade Dress is a Strong Indicator of Source

The strength of a trade dress is examined in its commercial context and takes into account the distinctiveness inquiry under the *Abercrombie* categories (*see supra* at III.B.1.a), as well as the presence of secondary meaning. *Fruit-Ices*, 335 F. Supp. 2d at 423.; *see also Fun-Damental*, 111 F.3d at 1003. With respect to the distinctiveness of a trade dress, this refers to the "tendency [of the trade dress] to identify the goods sold as emanating from a particular source, even when the source is unknown to the consumer." *Id.* An arbitrary trade dress, by its very nature, is deemed distinctive and strong for purposes of assessing likelihood of confusion. *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 454 (S.D.N.Y. 2000).

Accordingly, the Myron Trade Dress—a combination of completely arbitrary graphics and elements—is inherently distinctive and serves as a strong indicator of plaintiff as the source or origin. *See Two Pesos*, 505 U.S. at 768 (holding that arbitrary trade dresses, by "their intrinsic nature serve[] to identify a particular source of a product ...."). The strength of the Myron Trade Dress is also demonstrated by its strong secondary meaning. *See, e.g., Best Cellars*, 90 F. Supp. 2d at 455 (holding that plaintiff's trade dress was strong because it was arbitrary and had acquired secondary meaning). As set forth above, since 1998, Myron has sold more than 38 million units of products featuring the Myron Trade Dress, which evidences the strength of the trade dress as an

indicator of source or origin.  Defendant admitted that it was unaware of any other

company that offered a calendar depicting two mountain climbers.  (Jacobson Decl. Ex.

21, p. 39).  Consequently, a review of the evidence concludes that the Myron Trade Dress

is strong, and this factor weighs in favor of likelihood of confusion.  *See Clinique Labs.,*

*Inc. v. Dep Corp.,* 945 F. Supp. 547, 559–60 (S.D.N.Y. 1996).

> **b.**    ***Defendant's Infringing Trade Dress Creates a Commercial
> Impression That Is Confusingly Similar to the Myron Trade
> Dress***

One of the key factors in determining the likelihood of confusion is the

similarity of the competing marks.  *Louis Vuitton Malletier v. Burlington Coat Factory*

*Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005).  "To apply this factor, courts must

analyze the mark's overall impression on a consumer, considering the context in which

the marks are displayed and 'the totality of factors that could cause confusion among

prospective purchasers."  *Id.* (quoting *Gruner + Jaher USA Pub. v. Meredith Corp.*, 991

F.2d 1072, 1078 (2d Cir. 1993)).

It is unquestionable that an examination of the Infringing Trade Dress

leads to the conclusion that it is virtually identical to the Myron Trade Dress, with

virtually undetectable alterations.  Defendant offers for sale a line of dated products under

the name "Achieve Teamwork Planner" that copies nearly every detail of the Myron

Trade Dress.  The similarities between the respective trade dresses for the two products

include: (1) the word TEAMWORK in large, widely spaced capital letters above; (2) the

phrase TOGETHER WE CAN ACHIEVE THE IMPOSSIBLE in a smaller font;[7] (3)

graphic artwork depicting two silhouetted mountain climbers (a) connected by climbing

---

[7]    Myron's mark is TOGETHER WE ACHIEVE THE <u>EXTRAORDINARY</u> (instead of
IMPOSSIBLE, and defendant added CAN before "ACHIEVE").  The text on defendant's calendars copies
five of the six words that appear on Myron's calendars.

ropes; (b) one higher than the other; (c) facing each other, with the climber in the higher

position assisting the other climber; (d) standing on a silhouetted peak in the foreground;

(e) with lighter-colored, mountain peaks in the background that highlight the silhouette of

one or both climbers; and (f) the overall scene depicted in two tones with the bottom and

foreground printed in black.  The Myron Trade Dress and the Infringing Trade Dress are

shown below.



