# EXHIBIT J

03-22-1999

U.S. Patent & TMOfc/TM Mail Rcpt Dt. #541

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

T.M.E.O.
LAW OFFICE 104

MAR 24 P 1: 24

RECEIVED

APPLICANT:             MYRON MANUFACTURING CORPORATION

SERIAL NO.:            75/389,191

FILED:                 NOVEMBER 12, 1997

MARK:                  TOGETHER WE ACHIEVE THE EXTRAORDINARY

EXAMINING ATTORNEY:    Anita N. Odonovich
                       Law Office 104


Assistant Commissioner for Trademarks
**BOX NO FEE   ATTN LAW OFFICE 104**
2900 Crystal Drive
Arlington, Virginia  22202-3513

Sir:

      This is in response to an Office Action dated
September 18, 1998.

      The refusal to allow the registration of the subject mark
on the Principal Register has been noted.  It is respectfully
requested that this refusal be withdrawn for the following reasons.

### Nature of the Mark

      The mark sought to be registered is a slogan which, as
demonstrated below, has been extensively promoted and used.  The
slogan is not a generic term and does not describe any of appli-
cant's goods.  Thus, applicant's registration would not deprive
competitors of a term needed to identify or describe similar
products.

      Further, it is not a slogan that has been used by others.
For example, neither the search conducted by the Examining Attorney

nor a review of <u>Bartlett's Familiar Quotations</u> (15th Edition 1980) disclosed this slogan or a confusingly similar one.  Thus, there do not appear to be any "negatives" in the nature or quality of the slogan to support a refusal to register.

### Use as a Trademark and Public Perception

The refusal to register is based on the ground that the slogan is not being used as a trademark and/or is not perceived by the public as a trademark.

Applicant submits that there are at least two reasons why registration should not be refused on these grounds.  First, applicant has extensively used the "TM" trademark notice immediately juxtaposed to its TOGETHER WE ACHIEVE THE EXTRAORDINARY trademark in its catalogs, in promotions by which samples of its products are mailed to prospective customers and on many of millions of dollars worth of products sold.  Second, since the 1984 decision in <u>In re Astro-Gods Inc.</u>, 223 USPQ 621 (TTAB 1984), the general public has become accustomed to seeing numerous trademarks used on products as decorations simultaneously with their source identifying function.

As to the first point, the Declaration of Gwen Zaffe, submitted herewith, shows that applicant has prominently used the "TM" trademark notice with the TOGETHER WE ACHIEVE THE EXTRAORDINARY trademark on millions of samples sent out to promote applicant's goods and its trademark.  In addition, applicant has immediately juxtaposed "TM" to its trademark on all the products

which it has sold, except for pens, the barrels of which are too
small to bear the "TM" notice legibly.  Further, the "TM" notice is
used with the TOGETHER WE ACHIEVE THE EXTRAORDINARY trademark in
applicant's catalogs.  In view of these millions of instances in
which persons have seen the trademark TOGETHER WE ACHIEVE THE
EXTRAORDINARY trademark together with "TM", it is reasonable to
conclude that the slogan is perceived as a trademark to an appre-
ciable segment of consumers and prospective consumers of appli-
cant's goods.

As to the second point, it should be common knowledge
that for more than the last ten years many trademarks have come to
be used in what could be called a decorative way on T-shirts,
sweatshirts, luggage, sneakers and many other products.  Therefore,
as a result of many trademarks being extensively used in this way
(that is, not restricted to being placed only on labels or tags)
the public has come to accept this as trademark use, as well as
decorative use.

## Registrability of Slogans

Finally, it is well settled that distinctive slogans are
entitled to registration.  See, for example, In re E. Kahn's Sons
Co., 145 USPQ 215 (CCPA 1965) (THE WIENER THE WORLD AWAITED regis-
trable for bacon), In re Lincoln Park Van Lines, 149 USPQ 313 (TTAB
1996) (FROM MAINE'S COOL BREEZE TO THE FLORIDA KEYS registrable for
moving services).  Applicant submits that its slogan has acquired
distinctiveness.

## Cases Cited by Examining Attorney

Perhaps the most pertinent case cited by the Examining Attorney is <u>In re Astro-Gods Inc.</u>, <u>supra</u>, because applicant in that case was using its claimed mark in a manner similar to the present applicant. However, that case is absolutely distinguishable from the present one because applicant submitted no information as to the extent of the sales of goods bearing its mark and the Board concluded that applicant's sales had been minimal. The Board also found that the claimed trademark had not been promoted in such a manner and to such an extent as to create purchaser recognition of it as a trademark. In the present case the facts are diametrically opposite. Applicant has introduced evidence of its vast sales and its almost equally vast promotion through the dissemination of samples of products bearing the mark, together with the "TM" trademark notice.

Certain other cases cited by the Examining Attorney appear to either support the applicant's position that the subject mark is entitled to registration or are distinguishable from the facts in the present application. In <u>In re Owens-Corning Fiberglass Corp.</u>, 227 USPQ 1117 (Fed. Cir. 1985), the court held that the color pink as uniformly applied to fibrous glass residential insulation was registrable. It stated, at p. 421, that even if the color was ornamental this did not prevent it from acting as a trademark.

In <u>In re David Crystal, Inc.</u>, 132 USPQ 1 (CCPA 1961), two parallel colored bands were refused registration and in <u>In re</u>

Villeroy & Boch S.A.R.L., 5 USPQ 2d 1451 (TTAB 1987), a floral design pattern for tableware.  In neither case was there evidence of vast sales or promotion and in terms of registrability slogans can be distinguished from such designs.

**TMEP**

The Examining Attorney also cited TMEP §1202.04, et seq., in support of the refusal to register.  Section 1202.04 states, among other things, that ornamental matter may be classified along a continuum ranging from the inherently distinctive, which is registrable on the Principal Register, to purely ornamental matter, which is unregistrable under any circumstances.  Applicant submits that its trademark qualifies for registration under either the second or third category outlined in this Section 1202.04.  That is, applicant's slogan can be considered as ornamental (or exhortatory) matter which also serves as an identifier of a secondary source to applicant's customers and prospective customers.  This is particularly so since applicant has extensively used the trademark notice "TM" in immediate juxtaposition to its slogan trademark.  Such usage conveys to the relevant consumers that TOGETHER WE ACHIEVE THE EXTRAORDINARY is proprietary, that is, it is an identifier of a single source, even though that source may be anonymous.

As to the third category in Section 1202.04, applicant's slogan may be considered as ornamental matter which is neither inherently distinctive nor a secondary source indicator.  Rather, applicant's slogan has acquired distinctiveness as a result of

- 5 -

applicant's extensive promotion and sale of products bearing the slogan and because of applicant's use of the "TM" trademark notice in immediate juxtaposition to the slogan.

### Identification of Goods

The Examining Attorney has objected to an element of applicant's identification of goods.  Therefore, applicant requests that caps in International Class 25 be amended to read "baseball-style caps" in International Class 25.

### Specimens, Dates of First Use, Filing Fees

Applicant has submitted with the application three specimens of use for each class.  Applicant has stated the dates of first use and use in commerce for the mark in each class. Applicant has listed the goods by International Class in ascending numerical order and applicant has submitted together with the application its attorney's check No. 8699 in the amount of $1,715.00 to cover the filing fee in seven classes.

In view of the foregoing, a prompt publication is respectfully requested.

COLUCCI & UMANS
Attorneys for Applicant
101 East 52nd Street
New York, New York 10022
(212) 935-5700

By_____
                    Thomas A. Kain

Dated:   March 18, 1999
         New York, New York

- 6 -

## CERTIFICATE OF MAILING

APPLICANT:      MYRON MANUFACTURING CORPORATION

SERIAL NO.:     75/389,191

FILED:          NOVEMBER 12, 1997

MARK:           TOGETHER WE ACHIEVE THE EXTRAORDINARY

PAPER:          RESPONSE TO OFFICE ACTION
                MAILED SEPTEMBER 18, 1998


     I hereby certify that this correspondence is being
deposited with the United States Postal Service as first class
mail in an envelope addressed to the Assistant Commissioner for
Trademarks, **BOX NO FEE, ATTN LAW OFFICE** 104 , 2900 Crystal Drive,
Arlington, Virginia  22202-3513 on March 18 , 1999.

....................................................

....................................................
(Type/Print name of person mailing paper/fee)

**COLUCCI & UMANS**
**101 East 52nd Street**
**New York, NY  10022**

# EXHIBIT K



**EXHIBIT L**

1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    -------------------------------------x

5    MYRON CORP.,

6                              Plaintiff,

7              vs.

8    HOLLAND USA, INC. D/B/A/

9    AMSTERDAM PRINTING

10                             Defendant.

11   -------------------------------------x

12                    September 19, 2007

13                    9:45 a.m.

14

15

16       Deposition of PATRICK CAILLAT, held at

17   the offices of Colucci & Umans, 218 East

18   50th Street, New York, New York before

19   David Henry, a Certified Shorthand Reporter

20   and Notary Public of the State of New York.

