UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                  :

MYRON CORP.,                     :

                  Plaintiff      :    Case No. 07-CV-6877 (PAC)

                v.             :

                                    :

HOLLAND USA, INC D/B/A AMSTERDAM  :
PRINTING,                         :

             Defendants.     :

                                    :
-------------------------------------------------------------x

## REPLY DECLARATION OF MARIO AIETA IN FURTHER OPPOSITION TO PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION

I, MARIO AIETA, declare under penalty of perjury:

1.      I am a partner of the law firm of Fross Zelnick Lehrman & Zissu, P.C., counsel for Defendant in this action. I make this reply declaration in further opposition to Plaintiff's Request for a Preliminary Injunction.

2.      Prior to the commencement of the first deposition in this action, counsel for the parties agreed that until such time as a formal protective order was entered in this case by the Court, counsel for either party could designate exhibits or deposition testimony as either Confidential or For Attorneys' Eyes Only. At the deposition of the parties' 30(b)(6) witnesses, counsel for both parties designated certain parts of the transcript as For Attorneys Eyes Only.

3.      Exhibit 21 to the Declaration of Richard Jacobson submitted in support of plaintiff's request for a preliminary injunction, which is described by Mr. Jacobson as a "true and accurate copy of the deposition transcript of Kevin Kirbey," is actually only the first 49 pages of the transcript. The transcript of Mr. Kirbey's deposition is 85 pages in

length (not including signature page, errata page and exhibit page).

      4.      Attached hereto as Exhibit M are pages 50 to 73 and pages 84 and 85 of the transcript of the deposition of Kevin Kirbey. Certain parts of the testimony contained on pages 74 to 83 has been designated as For Attorneys Eyes Only and, therefore, is not included in Exhibit M.

I declare under laws of perjury of the United States of America that the foregoing is true and correct and this declaration was executed on September 27, 2007 at New York, New York.

_____
Mario Aieta

Exhibit M

1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    -------------------------------------x

5    MYRON CORP.,

6                              Plaintiff,

7              vs.

8    HOLLAND USA, INC. D/B/A/

9    AMSTERDAM PRINTING

10                             Defendant.

11   -------------------------------------x

12                        September 19, 2007

13                        1:30 p.m.

14

15

16        Deposition of KEVIN KIRBEY, held at

17   the offices of Colucci & Umans, 218 East

18   50th Street, New York, New York before

19   David Henry, a Certified Shorthand Reporter

20   and Notary Public of the State of New York.

21

22

23

24

25

2

1

2    A P P E A R A N C E S :

3

4       COLUCCI & UMANS

5       Attorneys for Plaintiff

6            218 East 50th Street

7            New York, New York 10022

8       BY:   RICHARD P. JACOBSON, ESQ.

9       AND:  FRANK J. COLUCCI, ESQ.

10

11      FROST ZELNICK LEHRMAN & ZISSU, PC

12      Attorneys for Defendant

13           866 United Nations Plaza

14           New York, New York 10017

15      BY:   MARIO AIETA, ESQ.

16

17

18   ALSO PRESENT:

19      ROBERT LACK

20

21

22

23

24

25

50

1                    Kirbey

2        Q.    During the break we marked this

3    calendar as Exhibit 19.  Have you seen --

4    you've seen a calendar like this

5    previously, a Myron calendar?

6        A.    Yes.

7        Q.    Is this substantially the same as

8    what you've seen previously?

9        A.    I think so.

10            (Deposition Exhibit 20, Amsterdam

11        Calendar, marked for identification.)

12        Q.    And would you identify Exhibit

13    20?

14        A.    That is our calendar.

15        Q.    And how do you refer to this

16    calendar internally?

17        A.    Good question, because I don't

18    normally.  I refer to it as the calendar

19    and pen sleeve.  Other folks, I really

20    don't know to be honest with you.  We

21    haven't talked about it that much.

22        Q.    Is it referred to by teamwork?

23        A.    I don't know, to be honest with

24    you.

25        Q.    Is it referred to as mountain

51

1                     Kirbey

2    climbers?

