UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MYRON CORP.,

        Plaintiff,

v.

HOLLAND USA, INC. D/B/A
AMSTERDAM PRINTING,

        Defendant.

Civil Action
No. 07-6877 (PAC)

---

## REPLY DECLARATION OF RICHARD P. JACOBSON
## IN FURTHER SUPPORT OF PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746, Richard P. Jacobson, declares under penalty of perjury as follows:

1.    I am a member of the law firm of Colucci & Umans, counsel for plaintiff, Myron Corp. ("Myron"). I submit this reply declaration in further support of Myron's motion for a preliminary injunction and to place before the Court true and accurate copies of pertinent documents and exhibits for the preliminary injunction hearing on September 27, 2007.

2.    On September 25, 2007, upon notice to counsel for defendant, I conducted the deposition of Larry Schaefer. The Notice of Deposition stated that "plaintiff will rely on Mr. Schaefer's deposition testimony at the preliminary injunction hearing on September 27, 2007 due to Mr. Schaefer's unavailability to attend the hearing."

3. Pursuant to Fed. R. Civ.P. 32(a)(3)(B), plaintiff hereby offers at the hearing on plaintiff's motion for a preliminary injunction the attached excerpts from the deposition of Mr. Schaefer, true and accurate copies of which are attached hereto as Exhibit 22.

4. Until February 27, 2007, Larry Schaefer was the chief financial officer of plaintiff, Myron Corp. ("Myron"), where he had held that position for ten years in addition to working at Myron as controller for his first two years of employment with the company.

5. During his deposition, Mr. Schaefer testified that he was familiar with Myron's Teamwork calendars. (Ex. 22 at 12:2-11)

6. Mr. Schaefer's testimony described the Advertising Specialty Institute ("ASI") as an organization that introduces suppliers to distributors and vice versa so that they can market and sell their respective products. Mr. Schaefer explained that a supplier is a company that sources and decorates a product for sale to a distributor. A distributor has the relationship with the individual customers. Myron, however, was "somewhat unique in that it sources and markets its products. So Myron describes itself as a mail order company; not as a distributor or a supplier." Myron is a member of the ASI, and at the time Mr. Schaefer was employed there he was the ASI liaison. (Ex. 22 at 12:25-14:20)

7. As Myron's designated ASI representative, Mr. Schaefer received periodic shipments of mailings and boxes containing product samples and printed matter, such as catalogs and mailers, from ASI distributors. He testified that these boxes would contain printed marketing materials describing the products, product catalogues, and offer sheets, as well as samples of products sold by ASI suppliers. These ASI boxes included materials from several suppliers. According to Mr. Schaefer, when he received a box of these ASI supplier shipments

he typically would bring it down to marketing and have them take a look at the contents. (Ex. 22 at 16:3-17:24)

8. Mr. Schaefer testified that it was not his practice to inspect the contents of these packages from ASI distributors other than to conduct a cursory inspection of the product samples inside. Mr. Schaefer's testimony is that these ASI shipments were of little interest to Myron because Myron sources its own product most of the time, and is not in the business of buying product from suppliers. Mr. Schaefer testified that he would never look through any catalogues that were included in these ASI boxes. (Ex. 22 at 18:8-25)

9. Defendant's defense relies upon the premise that Myron, specifically, Larry Schaefer, received an ASI mailing that included Dep. Ex. 15, which is the 2007 catalog of Windmill Press. Mr. Schaefer testified that prior to his deposition this week he had never seen the Windmill Press catalog. (Ex. 22 at 21: 6-10)

10. Mr. Schaefer's unequivocal testimony is that while employed by Myron as its CFO and thereafter, until the day of his deposition, he never saw either a catalog of Windmill Press or any sample of such product or any sample of the defendant's calendar that is at the heart of this motion. (Ex. 22 at 23:13-16; 25:8-11)

11. It is the testimony of Mr. Schaefer that if he had seen either version of defendant's calendar, either in a catalog or as a sample, he would have contacted Myron's trademark counsel. (Ex. 22 at 24:6-14; 25:18-25)

12. Mr. Schaefer further testified that it was not within the scope of his responsibilities to page through every catalog mailed to him. (Ex. 22 at 24:15-18) and when product catalogs were addressed to him his assistant usually did not relay them to him. (Ex. 22 at 49:5-15)

13.     Before filing the complaint in this matter, prudence dictated that Myron obtain an actual sample of the Achieve Teamwork calendar. Myron could not obtain a sample of defendant's "Achieve Teamwork" dated product until July 30, 2007, and it filed the complaint the very next day, thereby placing defendant on notice of Myron's claims.