**Myron's Calendar**                    **Defendant's Calendar**

As the foregoing makes clear, defendant's design of its products is

intended to closely mimic Myron's and thereby confuse consumers.  Any superficial

differences in the details of the products' trade dress are immaterial in the face of the

overwhelming similarities.  *Paddington*, 996 F.2d at 586 (differences in the details of

parties' respective trade dress for ouzo did not matter because "[e]ach label's lettering

style, layout, and coloration, taken together, convey the same impression....").  As a

result, this factor weighs heavily in favor of a likelihood of confusion.

### c.        *Myron's and Defendant's Product Lines are Identical*

This factor, proximity of the products, examines whether and to what extent two products compete with each other. *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 456 (S.D.N.Y. 2000) (citing *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996)). Accordingly, the court must consider "the nature of the products themselves and the structure of the relevant market," including "the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold." *Id.* (citation omitted).

The products at issue are indisputably identical, and defendant acknowledges that Myron is a direct competitor. (Jacobson Decl. Ex. 21, p. 14). Both Myron and defendant produce personalized business products, such as calendars and diaries, for the same consumer base of companies and individuals alike that are interested in purchasing such products. Both parties offer their products through direct marketing channels, including catalog, website, telephone sales and unsolicited mailing of product samples.

Consequently, this factor also weighs in favor of a likelihood of confusion.

### d.        *Actual Confusion is Not Necessary to Prevail on an Infringement Claim*

While Myron anticipates that discovery will reveal occurrences of actual confusion given the virtual identity of the parties' respective trade dresses on the same products, it is not yet aware of any instances. However, it is axiomatic that the Lanham Act does not require evidence of actual confusion as a prerequisite to recovery. *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1227 (2d Cir. 1987); *Lois*

*Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986); *Metlife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d 223, 232 (S.D.N.Y. 2005). Accordingly, "the absence of evidence of actual confusion sheds no light whatever on the problem." *TCPIP Holding Co., Inc. v. Haar Commc'ns Inc.*, 244 F.3d 88, 102 (2d Cir. 2001); *see also*, 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:12, at 23-52 (4th ed. 2004) (noting that courts do not require evidence of actual confusion because they recognize that such evidence is "very difficult, and often impossible, to obtain") (citing cases).[8]

### e.    There is No Gap to be Bridged by Myron

"This factor applies when the first user sells its products in one field and the second user sells its products in a closely related field, into which the first user might expand, thereby 'bridging the gap.'" *Best Cellars*, 90 F. Supp. 2d at 456. Again, because the parties are selling products within the same field, there is no gap to bridge, and consequently, this factor favors Myron.

### f.    Defendant's Adoption of the Myron Trade Dress Indicates Bad Faith

"This factor 'looks to whether the defendant adopted its [dress] with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 457 (S.D.N.Y. 2000) (quoting *Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (citation omitted)).

---

[8]    Furthermore, courts have recognized that examples of actual consumer confusion are rare in cases, as here, involving inexpensive products. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 928 (10th Cir. 1986).

Given the unlimited number of potential cover designs for pocket calendars, defendant's selection of virtually every element of the Myron Trade Dress leads to one conclusion—defendant intended to capitalize on the reputation and goodwill of the Myron Trade Dress. Defendant's calendar was a studied effort to replicate the Myron Trade Dress. Defendant admits that it possessed an actual sample of a calendar with the Myron Trade Dress during the design process, including the selection of the wording and graphic on the cover. (Jacobson Decl. Ex. 21, pp. 31-32, 40-41).

Consequently, defendant's choice of trade dress cannot possibly have been a coincidence. *See Clinique Labs., Inc. v. Dep Corp.,* 945 F. Supp. 547, 555 (S.D.N.Y. 1996) ("The overall appearance of the two lines of products is too similar even to entertain the idea that [defendant] did not mimic [plaintiff's] mark and dress."). Further, as the junior market entrant, defendant was under an affirmative duty to avoid adopting a trade dress confusingly similar to the Myron Trade Dress, and defendant's failure to do so evidences a deliberate attempt to cause, and take advantage of, consumer confusion.[9] *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987) ("[T]he second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer.") (citation omitted).

---

[9]     Defendant, apparently, is uncertain whether it sought any legal review of the Infringing Trade Dress prior to its production. (Jacobson Decl. Ex. 21, pp. 43-44, 47).