21

22

23

24

25

2

1

2   A P P E A R A N C E S:

3

4       COLUCCI & UMANS

5       Attorneys for Plaintiff

6               218 East 50th Street

7               New York, New York 10022

8       BY:   RICHARD P. JACOBSON, ESQ.

9       AND:  FRANK J. COLUCCI, ESQ.

10

11      FROST ZELNICK LEHRMAN & ZISSU, PC

12      Attorneys for Defendant

13              866 United Nations Plaza

14              New York, New York 10017

15      BY:   MARIO AIETA, ESQ.

16

17

18  ALSO PRESENT:

19      KEVIN KIRBEY

20      ROBERT LACK

21

22

23

24

25

                                                                    3
1                          Caillat
2    P A T R I C K   C A I L L A T ,   called as a
3         witness, having been duly sworn, was
4         examined and testified as follows:
5
6    EXAMINATION BY MR. AIETA:
7         Q.   Good morning, Mr. Caillat, my
8    name is Mario Aieta, I'm from the firm of
9    Frost Zelnick Lehrman & Zissu, and I'm
10   representing the defendant in this
11   deposition.  I'm going to ask you a series
12   of questions this morning.  You have to
13   respond to each of my questions with a
14   verbal response.  The court reporter cannot
15   note your response if you respond by
16   shaking your head or making a hand
17   movement.  If any of my questions is not
18   clear, please feel free to ask me to
19   clarify the question and I'll try to do so
20   for you.  And if you need to take a break
21   at some point to rest or use the restroom,
22   just let me know and we can do that.
23        A.   Okay.
24        Q.   Would you state your name and
25   residence address, please.

4

```
 1              Caillat
 2      A.  My name is Patrick Caillat, my
 3  residence is 43 White Meadow Road in
 4  Rockaway, New Jersey.
 5      Q.  And are you employed by the
 6  plaintiff in this case?
 7      A.  Yes.
 8      Q.  And what is your position there?
 9      A.  Vice-president of CRM marketing.
10      Q.  What does CRM stand for?
11      A.  Customer relationship management.
12      Q.  The plaintiff in this case is
13  Myron Corp.  I may refer to the plaintiff
14  at Myron occasionally, if that's not
15  confusing to you.
16      A.  Understood.
17      Q.  How long have you been employed
18  by Myron Corp.?
19      A.  A little over six years.
20      Q.  And did you hold a position there
21  prior to your position as VP, CRM
22  marketing?
23      A.  Yes.
24      Q.  What other positions have you
25  held at Myron Corp.?
```

5

1                      Caillat

2         A.   Prior to that title, my title was

3    vice-president of sales and marketing and

4    prior to that director of marketing.

5         Q.   You may have given me this in

6    your previous answer, I'm sorry.  How long

7    have you been VP CRM marketing?

8         A.   Since last year, since 2006.

9         Q.   Do you remember which month?

10        A.   I think it was July.

11        Q.   What are your responsibilities as

12   VP CRM marketing?

13        A.   I am responsible for planning and

14   circulation of promotional material,

15   mailings and catalogues for our prospecting

16   activities, our customer activities, our

17   web activities, for all territories we

18   operate in.

19        Q.   And your responsibilities as

20   vice-president marketing, I think that's

21   what you said your job position was prior

22   to the current one, is that right?

23        A.   Prior to this position,

24   vice-president of sales and marketing.

25        Q.   Okay.  And what were your

6

1            Caillat

2  responsibilities in that position?

3       A.   In that position, I was

4  responsible for also sales, meaning

5  outbound telesales for our US, Canada

6  Australia and Japan operations.

7       Q.   Did you say outbound telesales?

8       A.   Yes.

9       Q.   Does that mean by telephone?

10      A.   Yes.

11      Q.   And the first position you held

12 at Myron was -- I didn't catch the entire

13 title.  Sales?

14      A.   The first position was director

15 of marketing.

16      Q.   Director of marketing.  And what

17 were your responsibilities in that

18 position?

19      A.   Circulation, planning, for

20 prospect and customer activities for US,

21 Canada, Australia and Japan.

22      Q.   Mr. Caillat, would you give me a

23 brief description of your work history

24 prior to joining Myron.

25      A.   Prior to Myron, I worked for QVC

7

```
 1                    Caillat

 2    as a brand manager for approximately two

 3    years and prior to that I worked for the

 4    Franklin Mint as a marketing manager for

 5    approximately five and a half years.

 6        Q.    And prior to working at Franklin

 7    Mint, were you in school full-time?

 8        A.    Yes, I was in school.  I did a BA

 9    and an MBA.

10        Q.    And where did you get those

11    degrees from?

12        A.    I got a BA from the American

13    University in Paris and an MBA from a

14    school in Paris called ENPC.

15        Q.    Mr. Caillat, would you tell me

16    what you did to prepare for the deposition

17    today.

18        A.    I reviewed some documents with my

19    attorneys.

20        Q.    Did you speak to any employees of

21    Myron?

22        A.    I did.

23        Q.    Who did you speak to?

24        A.    Various people in the

25    organization in the effort of gathering
```

8

1                    Caillat

2     documents, so people in my department.

3          Q.    Do you remember their names?

4          A.    Well, I spoke to Susan Waller.

5          Q.    What does she do?

6          A.    She is a marketing manager.

7          Q.    Anybody else?

8          A.    I spoke to Jason Riccardi, who is

9     a marketing director.

10         Q.    Anyone else?

11         A.    And then in another department,

12    the product management product department,

13    I spoke with Michael Probert.

14         Q.    What does Mr. Probert do?

15         A.    He is the product manager.

16         Q.    Did you speak to anybody else in

17    preparation for today's deposition?

18         A.    I spoken with Bob, Bob Black, who

19    is here.

20         Q.    And what does Mr. Black do?

21         A.    Treasurer.

22         Q.    Okay, and you recall speaking to

23    anybody else in preparation for today's

24    deposition?

25         A.    I spoke with also Joe Albanese.

9

1                    Caillat

2        Q.    Who is Mr. Albanese?

3        A.    He is director of creative

4    services.

5        Q.    Also at Myron?

6        A.    Yes.

7        Q.    Is that the complete list?

8        A.    I think that about covers it.

9        Q.    Okay.  Now, leaving aside the

10   documents you may have reviewed with your

11   attorneys, did you review any documents on

12   your own in preparation for today's

13   deposition?

14       A.    No.  The documents I reviewed

15   were the documents that we've got prepared.

16       Q.    The documents that you prepared

17   in response to a document request from my

18   firm?

19       A.    Yes.

20       Q.    Where is Myron Corp. located?

21       A.    In Maywood, New Jersey.

22       Q.    Does it have any other physical

23   facilities?

24       A.    The corporation, Maywood

25   Corporation, that's the only facility I

```
 1                  Caillat
 2    know of.
 3         Q.   That's where the corporate
 4    offices are?
 5         A.   Yes.
 6         Q.   How many people work in the
 7    corporate offices?
 8         A.   I'm not sure.
 9         Q.   More than 200?
10         A.   I'm not sure.
11         Q.   You have no idea?
12         A.   I don't know because we have a
13    very large seasonal force and so I don't
14    know how that's accounted for.
15         Q.   Okay, let's leave out the
16    seasonal force.
17         A.   I wouldn't be able to tell you a
18    precise number.
19         Q.   Well, how about an imprecise
20    number?
21         A.   Well, I'm not going to guess,
22    so --
23         Q.   Well, I am asking you to.  It's
24    not a guess, it's an estimate.  Is it more
25    than 500 people?
```

11

```
 1                    Caillat
 2       A.   I don't know.
 3       Q.   You don't know if there are more
 4  than 500 people employed full-time at Myron
 5  Corporation?
 6       A.   Five hundred is probably on the
 7  high side, so I wouldn't think it's 500.
 8       Q.   Okay, is it more than 50?
 9       A.   Yes.
10       Q.   Is it more than 100?
11       A.   I don't know.  That range, it's
12  somewhere in that range, but I just don't
13  know.
14       Q.   Somewhere in the range of 50 to
15  100?
16       A.   To 500.  I wouldn't be able to
17  tell you exactly.
18       Q.   Well, do you park your car there,
19  Mr. Caillat, when you go to work?
20       A.   Yes, I do.
21       Q.   How many cars in the parking lot?
22       A.   As I explained to you, because we
23  have a very large seasonal workforce, that
24  wouldn't be helpful.
25       Q.   When does seasonal workforce work
```

12

```
 1              Caillat
 2  there, Mr. Caillat?  During what season?
 3      A.   It depends on what department.
 4  You might have people in production that
 5  predominantly are employed as a seasonal
 6  workforce in the second half of the year,
 7  mostly in the latter part of the year.  You
 8  might have people who come in for sales
 9  purposes to be on the phone for a period of
10  time and then they're not there, and that
11  could be at any time, so it depends.  The
12  answer is it depends.
13      Q.   Okay, how about right now, today?
14      A.   Right now there are quite a
15  number of seasonal workers.  I don't have a
16  precise number.
17      Q.   Okay, how many people at Myron
18  are managers as far as you're aware?
19      A.   I don't have a precise number for
20  you.
21      Q.   How many vice-presidents are
22  there?
23      A.   Vice-presidents at Myron,
24  including all our international locations,
25  I think there's 10.
```

13

1                    Caillat

2        Q.    How about in New Jersey?

3        A.    The number is probably closer to

4    five, but I'm not positive.

5        Q.    In discussing the people that you

6    spoke to this morning, you identified two

7    of them as managers.  How many managers

8    work in New Jersey?

9        A.    I think I just said that I'm not

10   really sure of that number.

11       Q.    Okay, is it more than ten?

12       A.    I don't know.

13       Q.    Is it more than 20?

14            MR. JACOBSON:    Object to the

15        line of questioning.  He's already

16        answered these questions.

17            MR. AIETA:    You can object,

18        Rich, just object.  You don't need to

19        do speaking objections.

20       Q.    Is it more than 30?

21       A.    I don't know.

22       Q.    You have no idea?

23       A.    If you're going to be in the 30,

24   40, 50 range, that's probably excessive, so

25   it's probably less than that.