3         A.   I don't know.

4         Q.   Is this the only pocket calendar

5    with a pen and pen sleeve that you make?

6         A.   Yes.

7         Q.   Who is Jing Mahler?

8         A.   She works in our new product

9    development area.

10        Q.   And what is her function?

11        A.   A lot of coordination,

12   communication, trying to make sure things

13   get done on time.  Kind of a

14   jack-of-all-trades, so to speak.

15        Q.   Is she responsible for creating

16   the design or implementing?

17        A.    Well, mostly just coordinating

18   between vendors and our internal folks

19   primarily.

20        Q.   And how long has she been at

21   Amsterdam?

22        A.   I think she started in 2004, but

23   it could have been 2005.  I can't be sure.

24        Q.   And what is the -- does a single

25   factory make your teamwork calendars?

52

1                    Kirbey

2        A.    Yes.

3        Q.    Are they made overseas?

4        A.    Yes.

5        Q.    Is this a factory that you've

6   done business with previously?

7        A.    Yes.

8        Q.    Is it somebody calls up Amsterdam

9   to order this calendar, and let's say they

10  don't have the product code or the SKU, how

11  would they order it, do you know?

12       A.    I have no idea.

13       Q.    Are you aware of any anecdotal

14  instances where people have called up and

15  ordered the mountain climber calendar?

16       A.    No.

17       Q.    Do you know what materials were

18  sent to the factory to create the samples

19  for the defendant's teamwork calendar?

20       A.    I don't know for sure.  I have

21  heard different stories about that.

22       Q.    From whom have you heard stories?

23       A.    Jing.

24       Q.    What did she tell you?

25       A.    She said initially there was a

53

1                    Kirbey

2    sample of a Myron calendar with a pen in

3    it.  She couldn't remember which one.  And

4    they she said their balance was our

5    Richford calendar, which is the stitched

6    version of this without the pen sleeve with

7    material fabricated to it and a pen put

8    into it.

9        Q.   So Jing told you that Myron's

10   calendar with the pen and pocket sleeve was

11   sent to the factory to help fabricate --

12       A.   She didn't send it, she heard

13   that it was sent.  She herself can't

14   remember if she actually sent it.

15       Q.   Who was responsible for coming up

16   with the color scheme for these calendars?

17       A.   That's a good question.  I'm not

18   totally sure.  I can guess it's one of

19   three people.

20       Q.   And who would those be?

21       A.   Margaret Enzien, Joe Achzet or

22   Michael Terrenzetti.

23       Q.   And is it the Richford calendar

24   that you said the design or the fabrication

25   is base upon with the stitching?

54

1                    Kirbey

2        A.   Yes.

3        Q.   Does the Richford use the same

4    color team as your teamwork calendar?

5        A.   It's offered in multiple

6    calendars.  I don't know if there's an

7    exact scheme like that, but it's probably

8    offered in eight or 12 different color

9    combinations.

10       Q.   Would there be a blue and black

11   combination?

12       A.   I don't know.  I know of a blue

13   and brown, I don't know about blue and

14   black.

15            (Deposition Exhibit 21, D000050-52,

16       marked for identification.)

17            (Deposition Exhibit 22,

18       D000105-110, marked for identification.)

19       Q.   Other than the flying geese

20   design, do you have any other calendars

21   that use the same blue and black color

22   scheme?

23       A.   Meaning in general blue and

24   black?

25       Q.   Yes.

55

1                    Kirbey

2       A.    Yes.

3       Q.    How would you describe the color

4   arrangement on this product, Exhibit 20?

5   Is this a four color, a two color, what

6   would the technical description be?

7       A.    Probably two.

8       Q.    Take a look at Exhibit 21,

9   please.  Have you read through the

10  document?

11      A.    Yeah, I skimmed through it.

12      Q.    So on the first page, the first

13  substantive e-mail indicates that it was

14  sent December 15, 2006, do you see that?

15      A.    Yes.

16      Q.    From Jing Mahler to Jake Jan, and

17  it states, I will start ordering process

18  for the teamwork climbing hardcover with

19  pen next Monday.