14.     Defendant or its counsel never contacted plaintiff prior to answering on August 23, 2007. In view of defendant's unwillingness to voluntarily stop selling the infringing calendars, the undersigned advised defendant's counsel on August 29, 2007 about Myron's intention to move for a preliminary injunction when the first draft of the proposed joint letter to the court was sent to him.

15.     At the initial scheduling conference before the Court, defendant represented, "The word 'teamwork' appears throughout the dated products industry on many, many, many products; Calendars, desk calendars. It's all over the place, including in association with two mountain climbers and a silhouetted mountain, one helping the other up the mountain." (Tr. of Conf. Sept. 10, 2007 at 9:21-10:1).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 26th day of September, 2007.

_____
Richard P. Jacobson

-5-

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the foregoing "Declaration of Richard P. Jacobson in Support of Plaintiff's Motion for Preliminary Injunction" has been served by email on defendant's attorney, Mario Aieta, Fross Zelnick Lehrman & Zissu, P.C., 866 United Nations Plaza, New York, New York 10017, on this 26th day of September, 2007.

*[signature]*

# EXHIBIT 22

Larry Schaefer                                                                    9/25/2007

```
 1
 2                 UNITED STATES DISTRICT COURT
 3                 SOUTHERN DISTRICT OF NEW YORK
 4                 Civil Action No. 07-6877 (PAC)
 5    ------------------------------------------------x
 6    MYRON CORP.,
 7                         Plaintiff,
 8            vs.
 9    HOLLAND USA, INC. D/B/A AMSTERDAM PRINTING,
10                         Defendant.
11    ------------------------------------------------x
12
13
14
15              DEPOSITION OF LARRY SCHAEFER
16                   Hackensack, New Jersey
17                    September 25, 2007
18
19
20    Reported by:
21    GLORIA HAGE
22
23
24
25
```

One Penn Plaza, NYC
email@tobyfeldman.com
Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS
tel (212) 244.3990
tel (800) 246.4950

Page 12

```
 1                        Schaefer
 2        Q     You also mentioned the Teamwork brand.
 3   When you say "Teamwork" what product do you mean?
 4        A     Teamwork is a type of design that's used
 5   for people who want to emphasize that type of
 6   relationship in their business.  They might use it
 7   for their employees or customers or what have you.
 8        Q     Let me show you Deposition Exhibit 19.  Is
 9   Deposition Exhibit 19 an example of Myron's product
10   that it refers to as Teamwork product?
11        A     Yes, it is.
12        Q     Is that also a Pocket Pal?
13        A     Yes, it is.
14        Q     Are you familiar with the Advertising
15   Specialty Institute?
16        A     Yes, I am.
17        Q     Is that frequently or commonly referred to
18   as ASA?
19        A     ASI.
20        Q     ASI rather?
21        A     Yes.
22        Q     Can we refer to Advertising Specialty
23   Institute as ASI for purposes of our conversation?
24        A     Yes.
25        Q     What is the purpose and function of the
```

                    Schaefer

1  
2  ASI?
3      A    As I understand it, ASI is an organization
4  that introduces suppliers to distributors and vice
5  versa so that they can market and sell their
6  respective products.
7      Q    How are those introductions made to your
8  understanding?
9      A    An organization would join this group and
10 fulfill requirements of whatever standards that ASI
11 has, and when you're in that group then you have the
12 ability to contact other members.
13     Q    How would members contact other members?
14     A    There's ASI identity numbers that are
15 provided once you join, and that tells other members
16 what it is you do, whether you're a supplier or a
17 distributor of product.  So as a distributor you
18 would be able to go in and look at suppliers of ASI
19 products to see whether or not any of them would be
20 of interest to your organization.
21     Q    What's the difference between a supplier
22 and a distributor?
23     A    A supplier is a company that sources and
24 decorates a product for sale to a distributor.  A
25 distributor has the relationship with the individual