Further evidence of defendant's bad faith is its unquestioned awareness of Myron as a competitor, and of the Myron Trade Dress:

> Where a second-comer acts in bad faith and intentionally copies a trademark or trade dress, a presumption arises that the copier has succeeded in causing confusion.... Where such prior knowledge is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, we have upheld finding of bad faith.

*Paddington Corp.*, 996 F.2d at 586-87 (citations omitted).

Consequently, this factor also weighs heavily in favor of the issuance of preliminary injunctive relief.

### g.    *Myron is Unable to Control the Quality of Defendant's Products*

Myron has earned a well-regarded reputation in the industry for its consistently high quality products. Since Myron cannot ensure that the infringing products adhere to the same standards and quality control, its reputation could be damaged if defendant's infringing products are inferior. *See Clinique Labs., Inc. v. DEP Corp.*, 945 F. Supp. 547, 556 (S.D.N.Y. 1996). Regardless of the actual quality of defendant's products, it is the inability of Myron to control the quality of products bearing its trade dress that matters. *See id.* Therefore, this factor also favors a finding of likelihood of confusion.

### h.    *The Sophistication of the Consumers Weighs in Myron's Favor*

This factor examines the degree of care and attention a consumer takes in evaluating a product before making a purchase. *Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 133 (S.D.N.Y. 1993). "A higher degree of consumer sophistication decreases the risk of consumer confusion." *Metlife*, 388 F. Supp. 2d at 235.

Myron's TEAMWORK line of calendar products range from $2.35 to $4.49, and defendant's prices range from $2.39 to $3.59 depending on the style and quantity ordered, although both offer discounts, particularly to attract new customers. (Caillet Decl. Exs. 1, 10) (Jacobson Decl. Ex. 21, p. 72). Both parties set fifty units as the minimum order. (Caillet Decl., ¶ 6; Ex. 10). With such low unit prices, consumers cannot be expected to spend significant time and care in distinguishing defendant's infringing products from Myron's. As a result, consumers are less likely to exhibit great care in making their selection, which exacerbates the likelihood of confusion. *Kurt S. Adler, Inc. v. World Bazaars, Inc.*, 897 F. Supp. 92, 99 (S.D.N.Y. 1995). Consequently, this factor favors Myron.

i.    ***Summary of the Polaroid Factors***

At least seven of the eight *Polaroid* Factors weigh decisively in favor of likelihood of confusion, namely, the strength of the Myron Trade Dress, the similarities of the Infringing Trade Dress, its use on identical goods, thereby obviating any need to bridge the gap, defendant's admitted use of the Myron Trade Dress in designing the Infringing Trade Dress, Myron's inability to control the quality of defendant's products, and the relatively inexpensive nature of the parties' products. The sole factor that does not favor either party is whether actual confusion has occurred, but no such proof is required. Therefore, Myron should be deemed likely to prevail on its claim for trade dress infringement, and thereby entitled to preliminary injunctive relief against defendant.

**C.    Defendant's Sale of Its Infringing Products is Irreparably Harming the Myron Trade Dress and the Goodwill Associated Therewith**

The Second Circuit has long held that "a showing of likelihood of confusion as to source will establish a risk of irreparable harm," thereby constituting

appropriate grounds for a preliminary injunction. *Fruit-Ices Corp. v. Coolbrands Int'l Inc.*, 335 F. Supp. 2d 412, 418 (S.D.N.Y. 2004) (citation omitted); *see also Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.*, 680 F.2d 891, 894 (2d Cir. 1982) ("[L]ikelihood of damage to reputation and good will ... entitles a plaintiff to preliminary relief."). Thus, Myron has plainly demonstrated that it is irreparably harmed by the likelihood of confusion resulting from defendant's unauthorized sale of infringing products, which harm will be exacerbated absent injunctive relief.

However, notwithstanding the presumption of irreparable harm that automatically follows a determination of liability under the Lanham Act, the harm to Myron is manifest. Defendant's products bearing the Infringing Trade Dress are likely to divert sales and profits from Myron to defendant. In addition, the goodwill and reputation associated with the Myron Trade Dress have been removed from the control of Myron by the confusion created by defendant's merchandise. A preliminary injunction is clearly warranted to prevent any further damage to Myron and irreparable harm during the pendency of this case.