14

1                     Caillat

2          Q.    Probably less than 30?

3          A.    Yes, if I had to guess, which

4     you're asking me to do, which of course is

5     not accurate, then yes, I would say that.

6          Q.    Well, I'm asking you to estimate,

7     Mr. Caillat.  You've done that before, I

8     take it?

9          A.    Yes.

10         Q.    Okay, I'm asking you to estimate.

11         A.    I just did that.  Less than 30.

12         Q.    Who is the CFO of Myron

13    currently?

14         A.    The CFO's name is Bill Byrne.

15         Q.    Was the CFO formerly a gentleman

16    named Mr. Schaefer?

17         A.    Yes.

18         Q.    When did he cease being CFO at

19    Myron?

20         A.    I believe it was February of this

21    year.

22         Q.    And why did Mr. Schaefer leave?

23         A.    From what he's told me, he wanted

24    to pursue other opportunities.

25         Q.    Do you know where he lives?

15

1                    Caillat

2        A.   No.

3        Q.   You don't know where he lives

4    now?

5        A.   No.

6        Q.   Do you know where he works?

7        A.   No.

8        Q.   Would you agree with me that that

9    information is probably available at the

10   records of Myron Corp.?

11       A.   Yes.

12            (Deposition Exhibit 1, MYRON 1,

13       marked for identification.)

14       Q.   Mr. Caillat, I'm showing you what

15   we've marked as Exhibit 1 for

16   identification.  Do you recognize that

17   document?

18       A.   Yes.

19       Q.   Do you know how this document was

20   generated?

21       A.   Yes.

22       Q.   How was it generated?

23       A.   It was generated by the product

24   department at Myron.

25       Q.   How was it generated?

16

<pre>
 1                    Caillat

 2        A.   It was generated by going through

 3    all the SKU's that are currently being sold

 4    in relation to teamwork pocket diaries at

 5    the moment at Myron.

 6        Q.   And can you explain to me what

 7    that -- what products that includes and

 8    what products it would exclude?

 9        A.   It includes all products that

10    have the trademark Teamwork Peak and the

11    design with the mountain climbers, the

12    trade dress with the mountain climbers.

13        Q.   Now, you just used the term the

14    trademark Teamwork Peak.  What is that?

15        A.   We have, I use sort of a generic

16    term for what I believe to be the phrase,

17    together we achieve the extraordinary,

18    which is a trademark of ours, and a

19    registered phrase of Myron's, and it's

20    associated with the word teamwork and with

21    the design of two mountain climbers, which

22    we refer to that as our trade dress, the

23    combination of the word teamwork and the

24    slogan, together we achieve the

25    extraordinary.  So those SKU's represent
</pre>

17

1                    Caillat

2    all the pocket diaries that include that

3    combination of phrases and that trade

4    dress.

5         Q.   So each of the SKU's on this

6    Exhibit 1 include all three of the elements

7    you've described, the word teamwork, the

8    phrase, together we achieve the

9    extraordinary, and an image of two mountain

10   climbers?

11        A.   Yes.

12        Q.   And all of these SKU's include

13   the same image of two mountain climbers?

14        A.    The vast majority I believe so,

15   and I'm not sure whether there is a

16   slightly different image on a couple of

17   them.  That's a possibility.

18        Q.   How many different mountain

19   climber images are used on Myron products?

20        A.    The ones we use right now are, is

21   the one that is used on the vast majority

22   of design.  There used to be a slightly

23   tweaked version before that which we only

24   have I believe a couple of SKU's in

25   activity from older repeat buyers on our

```
 1                 Caillat

 2    file.  So predominantly it's the design

 3    that we've been featuring in the complaint.

 4         Q.   Okay, my question actually was

 5    how many different mountain climber designs

 6    are used by Myron?

 7         A.   Two that I know of.

 8         Q.   Two.  And the word active on

 9    Exhibit 1, is that meant to indicate that

10    these are products currently in your

11    product line?

12         A.   Currently being sold, that people

13    can buy from us.

14         Q.   Do you use the word teamwork on

15    any other products?

16         A.   I believe we do.  I believe we do

17    on a keyring, although I'm not sure if

18    that's still an active product we have, I'm

19    not sure we still do.

20         Q.   Do you use it on baseball caps?

21         A.   No.

22         Q.   Do you use it on T-shirts?

23         A.   No.

24         Q.   Do you use it on pens?

25         A.   I don't believe so at the moment.
```

19

1                    Caillat

2        Q.    With reference to the phrase,

3    together we achieve the extraordinary, do

4    you use that phrase on any other products

5    than the products listed on Exhibit 1?

6        A.    On products other than --

7        Q.    Other than Exhibit 1.

8        A.    It's possible.  There might be a

9    keyring, as I mentioned earlier.  I'm not

10   positive whether we also used it on

11   products that are not calendars at the

12   moment.

13            (Deposition Exhibit 2, MYRON

14       0002-34, marked for identification.)

15       Q.    Mr. Caillat, I'm showing you what

16   we've marked as Exhibit 2, which appear to

17   be color photocopies of a number of Myron

18   products, is that correct?

19       A.    Yes.

20       Q.    Are those all current 2008

21   products?

22       A.    Yes, those exist for all 2008

23   products.  I see there are a couple that

24   are actual samples with the 2007 border

25   date, but we also have those available with

20

```
 1                  Caillat
 2   the 2008 border date, so yes, they would
 3   all be existing in the 2008 collection if
 4   you will.
 5        Q.   Okay.  Would you turn to page
 6   MYRON 0004.
 7        A.   Yes.
 8        Q.   Is that a photocopy of a box
 9   card?
10        A.   That is one of our gift boxes.
11             (Deposition Exhibit 3, Gift Box,
12        marked for identification.)
13        Q.   Sir, Exhibit 3 is a gift box?
14        A.   Yes.
15        Q.   Do you know what products you use
16   Exhibit 3 in connection with?
17        A.   In connection with the pocket
18   calendars that we have here.
19        Q.   The pocket calendars come in
20   Exhibit 3, some of them do?
21        A.   You can get this gift box either
22   because you ask for it, or because that's
23   part of the offer with some of these
24   calendars some of the times.
25        Q.   Okay.  So not every calendar
```

21

```
 1              Caillat
 2  ships in a gift box like Exhibit 3?
 3      A.   No.
 4      Q.   At times the customer
 5  specifically asks for the gift box?
 6      A.   Yes.
 7      Q.   That's something they can order?
 8      A.   Yes.
 9      Q.   Do they pay extra for that?
10      A.   Yes.
11      Q.   And sometimes the gift box is
12  part of a product that includes more than
13  one specific product?
14      A.   Yes, that's possible.
15      Q.   Okay.  Could I ask you to look at
16  page MYRON 0014 in Exhibit 2.
17      A.   Yes.
18      Q.   How long has that particular
19  cover image been in your collection, or in
20  your product line?
21      A.   That one predates my time at
22  Myron, so probably, well, it would be
23  before 2001.
24      Q.   Okay, so let's go back then to
25  the first page of this exhibit.  How long
```

22

1              Caillat

2   has that image been in the Myron product

3   line?

4        A.   We did a little bit of research

5   and we found early evidence of this as

6   early as 1995.

7        Q.   Can you explain to me what you

8   mean by research?

9        A.   Well, we've looked in our system

10  for sales activity and we've looked for

11  records of artwork being developed for this

12  design, and we found at the moment the

13  earliest record we found is 1995, which

14  doesn't mean it wasn't there before, it's

15  just the earliest we found so far.

16       Q.   Well, do you have -- are you

17  aware of any information to suggest to you

18  that it was there before?

19       A.   Not that we've found so far.

20            (Deposition Exhibit 4, MYRON

21       0035-36, marked for identification.)

22            (Deposition Exhibit 5, MYRON

23       0037-40, marked for identification.)

24       Q.   Mr. Caillat, I'm going to show

25  you what we've marked as deposition Exhibit

23

1                     Caillat

2    4.  That's two pages, correct?

3         A.   Yes.

4         Q.   Are those an excerpt from a 1995

5    Myron catalogue?

6         A.   Yes.

7         Q.   How long is the whole catalogue,

8    do you know?

9         A.   I'm sorry?

10        Q.   The entire catalogue, 1995

11   catalogue, do you know how big it is?

12        A.   No, not from the top of my head.

13        Q.   Mr. Caillat, did you play a role

14   in collecting catalogues for production to

15   the defendant in this case?

16        A.   Yes.

17        Q.   Where are those catalogues kept

18   at Myron?

19        A.   Well, they're not kept in any

20   particular organized manner.  We have some

21   of them in our creative services

22   department, and some people like myself

23   might have copies that they've kept over

24   time.

25        Q.   Okay.  So in order to collect

24

1                    Caillat

2    them, what did you have to do?

3         A.   I spoke with my director of

4    creative service, Joe Albanese, and

5    directed him to find whatever he could

6    find, and that's what he produced.

7         Q.   Okay, did you ask him to find one

8    copy of each catalogue for each year?

9         A.   To find all the catalogues that,

10   you know, we had produced over the years.

11        Q.   So you weren't expecting him, for

12   example, to hand you 30 copies of the 1997

13   catalogue because he happened to have 30?

14        A.   Yes, one copy of each.

15        Q.   Okay, and the second page of this

16   exhibit shows that teamwork pocket calendar

17   that we've been discussing?

18        A.   Yes.

19        Q.   Is this the earliest reference to

20   the teamwork pocket calendar you've been

21   able to find?

22        A.   Yes.

23        Q.   Were you able to find any

24   documents concerning the development of

25   this calendar?