20      A.    Okay.

21      Q.    Can you tell me what that means?

22      A.    Start putting together a forecast

23  and an idea of what they want and sell it.

24  It means at that point they would put

25  together a forecast of how much they want

56

1                    Kirbey

2      to buy.

3          Q.   And the teamwork with climbing

4      hardcover, is that what Exhibit 20 is?

5          A.   I believe so.

6          Q.   Turn to the second page.  And it

7      states or indicates that it's a note from

8      Jake Jan to Jing Mahler of your company.

9      Dear Jing -- can you read paragraph 2,

10     please.

11         A.   Number 2?

12         Q.   Yes.

13         A.   I leave the sample you gave, your

14     competitor's sample in TPE office but its

15     vinyl was too rough and we reject it

16     remember and I don't suggest that.

17         Q.   Do you know what Jake Jan is

18     referring to in his e-mail to Jing Mahler?

19         A.   I believe he is referring to the

20     calendar with the pen in it.

21         Q.   The Myron calendar?

22         A.   Yes, I think.  I haven't been

23     able to confirm that.

24         Q.   Looking at and touching Exhibit

25     19 which is the Myron calendar, would you

                    Kirbey

1   say that that is a rough vinyl?

2        A.   Would I say it's a rough vinyl?

3   No.

4        Q.   Do you know, do you have

5   experience in that?

6        A.   I would say no, it's not a rough

7   vinyl.

8        Q.   But you don't know whether Jake

9   Jan was referring to the Myron -- you think

10  Jake Jan was referring to the Myron sample?

11       A.   I believe he was, but I'm unable

12  to confirm that.

13       Q.   All right, turn to the third page

14  of Exhibit 21.  And here is another note to

15  Jake.  This is from Jing dated November 24,

16  2006.  And it states in item 1, do you

17  still have the calendars we sent to you in

18  the beginning, which is one of our

19  competitors' calendars with mountain

20  climbing.  If you do, please quote that

21  exactly calendar to us.  Had you seen this

22  before?

23       A.   Have I seen this e-mail before?

24       Q.   Yes.

58

                    Kirbey

1

2      A.   Not until I pulled it for this

3   inquiry.

4      Q.   Is there any other competitors'

5   calendar with the mountain climbing that

6   could be referred to in this paragraph

7   other than Myron's?

8      A.   Not that I am aware of.

9      Q.   All right, I'm done with that

10  exhibit.  This e-mail from Jing Mahler to

11  Jake Jan says here is the artwork for the

12  teamwork calendar, and the last page seems

13  to be just a black outline with the words

14  teamwork and some other words.  Do you know

15  if design appears on the electronic version

16  of this document?

17     A.   I don't know.  This specific

18  document, I don't know.

19         MR. JACOBSON:    Counsel, do you

20      know, there are a number of instances

21      like this where the attachments to the

22      e-mails are illegible.  Do you

23      know whether or not the electronic

24      versions are available and can be

25      printed in a legible manner?

1                    Kirbey

2          MR. AIETA:    I disagree with

3      your characterization that it's

4      illegible, but that's what the

5      electronic version looks like.

6          MR. JACOBSON:    Is there a

7      graphic that appears on it?

8          MR. AIETA:    It looks like that.

9      It's been scanned, so that's how it

10     looks, the one we have, that's how it

11     looks.  There may be better ones

12     available.

13     Q.   Were you involved in the

14 development of the defendant's teamwork

15 design that culminated in Exhibit 20?

16     A.   I was involved in the pen being

17 attached to the calendar to ensure that we

18 could hot stamp on the product.

19     Q.   That you could what?

20     A.   That we could hot stamp on it, so

21 I was involved in making sure that this was

22 engineered correctly.

23     Q.   What about the layout of the text

24 and the graphic itself?

25     A.   No.

60

1                    Kirbey

2        Q.   Did you have any approval or

3    oversight of the final product?

4        A.   Not at all.  I did have approval

5    to ensure that the pocket was to spec on

6    the calendar to hold the pen.

7        Q.   Who would have been involved in

8    arranging the layout of the text on the

9    calendar?

10        A.   Most likely Margaret Enzien.

11        Q.   Do you know whether she sought

12    any guidance from anybody else?