Larry Schaefer                                                9/25/2007

Page 14

```
 1                      Schaefer
 2   customers.  So a supplier might have a few customers
 3   in the form of distributor or distributors.
 4   Distributor have many customers because they have the
 5   sales force to sell to the end user.
 6        Q    Where would Myron fit into that, as being
 7   a supplier or a distributor or some other category?
 8        A    Myron is somewhat unique in that it
 9   sources and markets its products.  So Myron describes
10   itself as a mail order company; not as a distributor
11   or a supplier.
12        Q    Is Myron a member of the ASI, or at least
13   when you were employed there?
14        A    Myron is a member of the ASI.
15        Q    Was there one particular representative of
16   the company who was the ASI representative on behalf
17   of Myron?
18        A    At the time I was employed there I was the
19   ASI liaison, meaning that it was my name on the ASI's
20   contact registry.
21        Q    Other than being the contact person did
22   you attend any ASI meetings?
23        A    No.
24        Q    Did you participate in any telephone
25   conferences with ASI members --
```

```
 1                       Schaefer
 2   he said.
 3        Q    Mr. Schaefer, did you ever receive boxes
 4   from ASI suppliers?
 5        A    Yes.
 6        Q    What would be in these boxes?
 7        A    The boxes would contain printed material
 8   as well as samples of products sold by ASI suppliers.
 9        Q    When you say "printed material" can you
10   elaborate?
11        A    The material was anything from -- I'm
12   going to describe it as marketing material describing
13   the products, product catalogues, offer sheets,
14   things of that nature.
15        Q    And the types of samples you received
16   inside these boxes, what would they include?
17        A    It would include things like calendars,
18   mugs, key chains, pens, various types of products
19   that were logo'd to kind of describe what -- to
20   basically demonstrate how they could be decorated for
21   re-sale.
22        Q    Can you describe the approximate shape or
23   dimension or weight of these boxes that you received
24   from ASI suppliers?
25        A    They were heavy, and they were probably
```

Larry Schaefer                                              9/25/2007

Page 17

1        Schaefer
2  I'm going to say two and-a-half feet square, very
3  heavy boxes because of the print material.  The
4  printed material was basically wrapped in a plastic
5  and there could have been fifty copies or 75 copies.
6  I didn't look at the individual sheets.  But it was
7  just heavy.
8       Q    These shipments from ASI suppliers, did
9  they typically represent the work and materials of a
10 single supplier or were they for more than one
11 supplier?
12           MR. AIETA:  Objection.
13      Q    Let me rephrase the question.  Did these
14 ASI boxes include materials from more than one ASI
15 supplier generally?
16      A    Yes.
17      Q    Would these boxes include materials from
18 several suppliers?
19      A    Yes.
20      Q    When you would receive a box of these ASI
21 supplier shipments what would you typically do with
22 it?
23      A    I typically would bring it down to
24 marketing and have them take a look at the contents.
25      Q    Who would open up the box?

1                        Schaefer
2        A    I may open up some boxes or someone in
3   marketing would open up the boxes.
4        Q    Do you recall the frequency with which you
5   would receive these ASI boxes?
6        A    Seldom. Meaning maybe three, four times a
7   year.
8        Q    Were these shipments of any interest to
9   Myron?
10       A    Typically not.
11       Q    Why is that?
12       A    As I said, Myron sources its own product
13  most of the time, so it's not in the business
14  normally of buying product from suppliers.
15       Q    On those occasions when you opened up the
16  boxes yourself, would you go through the entire
17  contents of the box yourself?
18       A    No. Typically what I would do is to see
19  whether there was anything fun in terms of the
20  products that I might want to give to my nephew or
21  put on my desk. But I wouldn't go through and
22  examine the contents, no.
23       Q    Would you ever look through catalogues
24  that were included in these ASI boxes?
25       A    I would not have.