**D.     Myron's Claims Raise Sufficiently Serious Questions Going to the Merits, and the Balance of Hardships Tips Decidedly in Myron's Favor**

Myron's claims present serious questions going to the merits, and the fact that Myron is likely to succeed on the merits demonstrates the existence of serious questions that form a fair ground for litigation.

Further, the balance of hardships in the present case strongly favors the issuance of an injunction. Here, Myron is seeking to keep a direct competitor from selling a near replica of one of Myron's best-selling products. If defendant is permitted

to continue its infringing activities it will unquestionably lead to consumer confusion in the marketplace, and consumers seeking to purchase Myron's well-known products bearing the Myron Trade Dress will likely be diverted to defendant. The parties' businesses of selling calendars relies heavily on repeat orders from existing customers. (Caillet Decl. ¶ 7) (Jacobson Decl. Ex. 21, p. 16). Thus, the value of a new order reaps dividends beyond the year of said order because it is likely that the new customer will renew his or her order for years to come. Because of the high renewal rate, any customer that defendant attracts with the Infringing Trade Dress is likely a customer lost to Myron for years, if not forever, which is the embodiment of irreparable harm. As a result, Myron stands to lose considerable goodwill from defendant's continued sale of its infringing products. This harm is irreparable as a matter of law and uncompensable by damages.

On the other hand, defendant will not suffer any significant harm if its sales of the infringing goods are halted. Myron has used the Myron Trade Dress continuously since the 1990's. Defendant, on the other hand, introduced its line just this year for 2008 calendars. Defendant also introduces new calendar designs multiple times throughout the year. (Jacobson Decl. Ex. 21, p. 15). Defendant's selling season spans the entire year. (Jacobson Decl. Ex. 21, p. 15). Defendant offers a large selection of merchandise, and its ability to sell its other products that do not infringe the Myron Trade Dress will not be affected or curtailed in any way.

Moreover, the public will be served by an injunction because the public's interest lies in avoiding confusion. *See Corning Glass Works v. Jeannette Glass Co.*, 308 F. Supp. 1321, 1328 (S.D.N.Y. 1970), *aff'd*, 432 F.2d 784 (2d Cir. 1970).

Therefore, the alternative test for preliminary injunctive relief is also met.

## IV.    **CONCLUSION**

In conclusion, Myron respectfully submits that the facts before the Court clearly demonstrate that defendant, a direct competitor of Myron, intentionally and deliberately copied practically identically each and every element of the Myron Trade Dress—the silhouetted depiction of two mountain climbers ascending a peak, the word TEAMWORK, the phrase TOGETHER WE ACHIEVE THE EXTRAORDINARY, as well as the layout, format and colors. Moreover, defendant admits that it was fully aware of the Myron Trade Dress, and further admits having an actual sample of Myron's calendar featuring the Myron Trade Dress in its possession during the design and production of defendant's infringing calendar.

Based on these facts, as discussed in this memorandum, defendant's blatant infringement of the Myron Trade Dress creates a strong likelihood of confusion. In addition, Myron has suffered irreparable harm as a result of defendant's infringement. Accordingly, Myron further submits that it has met all of the requirements for the issuance of a preliminary injunction, and requests that the Court grant its motion.

Dated:     New York, New York
               September 24, 2007

Respectfully submitted,

**COLUCCI & UMANS**

By:_____
Frank J. Colucci (FC-8441)
Richard P. Jacobson (RJ-2843)
218 East 50th Street
New York, New York 10022
Telephone: (212) 935-5700
Facsimile: (212) 935-5728
Email: email@colucci-umans.com

*Attorneys for Plaintiff, Myron Corp.*

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the foregoing "Plaintiff's Memorandum of Law in Support of Its Motion for a Preliminary Injunction" in support of plaintiff's motion for a preliminary injunction has been served by email on defendant's attorney, Mario Aieta, Fross Zelnick Lehrman & Zissu, P.C., 866 United Nations Plaza, New York, New York 10017, on this 24th day of September, 2007.