25

1                    Caillat

2          A.   Yes, we found files in our

3     computer system that was showing pieces of

4     art that were being used to develop that

5     design.

6                (Deposition Exhibit 6, MYRON

7          0175-0181, marked for identification.)

8          Q.   Let me show you what we've marked

9     as Exhibit 6.  Are those copies of the

10    artwork you are referring to?

11         A.   Yes.

12         Q.   Let's take a look at the first

13    image which is on page MYRON 0175, do you

14    see that?

15         A.   Yes.

16         Q.   Were you able to find any

17    information indicating where that image

18    came from?

19         A.   The discussion with my director

20    of creative services is that based on what

21    he has visibility to in the system, it

22    looks like it was a composite of designs

23    that were drawn and things that were used

24    from the public domain and put together to

25    create this design.

26

1              Caillat

2      Q.    Who explained that to you?

3      A.    Joe Albanese.

4      Q.    Was Mr. Albanese employed by

5   Myron in 1995?

6      A.    I don't believe so.

7      Q.    Do you know how he determined

8   that these images were in the public

9   domain?

10     A.    I'm not sure.

11     Q.    If you look at the first page of

12   that Exhibit 7 --

13     A.    Exhibit 6 or Exhibit 7?

14     Q.    I'm sorry, Exhibit 6.  If you

15   look at the first page of Exhibit 6, you

16   will see there is a creation date modified

17   date for the image that's referred to

18   there?

19     A.    Yes.

20     Q.    Creation date modified date is

21   1998?

22     A.    Yes.

23     Q.    Did Mr. Albanese explain to you

24   why the creation date would be after the

25   product was created?

1              Caillat

2       A.    From what I understand, this

3   actually represents a file that is output

4   for production purposes of the product.  So

5   it could have been output at any time,

6   many, many years after the part was created

7   in that particular system that was being

8   used to produce the product and probably is

9   still used to produce the product.

10      Q.    Okay, so if you page through this

11  document, you'll see that all except the

12  very last page, each image refers to a date

13  in 1996 or later.  Do you see that?

14      A.    I see 1996, 1996.  Okay.

15      Q.    So you would agree with me that

16  all of these pages of Exhibit 6 except the

17  last page probably don't relate to the

18  creation of the image, but relate to the

19  production of the dies and images, is that

20  right?

21      A.    I'm not familiar with -- familiar

22  enough with a lot of these screen shots to

23  be able to exactly say what -- they

24  represent whether it's a production file or

25  an art file or something else.

28

1                    Caillat

2        Q.    Okay.  What about the last page,

3    did Mr. Albanese tell you anything about

4    that?

5        A.    Only that this is on file as

6    having been used for the development of the

7    final design.

8        Q.    And on file, in what file is it?

9        A.    In our computer system.

10        Q.    Somehow identified to this

11    design, mountain climber design?

12        A.    That's my understanding.

13        Q.    Do you know whether or not we

14    have the entire file that has been

15    identified to this mountain climber design?

16        A.    I don't know.

17        Q.    Do you use e-mail at Myron?

18        A.    Yes.

19        Q.    I notice there were no e-mails in

20    the documents that have been produced to

21    us.  Is it possible that the sales and

22    marketing of the Myron products at issue

23    here have never been discussed in e-mail at

24    Myron Corp.?

25        A.    The sales of the products?

29

1                      Caillat

2          Q.    Yes, the sales and marketing of

3     this product has never been discussed in

4     e-mails at Myron, is that possible?

5          A.    No, I wouldn't say that's

6     possible.

7          Q.    What about the discovery of

8     defendant's teamwork products, is it

9     possible that that was never discussed in

10    e-mail by anybody at Myron?

11         A.    That's possible.

12         Q.    That's possible?

13         A.    It is.

14         Q.    Okay, did you search your e-mails

15    for any e-mails relating to the defendant's

16    teamwork products?

17         A.    I did.

18         Q.    How did you do that?

19         A.    For anything relating to the

20    questions, I went through my e-mail and

21    tried to find anything relevant.

22         Q.    How did you go through your

23    e-mail?

24         A.    Well, I was looking for anything

25    around the time of where we saw that design

```
 1                  Caillat

 2   appear and see if I had any other

 3   conversations at that time, so I kind of

 4   went by date, since July, June, July, which

 5   is when we started seeing that design

 6   appear, seeing anything relevant during

 7   that time period.

 8        Q.   And how did you look through your

 9   e-mails?

10        A.   Just browsing through.

11        Q.   Just went through them one by one

12   or --

13        A.   Browsing through anything that

14   seemed relevant to teamwork, that had

15   teamwork for example in it or that had a

16   title that seemed relevant.

17        Q.   How did you browse through them?

18        A.   Just looking at the names of the

19   e-mails.

20        Q.   You looked at the subject line of

21   the e-mail?

22        A.   The subject line of the e-mail.

23        Q.   Do you use Microsoft Outlook for

24   your e-mail client?

25        A.   Yes.
```

31

1                    Caillat

2        Q.   And you looked through e-mails

3   that were in your inbox?

4        A.   Inbox and whatever was archived.

5        Q.   Archived?

6        A.   Yes.

7        Q.   What do you mean by archived?

8        A.   E-mail archives.

9        Q.   And what do you mean by archives?

10       A.   Older e-mails that are not in the

11  inbox, but are archived.

12       Q.   And do you let the program

13  Outlook do that or do you do it?

14       A.   No, I went through that date

15  range.

16       Q.   No, I'm talking about the

17  archive.  When you refer to archive, is

18  that the archive created automatically by

19  the Outlook program when it occasionally

20  asks you whether or not you want to archive

21  e-mails or is it some other process by

22  which e-mails are archived?

23       A.   I personally archive my e-mail

24  periodically.  That's how I do it.

25       Q.   And when you do that, do you put

1                     Caillat

2    all your e-mails in one folder called

3    archive or are they broken down by subject

4    or client?

5         A.   They retain their original folder

6    in which they are stored.

7         Q.   So you have an archive inbox?

8         A.   Yes, I do.

9         Q.   And so documents or e-mails that

10   were in your inbox are archived in your

11   archive inbox?

12        A.   Say that again?

13        Q.   E-mails that were in your inbox

14   when you archived them, they are moved to

15   your archived inbox?

16        A.   That's a good example.

17        Q.   Is that right?

18        A.   Yes.

19        Q.   Did you ask anybody else to

20   search e-mails relating to defendant's

21   products, if any?

22        A.   No, I did not.

23        Q.   I will show you Exhibit 5.  Now,

24   that's an excerpt from another Myron

25   catalogue, correct?

33

```
 1                  Caillat
 2      A.   Yes.
 3      Q.   And is that the 1996 catalogue?
 4      A.   Yes, it says spring, 1996.
 5      Q.   And is that a reference to when
 6  the catalogue is distributed?
 7      A.   Yes.
 8      Q.   Mr. Caillat, which year did you
 9  say you started work, at --
10      A.   2001.
11      Q.   At Myron, 2001.  And your current
12  position, when did you start?
13      A.   2006.
14      Q.   Mr. Caillat, earlier this morning
15  you referred to the word teamwork as a
16  trademark.  Do you remember that?
17      A.   Yes.
18      Q.   Why do you consider that word to
19  be a trademark?
20           MR. JACOBSON:    Objection.  You
21      can answer.
22      A.   I think what I explained is that
23  the registered phrase that I was referring
24  to when I was referring to teamwork
25  products was specifically, together we
```

34

1                   Caillat

2    achieve the extraordinary, phrase is

3    registered.

4         Q.   Okay, so does that mean you don't

5    consider the word teamwork to be a

6    trademark?

7              MR. JACOBSON:    Objection.

8         A.   I'm not -- that is something we

9    have an application pending for, so I don't

10   know the technical answer on that one.

11        Q.   But it's your understanding you

12   have an application to register the word

13   teamwork as a trademark pending in the

14   United States?

15        A.   Yes.

16        Q.   Do you consider any other single

17   word other than the word Myron to be a

18   trademark of the Myron Corporation?

19        A.   Any single word?

20        Q.   Yeah, any single word.  Teamwork

21   is a single word.  Do you consider any

22   other single word to be a trademark of the

23   Myron Corporation?

24        A.   I'm not aware of a single word

25   that's a trademark of Myron.

35

1                    Caillat

2        Q.    You're not aware of any others?

3        A.    No.   That doesn't mean there

4    aren't, but I'm not aware.

5        Q.    Would it be fair to say that

6    given your responsibilities at the company,

7    if there were other single word trademarks,

8    you might be aware of them?

9        A.    Yes.

10        Q.    What about the phrase, we've got

11    the gift for building business?  Do you

12    consider that to be a Myron trademark?

13        A.    I do.

14        Q.    How long has Myron been using

15    that trademark?

16        A.    I would say approximately at

17    least three years.

18        Q.    And how is that mark used?

19        A.    Typically in conjunction with the

20    Myron logo.

21        Q.    And how do you present that mark

22    to consumers?  Do you put it on products,

23    do you put it in catalogues, in mailings?

24        A.    Yes, we put it on advertising

25    material, possibly on letterhead, on the

```
1                    Caillat

2   website.

3        Q.   Is it on any products?

4        A.   I don't believe so.

5        Q.   What kind of advertising does

6   Myron do?

7        A.   We send samples of our products

8   through the mail.  We advertise our

9   products on our website, we produce

10  catalogues or brochures.  Those are our

11  main ways of advertising.

12       Q.   Are there any other ways of

13  advertising?

14       A.   In the past we've also published

15  some media ads in newspapers or magazines,

16  and you know, in general, I don't know if

17  you consider that means of advertising, but

18  we do speak to our customers on the phone,

19  so we have conversations about our product

20  on the phone as well.

21       Q.   Do you have sales people who do

22  the phone work?

23       A.   Yes, we do.

24       Q.   Do you have scripts for them?

25       A.   Occasionally, but it's mostly in
```

1                  Caillat

2    the relationship of the customer that the

3    conversation occurs, so it's not really

4    scripted per se.