13        A.   How do you define guidance?

14        Q.   Instruction.

15        A.   In regard to what?

16        Q.   In regard to the layout.

17        A.   Meaning just how far the letters

18    are spaced apart?

19        Q.   Yes.

20        A.   My guess is she would have asked

21    somebody in manufacturing to stand firm to

22    make sure the letters didn't bleed

23    together.

24        Q.   What about centering the text as

25    opposed to having it be oriented to the

61

1                     Kirbey

2    left, do you know about any discussions in

3    that respect?

4        A.   No, none at all.

5        Q.   Do you know whether anybody at

6    Holland or any of the affiliated entities

7    expressed any concern about what became

8    Exhibit 20 in terms of it being too similar

9    to Myron's design?

10       A.   No.

11       Q.   When you sent the product to your

12   legal counsel for review, do you know

13   whether Myron's calendar was sent as well?

14           MR. AIETA:    Objection.

15       A.   I don't know.  I'm not even sure

16   that the actual product was sent.  I don't

17   know if it was just a picture.

18       Q.   In terms of the sequence of

19   events regarding which design was developed

20   first for you, the mountain climber or the

21   flying geese, do you have any knowledge?

22       A.   No.

23       Q.   Do you know whether any

24   alternative designs were considered to go

25   with the teamwork and together we can

62

1                    Kirbey

2    achieve the impossible phrase?

3        A.   I don't know.

4        Q.   As far as you know, when was the

5    first time that defendant offered any

6    version of the teamwork calendar in its

7    catalogues or for sale?

8        A.   January, 2007.

9        Q.   And by that you are referring

10   only to the Windmill catalogue?

11       A.   Correct.

12       Q.   Did Amsterdam have the

13   defendant's teamwork calendar in January,

14   2007?

15       A.   No.

16       Q.   Do you know when Amsterdam first

17   offered the calendar?

18       A.   May, 2007.

19       Q.   And what is your basis for

20   stating that it was offered in May?

21       A.   I have a catalogue in detail

22   behind when it was made.

23       Q.   Which catalogue did it first

24   appear in?

25       A.   It's a large tabloid.  We call it

63

                    Kirbey

1

2   a tabloid, it's thin, it's about this big.

3        Q.   Do you know the name of it?

4        A.   Just the Amsterdam tabloid.

5        Q.   Does it say tabloid?

6        A.   I don't think it says tabloid, it

7   just says Amsterdam.

8             (Deposition Exhibit 23,

9        D000259-282, marked for identification.)

10        Q.   Take a look at Exhibit 23.  Can

11   you tell me if that's the catalogue that

12   the defendant's teamwork calendar first

13   appeared in?

14        A.   I don't believe so.

15        Q.   Why don't you think that Exhibit

16   23 is the first calendar it appeared in --

17   catalogue rather?

18        A.   My recollection is the cover was

19   a different cover than mailed in May, and I

20   think I have a sample of it, and I don't

21   believe that's mailed in May.  I have to

22   look at my numbers, but I think July or

23   June, probably July.

24        Q.   Now, Exhibit 23 says summer,

25   2007.  When would you send out your summer

64

                    Kirbey

1

2    catalogue?

3         A.   It would drop multiple times over

4    a three-month period.

5         Q.   And when would that three-month

6    period begin?

7         A.   I don't know, I'd have to look.

8         Q.   Now, this says next to summer of

9    2007, V1A.  Does that have some

10   significance in terms of timing?

11        A.   It might to the designers, I

12   don't know.  In terms of timing, no.  My

13   guess is the designers are using that to

14   keep track of their cover changes.  I don't

15   know that for sure.

16        Q.   So would that differentiate the

17   various summer catalogues, just changing

18   the cover?

19        A.   I don't know.

20             (Deposition Exhibit 24, D000192,

21        marked for identification.)

22             (Deposition Exhibit 25, D000193,

23        marked for identification.)

24        Q.   Can you tell me what Exhibit 24

25   is?

65

1                    Kirbey

2        A.    That is a, this was a spreadsheet

3   that we created off of our business systems

4   and selected customers that had the address

5   of 205 Maywood Avenue.