1              Schaefer
2    I'm uncertain about Union Pen.
3         Q    Are you familiar with a company called
4    Windmill Press?
5         A    I am not.
6         Q    Let me show you Deposition Exhibit 15 and
7    ask you to take a moment to flip through that
8    catalogue.  Do you recall ever seeing this catalogue
9    prior to today?
10        A    No.
11        Q    So you have not seen this catalogue marked
12   as Deposition Exhibit 15 prior to today?
13             MR. AIETA:  Objection.
14        A    I have not.
15        Q    Have you ever seen a sample from Windmill
16   Press, a sample product that came to you from
17   Windmill Press?
18        A    I do not recall seeing any sample of any
19   product from Windmill Press.
20        Q    If you look at the front cover on the
21   Windmill Press catalogue in the center square,
22   directing your attention to that image, have you ever
23   seen that image previously?
24        A    Yes, I have.
25        Q    When did you see the image in the center

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

1                    Schaefer
2       A    Yes.
3       Q    Can you describe the image or the artwork
4  that appears on the image in Deposition Exhibit 15
5  underneath the text?
6       A    Beneath the text it appears to be some
7  geese or birds flying in formation over a hill or a
8  mountain.
9            MR. JACOBSON:  Please mark this as Exhibit
10      29.
11           (Booklet Calendar, is received and marked
12      Plaintiff's Exhibit 29 for Identification.)
13      Q    I'm going to show you what has been marked
14 as Exhibit 29.  Have you ever seen Exhibit 29 before
15 today?
16      A    I have not.
17      Q    Is Exhibit 29 larger than the image that
18 appears on the cover of Deposition Exhibit 15?
19      A    Yes.
20      Q    Turning to page 5 of Deposition Exhibit
21 15, do you see an image of a calendar on page 5 of
22 Exhibit 15?
23      A    I do.
24      Q    Does that image appear substantially
25 similar to Exhibit 29?

Page 24

```
 1                      Schaefer
 2      A     Yes.
 3      Q     Is Exhibit 29 substantially larger than
 4  the image that appears on page 5?
 5      A     Yes.
 6      Q     If you had seen Exhibit 29 prior to today
 7  during the course of your employment at Myron, what
 8  action if any would you have taken?
 9            MR. AIETA:  Objection.
10      Q     You can answer the question.
11      A     In this instance I would have contacted
12  our intellectual property attorneys about whether or
13  not this was an infringement on our trademark or
14  trade dress.
15      Q     Is it within the scope of your
16  responsibilities to flip through every catalogue
17  that's mailed to you?
18      A     No.
19      Q     Flipping through Deposition Exhibit 15,
20  can you indicate whether the book consists primarily
21  of calendars and dated products?
22      A     Yes, it does.
23      Q     If you had received Exhibit 15 -- which
24  you say you have not -- would you have noticed the
25  image on the cover that features the word "Teamwork"?
```

```
 1                         Schaefer
 2             MR. AIETA:  Objection.
 3     Q       You can answer.
 4     A       Yes, I would have noticed it.
 5     Q       You've testified that you've not received
 6  Exhibit 15, correct?
 7     A       Yes.
 8     Q       I'm going to show you what has been marked
 9  as Exhibit 20.  Have you seen Exhibit 20 prior to
10  today?
11     A       I have not.
12     Q       Are you aware of who makes Exhibit 20?
13     A       By looking at it, Amsterdam.
14     Q       Why is that?
15     A       The name is on the cover of the --
16     Q       It's printed on the bottom?
17     A       Right.
18     Q       If you had seen Exhibit 20 during the
19  course of your employment with Myron, what action if
20  any would you have taken?
21             MR. AIETA:  Objection.
22     Q       You may answer.
23     A       I would have brought this product to the
24  attention of our intellectual property attorneys for
25  trademark infringement.
```

```
 1                      Schaefer
 2    questions.
 3              MR. JACOBSON:  Redirect briefly.
 4    EXAMINATION BY MR. JACOBSON:
 5         Q    Mr. Schaefer, when you were employed by
 6    Myron did mail go directly to you when it was
 7    addressed to you at the office?
 8         A    No.  I had an administrative assistant,
 9    and her job was to separate the advertising mail from
10    mail that I needed to see.
11         Q    By what do you mean "advertising mail"?
12         A    Junk mail.
13         Q    Would you consider product catalogues junk
14    mail?
15         A    By and large.
16              MR. JACOBSON:  Thank you.
17              MR. AIETA:  I have another question.
18    EXAMINATION BY MR. AIETA:
19         Q    Mr. Schaefer, with respect to this Exhibit
20    15, if you had seen this would you have notified your
21    attorneys?
22         A    I would have.
23         Q    Just by seeing the cover, the outside
24    cover?
25         A    I would have.
```