5        Q.   Do you have guidelines for them?

6        A.   We do.

7        Q.   Have those materials been

8    included in any of the production here?

9        A.   No.

10       Q.   Do you know whether or not the

11   teamwork products that we've been

12   discussing this morning are mentioned in

13   any of the scripts or guidelines that your

14   sales people use on the telephone?

15       A.   No, I don't know.

16       Q.   What was the last time Myron did

17   media advertising as far as you know?

18       A.   The latest possible date would

19   have been in 2005.

20       Q.   And was that all print

21   advertising?

22       A.   Print media, yes.

23       Q.   No radio or television?

24       A.   Correct.

25       Q.   Does Myron maintain copies of the

38

```
1                    Caillat
2   print advertising at its facilities?
3        A.   I am sure there are copies.
4        Q.   Do you know who is responsible
5   for maintaining them?
6        A.   If there are copies, there is no
7   particular process or responsibility for
8   maintaining that, so it would be anecdotal,
9   if they are found.
10       Q.   So as far as you are aware, there
11  is no specific file folder or cabinet that
12  says media advertising on it?
13       A.   I might have some, the guy next
14  door might have some, but that's about it.
15       Q.   Does Myron Corp. have a document
16  management system for electronically stored
17  information?
18       A.   No.
19       Q.   Does Myron Corp. have a formal
20  document management system for documents
21  that are not in electronic format?
22       A.   That's a very broad question.
23  You know, the various departments might
24  have different policies.
25       Q.   Is there a central file room?
```

39

1                    Caillat

2        A.    For what?

3        Q.    Myron Corporation.

4        A.    For what types of documents?

5        Q.    For corporate documents

6    generally.

7        A.    I don't know.

8        Q.    Are you aware of a document

9    retention policy that Myron Corporation

10   has?

11       A.    No, I am not aware of a document

12   retention policy.

13       Q.    What about your department, does

14   your department have a document retention

15   policy?

16       A.    I can't say that we do.

17       Q.    Do you have a particular practice

18   that you implement in your department?

19       A.    We have practices, yes, not

20   policies, we have practices such as

21   trying -- well, let me speak of my

22   department first and then I can speak of

23   departments I know of.  In my department we

24   try to keep samples of some of the mailings

25   that we send or some of the catalogues that

40

```
 1              Caillat
 2   we send so we can have them for future
 3   reference.  In a department that works also
 4   at Myron, the product department, they have
 5   a practice of logging competitive
 6   information, advertising material for
 7   competitors, also for reference.
 8        Q.   Which department is that?
 9        A.   The product department.
10        Q.   Product department.  And do you
11   know if the product department practice is
12   described in any written document?
13        A.   I don't know.
14        Q.   Did you have a chance to review
15   the deposition notice that brings you here
16   today?
17        A.   I have.
18        Q.   You may recall one of the
19   categories of information that is listed on
20   that deposition notice is the first date of
21   awareness by Myron Corp. of the line of
22   calendars identified in the complaint in
23   this action as defendant's teamwork
24   products.
25             Did you take any steps to
```

41

1                   Caillat

2    familiarize yourself with any information

3    or knowledge available to Myron Corp.

4    concerning the first date on which you

5    became aware of defendant's teamwork

6    products?

7        A.   I did.

8        Q.   What did you do?

9        A.   I spoke with Mike Probert in the

10   product department and I looked at

11   advertising material that I had received

12   myself.

13       Q.   And why did you choose to speak

14   to Mike Probert for this purpose?

15       A.   Because he is the product manager

16   in charge of pocket calendars, which is the

17   product form that's in question.

18       Q.   And it's not clear to me how your

19   response answers my question.  So because

20   he is that person, why does it make sense

21   to talk to him about the first awareness?

22       A.   Because as a practice, he would

23   be looking out for competitive information,

24   samples of catalogues, and hopefully

25   logging them as they arrive, he or his

1              Caillat

2    team.

3              (Deposition Exhibit 7, MYRON

4         0182-0199, marked for identification.)

5         Q.  Mr. Caillat, I'm showing you

6    what's been marked as Exhibit 7 which is

7    Bates numbered MYRON 0182 through 0199.

8    And is this one of the logs you were just

9    describing for me?

10        A.   Yes.

11        Q.   Where is this log maintained at

12   Myron?

13        A.   It's maintained on a computer in

14   the product department.

15        Q.   It's maintained in the form of a

16   spreadsheet?

17        A.   Yes.

18        Q.   And it's your understanding that

19   this is updated periodically?

20        A.   Yes.

21        Q.   Who contributes information to

22   this spreadsheet as far as you're aware?

23        A.    As people receive promotional

24   material in the organization from various

25   competitors, they attempt to pass them

43

```
 1                  Caillat

 2   along to the product department for their

 3   review.

 4         Q.   And then who enters the

 5   information into the spreadsheet?

 6         A.   I believe the person who did this

 7   is Kalpita Ramani.

 8         Q.   Now, are you aware of some

 9   guidelines that dictate or guide what gets

10   entered into this spreadsheet?

11         A.   No, other than they do their best

12   to capture what they come across, whether

13   it be by catalogue sample or e-mail.

14         Q.   And who is they?

15         A.   The product department.

16         Q.   And who decides what information

17   to enter into the spreadsheet?

18         A.   I don't know.

19         Q.   You don't decide?

20         A.   I don't decide.  That department

21   does not report in to me.

22         Q.   Would you look at page 184, and

23   the bottom entry on the left side,

24   6/15/2007, sample received (Probert

25   Associates) do you see that?
```

44

```
1                    Caillat
2        A.   Yes.
3        Q.   Do you know what Probert
4   Associates refers to?
5        A.   I believe it's the name under
6   which he received that mailing, and I
7   believe that that's a name that has an
8   address at his home.
9        Q.   Sorry, he is Mike Probert?
10       A.   Yes, I'm sorry, Mike Probert.
11       Q.   Do you know where Mr. Probert
12  lives?
13       A.   No.
14       Q.   The entry says sample received
15  (Probert Associates of teamwork) diary
16  depicting "geese flying in formation" on
17  June 15 (home) and brought to the attention
18  of Myron senior management on 6/18/07.
19  Sample was sent to outside counsel.
20            Do you know who Myron senior
21  management is?
22       A.   That would be myself or the
23  owners.  I'm not sure exactly who he is
24  referring to here.
25       Q.   Do you recall whether or not the
```

45

1                       Caillat

2    sample in question was brought to your

3    attention on or about June 18?

4         A.    Yes, he did bring it to my

5    attention at some point after that.

6         Q.    Now, what about samples that you

7    receive, are they ever entered into this

8    log?

9         A.    Occasionally.

10        Q.    But not always?

11        A.    Not always.

12        Q.    And you do receive samples,

13   right?

14        A.    Occasionally I do.

15        Q.    And you receive them at your work

16   address?

17        A.    Yes.

18        Q.    Do you receive them at your home

19   address?

20        A.    No.

21             (Deposition Exhibit 8, MYRON

22        0241-0277, marked for identification.)

23        Q.    Mr. Caillat, let me show you what

24   we've marked as Exhibit 8.  Can you

25   identify those documents?

46

1                    Caillat

2        A.    The first one is a letter from

3   Amsterdam Printing addressed to me at

4   Myron --

5        Q.    Okay, rather than going through

6   them page by page, which I think may not be

7   necessary, can you characterize the entire

8   group of documents?

9        A.    Okay, let me go through them real

10  quick.  Okay, so they are a set of mailing

11  offers addressed to me at Myron

12  Corporation, various pocket calendar

13  product offers from Amsterdam.

14       Q.    And do you know over what period

15  of time you received those mailings?

16       A.    I can determine that because --

17  well, on some of these I see the envelope

18  has been printed and there's a date, so

19  there's some in 2007, and if I recall

20  correctly there is some in 2006, yes, here

21  is one.  So 2006 and 2007 it looks like.

22       Q.    So those are some or all of the

23  samplers that you received from Amsterdam?

24       A.    Some.

25       Q.    During that period of time, some.

47

1                    Caillat

2        A.   Some, the ones that I could find.

3        Q.   Do you keep these in someplace in

4    your office?

5        A.   I occasionally keep them,

6    occasionally discard them, occasionally

7    pass them along to someone else in the

8    product department.  So I don't keep them

9    in a particular place or any particular

10   organized manner.

11       Q.   Do you know if there's anybody

12   else at Myron who receives samplers in the

13   mail from Myron's competitors?

14       A.   Yes, I know a few people.

15       Q.   Can you give me the names of the

16   people you know of who receive samples?

17       A.   The people I know of include

18   myself obviously, Mike Probert, Louisa

19   Gormley, Kalpita Ramani I believe, and

20   there might be more, but those are the ones

21   that I know of.

22       Q.   Do you know why Mr. Probert

23   brought the sampler that he received with

24   the flying geese to your attention?