6        Q.    And when was this created?

7        A.    Some time in the past seven days.

8   I don't exactly remember the date, to be

9   honest with you.

10        Q.    And whose database is this from?

11        A.    It's from our, Holland's data

12   that drives our business.

13        Q.    On Holland's database is

14   available to Amsterdam?

15        A.    Yes.

16        Q.    And to Union Pen?

17        A.    Yes.  They are broken out

18   separately, but technically they reside on

19   the same physical piece of hardware.

20        Q.    Any other companies?

21        A.    Baldwin Cook and Go Promos.

22        Q.    And I presume from this database

23   that you can tell what mailings or samples

24   were sent to these people?

25        A.    We can look at every mailing that

                        Kirbey

1

2   was sent to an individual.

3       Q.   And that's not included on

4   Exhibit 24 though, is it?

5       A.   Correct, that's just the customer

6   list.

7       Q.   So from Exhibit 24, you can't

8   tell what was sent, if anything, to the

9   people at 205 Maywood Avenue?

10          MR. AIETA:    Objection.

11      Counsel, you extracted that page from

12      what was sent to you as an exhibit

13      with more than one page, so I think

14      you're misleading the witness.

15          MR. JACOBSON:   I only have one

16      page.  That's all you provided us.

17          MR. AIETA:   I think that's

18      incorrect.

19          THE WITNESS:   I believe this is

20      the second page.

21      Q.   So Exhibit 25 goes with it?

22      A.   I'd have to look at what you

23   provided and see if it goes with it.  I

24   believe so.

25      Q.   So tell me the significance then

67

1                    Kirbey

2   of Exhibit 25.

3        A.    25 is the detail of what was sent

4   to the customers listed in Exhibit 24.

5        Q.    So the five customers listed on

6   Exhibit 24 --

7        A.    No, six customers listed.

8        Q.    Sorry, six customers listed on

9   Exhibit 24 all were sent every mailing

10  listed on Exhibit 25?

11       A.    No.  This is a combination of

12  mail.  It doesn't tell you exactly which

13  customer got what, but in total this is

14  what was sent to these six customers.

15       Q.    So apart from the mailing of the

16  Windmill catalogue to ASI members, what

17  evidence do you have that it was received

18  by anyone at Myron Corp.?

19            MR. AIETA:    Objection.

20       A.    I don't have any evidence of

21  anything being received.  I can only tell

22  you what was sent.

23       Q.    And from looking at Exhibit 25,

24  which item on here correlates to the

25  January, 2007 Windmill catalogue which was

68

1              Kirbey

2    previously marked as Exhibit 15?

3        A.    These do not correspond to the

4    January, 2007 Windmill.

5        Q.    And do you have other documentary

6    proof to establish that the Windmill

7    catalogue of January, 2007 was mailed to

8    somebody at Myron?

9        A.    Correct, yes.

10       Q.    And what proof does that consist

11   of?

12       A.    That's a list of every customer

13   that that catalogue was mailed to with a

14   contact name and address of where it was

15   delivered to.

16       Q.    And that's the catalogue that was

17   bundled with the Ad Graphics catalogue?

18       A.    Correct.

19       Q.    Do you know how they were

20   physically bundled together?

21       A.    They were just put in an

22   envelope.

23       Q.    Was there an order that the

24   catalogues were attached to one another or

25   bound together?

```
1                    Kirbey
2        A.   I couldn't tell you.
3        Q.   Were the Windmill Press
4   catalogues mailed out of any of the Holland
5   company offices?
6        A.   They were mailed from a printer.
7        Q.   From a printer?
8        A.   Yes.  The date is provided to the
9   printer and I believe they mailed them, but
10  I'd have to confirm for sure.
11           MR. AIETA:     Counsel, if I may
12        just clarify, it looks like one of the
13        documents that Betsy Johnson advised
14        you last night was a privileged
15        document was not.  It was a screen
16        shot of the spreadsheet with
17        Mr. Schaefer's name on it.  So we'll
18        provide that as soon as I can print it
19        out.  That's 194.
20        Q.   Do you know how the bundling of
21  the ASI catalogues is done physically, the
22  process?
23        A.   No.
24        Q.   It's just done at the printers?
25        A.   I believe so.
```

70

1                    Kirbey

2          Q.    And how many ASI distributions do

3    you do, or how many ASI bundling

4    distributions does, or did Windmill do once

5    you -- did Windmill Press do once you were

6    overseeing it?