25       A.   Yes.

48

```
1              Caillat
2      Q.   Why?
3      A.   He was concerned that the
4  conjunction of the word teamwork, the
5  phrase that was being used, the design that
6  had a color scheme and a feel to it was
7  very, very similar to our trade dress, and
8  that it was, you know, a concern for
9  infringement.
10     Q.   And were you the right person to
11 advise?  Was bringing it to your attention
12 the correct person?
13     A.   I'm one of the persons that
14 should know about it so that it can be
15 discussed with our lawyers.  He might have
16 discussed it with other people as well.
17     Q.   Do you recognize the name Elena
18 Capicchioni?
19     A.   No, I can't say that I do.
20     Q.   Do you recognize the name Barbara
21 Chrencik?
22     A.   Yes.
23     Q.   Who is Barbara Chrencik?
24     A.   She is a manager at Myron.
25     Q.   What department?
```

49

Caillat

1          A.   In the credit and collection

2    department.

3          Q.   And who does she report to?

4          A.   I'm not sure.

5          Q.   Do you know of any specific

6    person at Myron whose last name is Smith

7    whose first name begins with the letter M?

8          A.   No.

9          Q.   The address that appears on the

10   envelope on the first page of Exhibit 8, is

11   that the corporate headquarters of Myron?

12         A.   Yes.

13         Q.   If mail is sent to Myron Corp.

14   addressed to Myron Corp. and not to any

15   particular individual, do you know what

16   happens to that mail?

17         A.   No.

18         Q.   Is there someone at Myron Corp.

19   who might know what happens to that mail?

20         A.   We'd have to find out.

21         Q.   Is there a mailroom?

22         A.   Yes, there are individuals in

23   charge of picking up the mail, so we'd have

24   to find out.

25

50

1                      Caillat

2            (Recess taken.)

3    FURTHER EXAMINATION BY MR. AIETA:

4        Q.   Mr. Caillat, we're back on the

5    record.  Other than yourself and

6    Mr. Probert, are you aware of anybody else

7    employed by Myron who receives samplers or

8    catalogues from Amsterdam Printing?

9        A.    In asking to the various people

10   in my department, I found that various

11   people had received various samples and I

12   tried to collect those, not remembering

13   exactly who got what, but there were some

14   other individuals, and it's quite possible

15   that other people might be receiving

16   samples, but not that I've found so far.

17   So the short answer is yes, some other

18   people were receiving samples, I gathered

19   the ones that I could find.

20       Q.   What about catalogues, do you

21   know whether other people received

22   catalogues?

23       A.   Same answer on that.

24       Q.   Those who received samples could

25   have received catalogues?

1                  Caillat

2        A.    Yes.

3        Q.    Do you remember whether or not

4    you've ever received a catalogue from

5    Amsterdam Printing?

6        A.    Yes.

7        Q.    You have?

8        A.    Yes, I have.

9        Q.    Do you remember the names of the

10   people you've identified as people who may

11   have identified catalogues or samples from

12   Amsterdam Printing?

13       A.    I think I mentioned earlier that

14   Louisa Gormley and Kalpita Ramani I believe

15   received calendars and samples, and I think

16   I have found -- I had found in the samples

17   that I had found going around, possibly

18   some things that might have been addressed

19   to Susan Waller as well.  There might have

20   been other samples that we found from

21   people that may or may not be at Myron any

22   more, I don't remember specifically the

23   names.

24       Q.    Let me show you what we'll mark

25   as the next exhibit.

52

Caillat

1    Caillat

2         (Deposition Exhibit 9, MYRON 0174,

3        marked for identification.)

4         It's stamped 0174 with the Myron

5    stamp and I ask you to tell me what that

6    document is.

7         A.   This is the amount of advertising

8    spent that we've incurred, Myron

9    Corporation, since 2002 in promoting

10   teamwork, using the teamwork word in a

11   broad sense, teamwork related pocket

12   calendars, teamwork themed pocket calendars

13   with the mountain climbers and so on and so

14   forth.

15        Q.   Can you tell me what the row that

16   is captioned customer means?

17        A.   That represents the advertising

18   spent when we send promotional material to

19   our own customers.

20        Q.   And prospects, what does that

21   mean?

22        A.   Prospects represents advertising

23   spent that we have incurred in promoting

24   those products to prospects by renting

25   outside names from the business community.

Caillat

2      Q.   And can you explain for me how,

3   let's just pick one number, customer 2002,

4   the number $118,186, and can you explain to

5   me how that was calculated?

6      A.   That's -- we have in our system,

7   we track the samples, the number of samples

8   that we send by promotion and then we're

9   able to add it all up annually and we will

10  precisely determine that for the particular

11  number of SKU's, this is the number of

12  pieces that we've sent and this is the

13  amount of money that was associated with

14  those campaigns.

15     Q.   So included within this number is

16  the cost to Myron of producing the sample

17  mailings?

18     A.   It is included, yes.

19     Q.   Is there anything else included

20  in that number?

21     A.   The cost of the envelope,

22  printing the letter, inserting all these

23  components into the package, and the

24  postage, so all the costs that are directly

25  attributed to promotion.

54

1                      Caillat

2        Q.    And when you say this is related,

3    I forget exactly how you phrased it, but

4    related to the teamwork SKU's, in what way

5    is it related to those SKU's?

6        A.    It represents older mailings that

7    were sent in which the teamwork SKU's were

8    sampled.

9        Q.    And in those mailings, would the

10   teamwork SKU be the only sample?

11       A.    In the spending?

12       Q.    Yes.

13       A.    That's what this represents, yes.

14       Q.    Do you send out sample mailings

15   with more than one SKU in each envelope or

16   package?

17       A.    No, not that I can think of.

18       Q.    In the numbers that appear under

19   the lines, or across the rows for customer

20   and prospect, do those numbers include any

21   catalogue costs?

22       A.    No.

23       Q.    And you have a separate number

24   there for catalogue costs.  Can you tell me

25   what that means?

1                    Caillat

2        A.   Yes.  We've tried to do an

3    estimation of the catalogues that we spent

4    that we mailed in that time period, and for

5    the cost of sending out those catalogues,

6    what was the proportion of the space in

7    those catalogues that was dedicated to the

8    teamwork SKU's.

9            (Deposition Exhibit 10, Myron

10           2007/2008 Catalogue, marked for

11           identification.)

12       Q.   We've marked as Exhibit 10 the

13   2007 Myron catalogue, is that correct?

14       A.   Yes, it's 2007/2008.

15       Q.   When was this catalogue first

16   sent to customers or prospects?

17       A.   This catalogue was sent only to

18   customers, and I believe it was mailed in

19   August of this year.

20       Q.   Do you ever send catalogues to

21   prospects?

22       A.   Very rarely.  We have in the

23   past.

24       Q.   With reference to your

25   description to me of how the catalogue

56

1                    Caillat

2    costs shown in Exhibit 9 were calculated,

3    can you explain to me with reference to

4    Exhibit 10 how that calculation was made?

5         A.   Yes, I can.  Well, I can give you

6    my -- a description of how I believe it was

7    calculated.  The exact calculation, since I

8    did not do it, it would not be fair for me

9    to give you a formula or something like

10   that, but the general concept is that if

11   you have, if the cost of this book, let's

12   say it's a dollar to make it easy, and you

13   have the amount of surface, the number of

14   pages, that is say ten percent dedicated to

15   the teamwork related SKU's, then we would

16   do as an estimation that ten percent of a

17   dollar, ten cents was spent per catalogue

18   on advertising teamwork related SKU's.

19   That's how we would do that.

20        Q.   Does this catalogue contain all

21   of the products that Myron offers to

22   customers or prospects currently?

23        A.   No, I don't believe it includes

24   all products.

25        Q.   Do you know how many SKU's Myron

57

1                        Caillat

2   currently has that it offers to customers?

3          A.   It's in the hundreds.  I don't

4   have a precise number.

5          Q.   Is there another catalogue that

6   contains products currently offered to

7   customers or prospects that are not in this

8   catalogue?

9          A.   We do have some other brochures.

10  They do not feature the teamwork product

11  though.  For example there is a small

12  brochure containing holiday cards.

13         Q.   The trade dress that's at issue

14  in this case, that's referred to

15  internally, or I'm sorry, that's referred

16  to by Myron in its catalogue as a theme,

17  correct?

18         A.   Is it?

19         Q.   I'll tell you what, I will

20  withdraw that question.  How about on the

21  website, it's referred to on the website as

22  a theme, is it not?

23         A.   Yes, I believe the word theme is

24  used.

25             (Deposition Exhibit 11, MYRON

58

1                  Caillat

2         0155-0164, marked for identification.)

3         Q.   I'm showing you what we've marked

4    as Exhibit 11.  Do you recognize those

5    pages?

6         A.   Yes.

7         Q.   Can you tell me what they are?

8         A.   They are from the Myron website.

9         Q.   They are printouts of the Myron

10   website?

11        A.   Yes.

12        Q.   And are you responsible for the

13   content of the website?

14        A.   Ultimately, yes.

15        Q.   How often is the website updated?

16        A.   It's on an ad hoc basis, but

17   typically something changes every week.

18        Q.   Let me ask you to turn your

19   attention back to Exhibit 10, the

20   catalogue.  I may -- I think I asked you a

21   question but I'm not sure I got the answer.

22   When was this first sent out to customers?

23        A.   I believe in August of this year.

24        Q.   August of 2007?

25        A.   2007.

59

1                         Caillat

2          Q.    When do prospects first begin to

3    receive promotions for the products in this

4    catalogue?  Let me start again.  You have

5    dated products in the catalogue, correct?

6          A.    Yes.

7          Q.    Calendars and desk sets and that

8    sort of thing, correct?

9          A.    Yes.

10         Q.    This catalogue that's Exhibit 10

11   has dated products for the year 2008, is

12   that correct?