7          A.    What is a bundled distribution?

8          Q.    Well, you said that the Windmill

9    catalogue was bundled with the Ad Graphics.

10         A.    Yes, and mailed to distributors.

11         Q.    And mailed to distributors.

12         A.    I don't have the exact count, but

13   the file has a count in it so off the top

14   of my head I couldn't tell you how many,

15   but the file has a count of every name, so

16   we would have them.

17         Q.    And do you know the size of the

18   Ad Graphic catalogue?

19         A.    No.

20         Q.    Was it larger than the Windmill

21   Press catalogue?

22         A.    I don't know.

23         Q.    Who sets pricing for calendars

24   you sell?

25         A.    Different by brand.

71

```
1                    Kirbey
2       Q.   By brand?
3       A.   Yes.
4       Q.   And by brand do you mean
5  Amsterdam versus Union Pen?
6       A.   Correct.
7       Q.   D you have different brands
8  within each division though?
9       A.   No.  Our terminology, we would
10 refer to a brand as Amsterdam would be a
11 brand, Union Pen would be a brand.
12      Q.   Is one -- does one SKU higher,
13 have a higher price point than the other?
14      A.   I don't know.
15      Q.   Are you selling or are you
16 pricing the teamwork calendars at a higher
17 price point than your other calendars?
18      A.   I don't know.
19      Q.   This was a new product for you,
20 the defendant's teamwork calendar?
21      A.   It's a compilation of other tings
22 we sold put together.  We never sold a pen
23 and calendar set before.  We've sold a
24 stitched vinyl book like that and we sold a
25 mountain climber motivational four-color.
```

72

1                    Kirbey

2        Q.    And what sort of pricing

3    discounts do you typically offer?

4        A.    That would be an attorney only

5    conversation.

6        Q.    Well, I'm talking about discounts

7    that I've seen in publications that have

8    been sent out talking about catalogues.

9        A.    It's varied and it's never the

10   same for any book.  Each customer can have

11   a specific price if we choose to.

12       Q.    So there are times where

13   customers will receive a catalogue and it's

14   regular price?

15       A.    Yes.

16       Q.    And there are times when a

17   customer will receive a catalogue and the

18   price of the calendars is discounted by ten

19   percent?

20       A.    Could be, I don't know for sure.

21       Q.    Have you ever seen situations

22   where the calendars are offered at two for

23   one?

24       A.    Not to customers.

25       Q.    Then to who?

73

1                    Kirbey

2        A.    Prospects.

3        Q.    To whom?

4        A.    Typically to prospects.  On rare

5    occasions it will go to customers.  It will

6    go to what we refer to potentially as last

7    customers.  It wouldn't go any further than

8    that.

9        Q.    Did you do any sampling with the

10    teamwork calendars?

11        A.    Yes.

12              (Recess taken.)

13              (Mr. Lack no longer present.)

14              (Deposition Exhibit 26, MYRON

15        0214-216, marked for identification.)

16    FURTHER EXAMINATION BY MR. JACOBSON:

17        Q.    I marked this document as Exhibit

18    26, and can you identify it?

19        A.    I believe that is one of our

20    catalogues.

21        Q.    And from what day?

22        A.    I don't know.  I'd have to go

23    back in the date and see.

24        Q.    How can you tell that from --

25        A.    I can go back in our system and

84

1                    Kirbey

2    is.

3         Q.   Do you know whether they're

4    selling comparably?

5         A.   I don't know.

6         Q.   Do you know whether you ordered

7    the same amounts?

8         A.   I don't know.

9         Q.   And you don't have any data on

10   average order size from customers for these

11   products, do you?