13         A.    Yes.

14         Q.    When do you first begin to send

15   prospects, promotions for dated products

16   for 2008?

17         A.    Typically in July, so for this

18   year, for 2008 products, we began in July,

19   2007.

20         Q.    That's when you first started to

21   send out promotions for 2008 dated

22   products?

23         A.    Yes.

24         Q.    And when do you begin to take

25   orders for 2008 dated product?

60

1                    Caillat

2        A.   In that same month, July.   For

3    prospects you're talking about?

4        Q.   For prospects.

5        A.   Yes.

6        Q.   Does there come a point in time

7    where generally you no longer receive

8    orders for 2008 dated products?

9        A.   Yes.

10       Q.   I'm asking in reference to prior

11   years.  A dated product for a specific

12   year, does there come a point in time where

13   you no longer receive orders for that dated

14   product?

15       A.   Yes.

16       Q.   About when in the calendar year

17   does that take place?

18       A.   December.

19       Q.   And during the period between

20   July and December, is there any particular

21   period when you are receiving most of your

22   orders or more orders?  Month by month or

23   biweekly or --

24       A.   From a prospects standpoint, I'd

25   say it's fairly even in those months.

61

```
 1              Caillat
 2      Q.   From July to December?
 3      A.   Right, and it tends to decline
 4  towards the December time frame.
 5      Q.   Okay, and what about for
 6  customers?
 7      A.   For customers we take orders all
 8  year long, so it's fairly even all year
 9  long.
10      Q.   For dated products as well?
11      A.   For dated products, yes.
12      Q.   When do you begin to shift dated
13  products to your customers?
14      A.   Normally in July.
15      Q.   If you receive an order for a
16  dated product from a customer in May, do
17  you hold that until some later point in
18  July or August?
19      A.   Yes, July or later.
20      Q.   And are your customers able to
21  ask you for a specific ship date or do you
22  ship them at a time that you determine?
23      A.   Yes, they can ask for a ship
24  date.
25      Q.   Those customers who ask for a
```

62

1                    Caillat

2    ship date, is there any particular time

3    when generally customers ask for their

4    dated products to be shipped?

5         A.   I'd say it's fairly even between

6    July and October, maybe November.

7              (Deposition Exhibit 12, MYRON

8         0165-0173, marked for identification.)

9         Q.   I'm showing you what we've marked

10   as Exhibit 12, and do you recognize those

11   documents?

12        A.   Yes.

13        Q.   Can you tell me what they are?

14        A.   They are copies, photocopies or

15   scans of some Myron pocket calendar offers,

16   and the sample itself, the product sample.

17        Q.   Are these types of offers sent to

18   customers or prospects or both?

19        A.   Well, let me go through it again.

20   We have some of both in this printout, in

21   these printouts.

22        Q.   Is it possible for you to

23   distinguish between -- by page number

24   between those sent to customers and those

25   sent to prospects?

63

1                    Caillat

2        A.    Yes.

3        Q.    Can you do that for me?

4        A.    Just starting from the top?

5        Q.    Yes.

6        A.    0165, prospects; 0166, prospects;

7    0167, customer; 0168, prospects; 0169,

8    customer; 0170, prospects; 0171, customer;

9    0172, customer; 0173, customer.

10        Q.    And would it be fair to call

11    these sample mailings?

12        A.    Yes.

13        Q.    Do you sample products other than

14    the teamwork products that are featured in

15    Exhibit 12 here?

16        A.    Yes.

17        Q.    How many other products do you

18    sample?

19        A.    Dozens.

20        Q.    Dozens of different products a

21    year?

22        A.    Yes.

23        Q.    And all of the products that you

24    sample are accompanied by some form of

25    letter like this?

64

1                    Caillat

2        A.    Yes.

3        Q.    Mr. Caillat, do you have a

4    minimum order for a product like this

5    teamwork product?

6        A.    Yes.

7        Q.    What is the minimum order?

8        A.    Fifty pieces.

9        Q.    And do you know what the total

10   value of the order would be, pieces mailed

11   altogether, how much would the customer

12   have to pay?

13       A.    For what?

14       Q.    For the minimum order that one

15   could place for this product.

16       A.    Well, it depends on the SKU

17   obviously.  Not all SKU's are priced the

18   same, so say the SKU is three fifty for 50,

19   then it's a three fifty times 50.

20       Q.    Do you know what your lowest

21   price teamwork SKU is?

22       A.    Not from the top of my head, no.

23       Q.    It's always 50 is the minimum?

24       A.    Yes, for these pocket calendars.

25       Q.    Do you have a sense of what the

65

1                   Caillat

2    average order size is?

3        A.   Yes.

4        Q.   What is the average order size?

5            MR. JACOBSON:    I'm going to

6        object.  I think we may be getting

7        into some confidential counsel only

8        material.

9    -------------------------------------------

10   **CONFIDENTIAL ATTORNEYS' EYES ONLY

11   MATERIAL BOUND SEPARATELY**

12   -------------------------------------------

13       Q.   Mr. Caillat, are you aware of any

14   instances when any company other than Myron

15   or Amsterdam has used the word teamwork in

16   connection with dated calendar products?

17       A.   Since we've looked at what

18   Amsterdam has started doing, I believe

19   we've identified something from Union that

20   was similar, a company called Union.

21       Q.   Any other instances that you are

22   aware of?

23       A.   And there was I believe another

24   one, but I don't remember the name of the

25   company that was just discovered, a company

```
 1                   Caillat
 2    that I had never heard of and I still don't
 3    remember the name.
 4         Q.   Windmill?
 5         A.   That's the one.
 6         Q.   Are you aware of any companies
 7    using the word teamwork on inspirational
 8    products other than desk calendars?
 9         A.   Yes, I've seen it.
10         Q.   What kinds of products have you
11    seen it on?
12         A.   I've seen posters and things of
13    that nature, mostly posters type things.
14         Q.   What about wall calendars?
15         A.   I'm not sure if I've seen that on
16    wall calendars, but I've seen posters, for
17    example.
18         Q.   Are you familiar with, or are you
19    aware of any company other than the
20    defendant here using a phrase identical to
21    or substantially similar to the phrase,
22    together we achieve the extraordinary, on
23    dated materials?
24         A.   No.
25         Q.   What about on inspirational
```

67

```
 1                 Caillat
 2   materials or corporate materials?
 3        A.   No.
 4        Q.   Myron's teamwork calendars are
 5   good sellers?
 6        A.   Yes, it's our single biggest
 7   branded brand.
 8        Q.   Why do you think that's the case?
 9        A.   Our customers like it.
10        Q.   Why do you think they like it?
11        A.   You have to ask them.
12        Q.   Has Myron ever asked their
13   customers why they like this product?
14        A.   They like our products for many
15   reasons.  Some of them like -- yes, the
16   answer to your question would be yes.  We
17   haven't done specifically a survey on
18   teamwork, if that's what you're asking me.
19   We've done surveys from our customers in
20   general, you know, people might like this
21   because they think it's a good message and
22   they like to keep that message, they
23   associate with that message, and they are
24   customers themselves to which they give the
25   product associated with that message, so
```

68

```
 1              Caillat
 2   they feel that it represents their company
 3   well, for example.
 4       Q.   But you haven't done that testing
 5   or you haven't asked those questions with
 6   respect to a teamwork product?
 7       A.   Not specifically, no.  It's come
 8   up occasionally in various discussions,
 9   like a focus group for example.
10       Q.   Focus groups, have you done focus
11   groups?
12       A.   We have done focus groups, yes.
13       Q.   When was the last time you did
14   focus groups?
15       A.   Earlier this year we did one.
16       Q.   What kind of data was generated
17   by the focus group?
18            MR. JACOBSON:    I just want to
19       caution the witness if you're going to
20       discuss proprietary information, then
21       we'll have to ask Mr. Kirbey to leave
22       the room again.
23       A.   What I was going to say perhaps
24   to not get into that is the last one we did
25   really did not relate to pocket calendars,
```

69

1                      Caillat

2    so perhaps I could bring us to another time

3    in the past where we've done one relative

4    to calendars that would be more appropriate

5    for discussion.  Because if you're going to

6    talk about the last one, then I can't

7    discuss it.

8          Q.   That's fine, and just to be

9    clear, I'm not going to ask you -- with

10   respect to the last one, I'm not asking you

11   to identify the kind of product or any

12   identifying features about the product.

13   Let's just leave the product itself totally

14   out of it.  My question was what kind of

15   data was generated?  Did you get a written

16   report, did you get a videotape of a focus

17   group?

18         A.   Yes, a written report, and I

19   believe a video discussion.

20         Q.   Is there any other kind of data

21   that you recall being generated from that,

22   a Powerpoint presentation, handwritten

23   notes of people who attended the

24   discussion?

25         A.    Yes, and again, that last one was

70

1                     Caillat

2    not pertaining to --

3         Q.    Exactly.   There were handwritten

4    notes?

5         A.    Yes.

6         Q.    Okay, notes taken by the Myron

7    attendees?

8         A.    Yes.

9         Q.    Were there notes taken by the

10   people who conducted the focus group for

11   you?

12        A.    Not handwritten notes, no.   We

13   produced a report.

14        Q.    Let's go then to the prior focus

15   group which you suggested may have related

16   in some way to calendar products, is that

17   right?

18        A.    Yes.

19        Q.    When did that focus group take

20   place?

21        A.    Last year.

22        Q.    In 2006?

23        A.    Yes.

24        Q.    Again, just focusing on the

25   result, the manner in which the result was

71

1                    Caillat

2    presented, did you obtain a written report

3    from that focus group?