12        A.   No.

13        Q.   Have you received any inquiries

14   from any customers inquiring about whether

15   there is any connection between your

16   company or products and Myron?

17        A.   No.

18             MR. JACOBSON:    Thank you very

19        much, Mr. Kirbey.

20             MR. AIETA:    I just have one

21        question to clarify, if you don't

22        mind.

23   EXAMINATION BY MR. AIETA:

24        Q.   You were asked about the selling

25   season for these products.  You indicated

85

1                    Kirbey

2    it starts January 1 and ends December 31.

3         A.   Yes.

4         Q.   Is there a period of time during

5    the year when more of the products are

6    sold, that is to say when more orders are

7    taken?

8         A.   Typically second week of

9    September through December, first week in

10   December.

11            MR. AIETA:    No other questions.

12            MR. JACOBSON:    Thank you.

13       (Time noted:  4:00 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

86

1

2              A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK    )
                          : ss
5    COUNTY OF            )

6

7              I, KEVIN KIRBEY, hereby certify

8    that I have read the transcript of my

9    testimony taken under oath in my deposition

10   of September 19, 2007; that the transcript

11   is a true, complete and correct record of

12   my testimony, and that the answers on the

13   record as given by me are true and correct.

14

15

16         _____

17              KEVIN KIRBEY

18

19

     Signed and subscribed to before
20   me, this            day
     of                  , 2007.
21

22
     _____
23   Notary Public, State of New York

24

25

87

```
 1

 2                C E R T I F I C A T E

 3    STATE OF NEW YORK       )

 4                            ) ss.:

 5    COUNTY OF NEW YORK      )

 6

 7        I, DAVID HENRY, a Notary Public within

 8    and for the State of New York, do hereby

 9    certify:

10        That KEVIN KIRBEY, the witness whose

11    deposition is hereinbefore set forth, was

12    duly sworn by me and that such deposition

13    is a true record of the testimony given by

14    such witness.

15        I further certify that I am not

16    related to any of the parties to this

17    action by blood or marriage; and that I am

18    in no way interested in the outcome of this

19    matter.

20        IN WITNESS WHEREOF, I have hereunto

21    set my hand this 20th day of September,

22    2007.

23

24        -------------------------

25        DAVID HENRY
```

88

1

2                         E R R A T A

3    PAGE   LINE   EMENDATION

4    _____  _____  _____
     _____  _____  _____
5    _____  _____  _____
     _____  _____  _____
6    _____  _____  _____
     _____  _____  _____
7    _____  _____  _____
     _____  _____  _____
8    _____  _____  _____
     _____  _____  _____
9    _____  _____  _____
     _____  _____  _____
10   _____  _____  _____
     _____  _____  _____
11   _____  _____  _____
     _____  _____  _____
12   _____  _____  _____
     _____  _____  _____
13   _____  _____  _____
     _____  _____  _____
14   _____  _____  _____
     _____  _____  _____
15   _____  _____  _____
     _____  _____  _____
16   _____  _____  _____
     _____  _____  _____
17   _____  _____  _____
     _____  _____  _____
18   _____  _____  _____
     _____  _____  _____
19   _____  _____  _____
     _____  _____  _____
20   _____  _____  _____
     _____  _____  _____
21   _____  _____  _____
     _____  _____  _____
22   _____  _____  _____
     _____  _____  _____
23   _____  _____  _____
     _____  _____  _____
24   _____  _____  _____
     _____  _____  _____
25   _____  _____  _____

89

1

2                    INDEX OF EXHIBITS

3

4       13, Notice of Deposition          18

5       14, Complaint                     19

6       15, Windmill Press Catalogue      21

7       16, Brochure entitled Windmill    36

8       Press New Products

9       17, Printout from Amsterdam       42

10      website

11      18, Defendant's Response to       44

12      Request for Production of

13      Documents

14      19, Myron Calendar                49

15      20, Amsterdam Calendar            50

16      21, D000050-52                    54

17      22, D000105-110                   54

18      23, D000259-282                   63

19      24, D000192                       64

20      25, D000193                       64

21      26, MYRON 0214-216                73

22      27, Union Pen Co. Website         76

23      printout

24

25