4         A.   I believe we did.

5         Q.   Did you obtain a videotape of the

6    focus group discussions?

7         A.   I'm not sure about that one.

8         Q.   Did you obtain, or did you

9    collect notes from the Myron attendees?

10        A.   I don't know if notes were

11   collected.

12        Q.   Did you attend that presentation?

13        A.   Yes.

14        Q.   Did you yourself make notes?

15        A.   I might have, yes.

16        Q.   And do you know if you still have

17   yours?

18        A.   I don't know.

19        Q.   What about the written report, do

20   you know if you still have that or if Myron

21   still has that?

22        A.   I assume we do.

23        Q.   Is there someone, or is there a

24   way that you would search to determine

25   whether or not you have a videotape of that

72

1                   Caillat

2    focus group?

3         A.   Yes.

4         Q.   But as you sit here today, you're

5    not sure if you do or not?

6         A.   I'm not sure if we had one or not

7    in this particular case.

8         Q.   Now, at that focus group, what

9    did that focus group relate to?

10        A.   It was about one of our lines of

11   calendars, but it was not specifically on

12   teamwork, but some of the -- some of those

13   products might have had some teamwork

14   design.

15        Q.   Okay, did those products feature

16   another inspirational phrase or slogan?

17        A.   I'm not really sure.  There were

18   lots of concepts and things that were

19   presented.  I'm not sure on the details.

20        Q.   Do you recall whether or not that

21   focus group involved products that Myron

22   actually sold at the time?

23        A.   I believe so.

24        Q.   Other than the defendant in this

25   case and other than Union Pen and Windmill,

73

1                    Caillat

2    are you aware of any other company that's

3    using a trade dress that you consider to be

4    similar to that used by Myron?

5        A.   No.

6        Q.   Are you aware of any evidence of

7    confusion between the products made by

8    Myron Corp. and the products made by the

9    defendant in this case?

10       A.   Since it is practically new, no.

11       Q.   And what do you mean by

12   practically new?

13       A.   It appeared on our radar screen

14   in June.

15       Q.   It being defendant's product?

16       A.   Yes.

17       Q.   You mentioned that Myron did some

18   print media advertising.  You may have also

19   said this during your answer, I don't

20   recall.  Did that print media advertising

21   relate in any way to the teamwork products?

22       A.   I don't know.  We'd have to try

23   to find some examples of that.  It's such a

24   small -- it was such a small portion of our

25   advertising effort.

74

1                    Caillat

2        Q.    Are you aware of any trade press

3    coverage or general press coverage relating

4    to the teamwork products?

5        A.    No, I am not aware.

6        Q.    You haven't seen any while you

7    were at Myron, while you have been at

8    Myron?

9        A.    I one time saw an article about

10   direct marketing that was showing one of

11   our teamwork products as an example of good

12   direct marketing.  That was it.

13       Q.    Do you know if a copy of that

14   article has been retained by Myron?

15       A.    I don't believe so.  It was a

16   long time ago.

17            (Recess taken.)

18   FURTHER EXAMINATION BY MR. AIETA:

19       Q.    Mr. Caillat, Myron is currently

20   in the process of sending out samples for

21   its 2008 dated products?

22       A.    Yes.

23       Q.    That's something you're doing

24   now?

25       A.    Yes.

75

```
 1                  Caillat
 2      Q.   And for how long into the year
 3  will you continue to do that?
 4      A.   Until November.
 5      Q.   You will still be sending out
 6  samples for 2008 dated products in
 7  November?
 8      A.   Yes.
 9      Q.   And how about promotions to your
10  customers, how late in the year will you
11  continue to do that for dated products?
12      A.   I'm sorry, was the question
13  before relative to prospects?
14      Q.   Prospects, yes.
15      A.   Then I don't remember
16  specifically for prospects, if that's what
17  you were asking.
18      Q.   Yeah, the first question was how
19  late into the year do you send out
20  promotions for prospects, samples for
21  prospects?
22      A.   Last year we probably had some
23  fairly late in the year.  This year I'm not
24  too sure.
25      Q.   You're not sure when the end date
```

76

1                    Caillat

2    will be for prospects?

3         A.    Well, you are confusing me a

4    little bit because you keep going back

5    between calendars and teamwork and I'm not

6    sure which --

7         Q.    Let me clarify my question for

8    you.  With respect to all of the teamwork

9    SKU's which -- that are at issue in this

10   case, which I understand are all dated

11   products.

12        A.    Yes.

13        Q.    When do you anticipate will be

14   the last promotional mailing to prospects?

15        A.    That's the one that I'm not

16   really sure, because we mailed a variety of

17   products in the prospect program this year,

18   and I'm not really sure when the last time

19   would be where one of these teamwork

20   products will be mailed.  If I could help

21   with you last year's, I can do that.

22        Q.    Okay, we'll get to last year in a

23   second.  Is it your expectation that there

24   are still some mailings for dated teamwork

25   products to be done this year?

77

1                    Caillat

2        A.    This year in prospect we are not

3    sending as many as last year, so I'm not

4    too sure.

5        Q.    Okay, and with respect to

6    customers, is it your understanding that

7    there are still some promotions to be done

8    to customers for 2008 dated teamwork

9    products?

10       A.    I believe we have some upcoming,

11   yes.

12       Q.    And do you have a sense as to

13   when the last one will be sent?

14       A.    No, not from the top of my head.

15       Q.    Referring to last year then, what

16   is your recollection as to when the last

17   dated product promotion for a teamwork

18   product to customers took place?

19       A.    To customers, I believe we had

20   some up until November.

21       Q.    And the same question for

22   prospects.  When was the last promotion?

23       A.    I believe we had some up until

24   October or November in prospect.

25       Q.    With reference to the 2007

78

```
 1              Caillat
 2   calendar year, do you know how many samples
 3   to prospects you sent out for teamwork
 4   related products?
 5           MR. JACOBSON:   I'm going to
 6       object.  I mean, this is far afield
 7       from where we talked about when we
 8       spoke on the phone.  This is along the
 9       lines of information you said you were
10       not going to provide to me, so you're
11       asking him how many samples he sent
12       out?
13           MR. AIETA:   Actually I don't
14       think it was, but if you want to have
15       this discussion off the record, I'm
16       happy to do that.  If you'd like my
17       client to leave the room, we're happy
18       to do that too.
19           MR. AIETA:   Well, we can discuss
20       off the record.
21           (Discussion off the record.)
22           (Recess taken.)
23           MR. AIETA:   I think we can stop
24       there.  That's fine.
25           (Time noted:  12:04 p.m.)
```

79

1

2          A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK    )
                          : ss
5    COUNTY OF            )

6

7              I, PATRICK CAILLAT, hereby

8    certify that I have read the transcript of

9    my testimony taken under oath in my

10   deposition of September 19, 2007; that the

11   transcript is a true, complete and correct

12   record of my testimony, and that the

13   answers on the record as given by me are

14   true and correct.

15

16

17        _____

18             PATRICK CAILLAT

19

20
     Signed and subscribed to before
21   me, this          day
     of                 , 2007.
22

23   _____
24   Notary Public, State of New York

25

80

```
1
2                C E R T I F I C A T E
3    STATE OF NEW YORK        )
4                             ) ss.:
5    COUNTY OF NEW YORK       )
6
7         I, DAVID HENRY, a Notary Public within
8    and for the State of New York, do hereby
9    certify:
10        That PATRICK CAILLAT, the witness
11   whose deposition is hereinbefore set forth,
12   was duly sworn by me and that such
13   deposition is a true record of the
14   testimony given by such witness.
15        I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage; and that I am
18   in no way interested in the outcome of this
19   matter.
20        IN WITNESS WHEREOF, I have hereunto
21   set my hand this 20th day of September,
22   2007.
23
24        -------------------------
25        DAVID HENRY
```

81

```
1

2                    E R R A T A

3       PAGE   LINE   EMENDATION

4       _____  _____  _____
        _____  _____  _____
5       _____  _____  _____
        _____  _____  _____
6       _____  _____  _____
        _____  _____  _____
7       _____  _____  _____
        _____  _____  _____
8       _____  _____  _____
        _____  _____  _____
9       _____  _____  _____
        _____  _____  _____
10      _____  _____  _____
        _____  _____  _____
11      _____  _____  _____
        _____  _____  _____
12      _____  _____  _____
        _____  _____  _____
13      _____  _____  _____
        _____  _____  _____
14      _____  _____  _____
        _____  _____  _____
15      _____  _____  _____
        _____  _____  _____
16      _____  _____  _____
        _____  _____  _____
17      _____  _____  _____
        _____  _____  _____
18      _____  _____  _____
        _____  _____  _____
19      _____  _____  _____
        _____  _____  _____
20      _____  _____  _____
        _____  _____  _____
21      _____  _____  _____
        _____  _____  _____
22      _____  _____  _____
        _____  _____  _____
23      _____  _____  _____
        _____  _____  _____
24      _____  _____  _____
        _____  _____  _____
25      _____  _____  _____
```

82

1

2                    INDEX OF EXHIBITS

3

4    1, MYRON 1                        15

5    2, MYRON 0002-34                  19

6    3, Gift Box                       20

7    4, MYRON 0035-36                  22

8    5, MYRON 0037-40                  22

9    6, MYRON 0175-0181                25

10   7, MYRON 0182-0199                42

11   8, MYRON 0241-0277                45

12   9, MYRON 0174                     52

13   10, Myron 2007/2008 Catalogue     55

14   11, MYRON 0155-0164               57

15   12, MYRON 0165-0173               62

16

17

18

19

20

21

22

23

24

25