**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| MYRON CORP., | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : Civil Action No. |
|  | : 07-CV-6877 (PAC) |
| HOLLAND USA, INC. D/B/A | : |
| AMSTERDAM PRINTING | : |
|  | : |
| Defendant. | : |

---

**PLAINTIFF'S POST-HEARING MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

Frank J. Colucci (FC-8441)
Richard P. Jacobson (RJ-2843)
Colucci & Umans
218 East 50th Street
New York, New York 10022
Telephone: (212) 935-5700
Facsimile: (212) 935-5728
Email: email@colucci-umans.com

*Attorneys for Plaintiff, Myron Corp.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ............................................................................... iii

I.    INTRODUCTION.................................................................................1

II.   THE MYRON TRADE DRESS, AS THE COVER OF A CALENDAR,
      IS PACKAGING, AND, THEREFORE, PROTECTED BECAUSE IT IS
      INHERENTLY DISTINCTIVE ...........................................................1

      A.    The Myron Trade Dress is Both Aesthically Pleasing and
            Source-Identifying.....................................................................2

      B.    The Unique Composition of Arbitrary Elements Renders the
            Myron Trade Dress Inherently Distinctive...............................7

      C.    Even if the Myron Trade Dress Falls Within the Product
            Configuration Classification, the Myron Trade Dress
            Has Acquired Secondary Meaning.............................................9

            1. Length and Exclusivity of Use .............................................10

            2. Advertising Expenditures......................................................11

            3. Sales Success of the Myron Trade Dress...............................13

            4. Defendant Intentionally and Willfully Copied
               the Myron Trade Dress ........................................................14

            5. Circumstantial Evidence Establishes That Customers
               Link the Myron Trade Dress to Myron, and No
               Survey is Required in Light of Other Evidence
               Supporting Secondary Meaning............................................15

            6. Unsolicited Media Coverage of the Myron Trade Dress
               is Not Expected for a Niche Market .....................................15

            7. Summary of the Secondary Meaning Factors.......................16

III.  REGARDLESS OF WHETHER THE MYRON TRADE DRESS IS
      INHERENTLY DISTINCTIVE OR HAS ACQUIRED SECONDARY
      MEANING, DEFENDANT'S BRAZEN COPYING CREATES A
      STRONG LIKELIHOOD OF CONFUSION....................................16

.

IV.     THE LIKELIHOOD OF CONFUSION CAUSED BY DEFENDANT'S
        INFRINGING TRADE DRESS CREATES A PRESUMPTION OF
        IRREPARABLE HARM THAT IS NOT REBUTTED BY THE
        TIMING OF MYRON'S MOTION ...................................................................18

V.      CONCLUSION ...................................................................................................24

.

## TABLE OF AUTHORITIES

### CASES

*Abercrombie & Fitch Co. v. Hunting World, Inc.,*
537 F.2d 4 (2d Cir. 1976) ............................................................................................8

*Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.,*
909 F. Supp. 896 (S.D.N.Y. 1995) ..............................................................................19

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,*
973 F.2d 1033 (2d Cir. 1992) .......................................................................................9

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.,*
348 F. Supp. 2d 217 (S.D.N.Y. 2004) ...........................................................................5

*Centaur Communications, Ltd. v. A/S/M Communications, Inc.,*
830 F.2d 1217 (2d Cir. 1987) ...................................................................10, 11, 12, 17

*Citibank, N.A. v. Citytrust,*
756 F.2d 273 (2d Cir. 1985) .......................................................................................19

*Comic Strip, Inc. v. Fox Television Stations, Inc.,*
710 F. Supp. 976 (S.D.N.Y. 1989) ..............................................................................20

*Essie Cosmetics, Ltd. v. Dae Do International, Ltd.,*
808 F. Supp. 952 (E.D.N.Y. 1992) ........................................................................10, 12

*First Brands Corp. v. Fred Meyer, Inc.,*
809 F.2d 1378 (9th Cir. 1987) ....................................................................................12

*First Jewellery Co. of Canada Inc. v. Internet Shopping Network LLC,*
53 U.S.P.Q.2d 1838 (S.D.N.Y. 2000) ..........................................................................18

*Fisher-Price, Inc. v. Well-Made Toy Manufacturing Corp.,*
25 F.3d 119 (2d Cir. 1994) .........................................................................................18

*Fruit-Ices Corp. v. Coolbrands International Inc.,*
335 F. Supp. 2d 412 (S.D.N.Y. 2004) ........................................................................4, 8

*Fun-Damental Too, Ltd. v. Gemmy Industries Corp.,*
111 F.3d 993 (2d Cir. 1997) .........................................................................................8

*Harlequin Enterprises Ltd.. v. Gulf & Western Corp.,*
644 F.2d 946 (2d Cir. 1981) ..................................................................................14, 19

*Harold F. Ritchie, Inc. v. Chesebrough-Ponds, Inc.*,
281 F.2d 755, 758 (2d Cir.1960)...................................................................17

*Hasbro, Inc. v. Lanard Toys, Ltd.*,
858 F.2d 70, 79 (2d Cir.1988)......................................................................18

*King v. Innovation Books*,
976 F.2d 824, 831 (2d Cir.1992)...................................................................18

*Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*,
71 F.3d 996 (2d Cir. 1995).........................................................................2, 4

*Krueger International, Inc. v. Nightingale Inc.*,
915 F. Supp. 595 (S.D.N.Y. 1996) ..................................................................5

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
113 F.3d 373 (2d Cir. 1997).....................................................................2, 3, 5

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
117 F. Supp. 2d 360 (S.D.N.Y. 2000)..............................................9, 11, 13, 15

*Majorica, S.A. v. R.H. Macy & Co., Inc.*,
762 F.2d 7 (2d Cir. 1985).........................................................................19

*Malaco Leaf, AB v. Promotion in Motion, Inc.*,
287 F. Supp. 2d 355 (S.D.N.Y. 2003)............................................................5, 6

*Masterfoods USA v. Arcor USA, Inc.*,
230 F. Supp. 2d 302 (W.D.N.Y. 2002) .............................................................5

*Metlife, Inc. v. Metropolitan National Bank*,
388 F. Supp. 2d 223 (S.D.N.Y. 2005)............................................................22

*Metrokane, Inc. v. The Wine Enthusiast*,
160 F. Supp. 2d 633 (S.D.N.Y. 2001).........................................................11, 13

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
818 F.2d 254 (2d Cir.1987)........................................................................17

*National Football League v. Coors Brewing Co.*,
205 F.3d 1324 (2d Cir. 1999).....................................................................20

*Nova Wines, Inc. v. Adler Fels Winery LLC*,
467 F. Supp. 2d 965 (N.D..Cal. 2006) ..........................................................5, 7

*Paddington Corp. v. Attiki Importers & Distributors, Inc.*,
996 F.2d 577 (2d Cir. 1993)..........................................................................2, 4, 5

*PAF S.r.l. v. Lisa Lighting Co., Ltd.*,
712 F. Supp. 394 (S.D.N.Y. 1989) ...............................................9, 10, 11, 13, 15

*Pfizer Inc. v. Perrigo Co.*,
988 F. Supp. 686 (S.D.N.Y. 1997) ...........................................................13, 14

*Polaroid Corp. v. Polarad Electronics Corp.*,
287 F.2d 492 (2d Cir. 1961)..................................................................17

*Readers Digest v. Conservative Digest, Inc.*,
821 F.2d 800 (D.C.Cir.1987) ................................................................17

*Rose Art Industries, Inc. v. Swanson*,
235 F.3d 165 (3d Cir. 2000).....................................................................4

*Thompson Medical Co., Inc. v. Pfizer Inc.*,
753 F.2d 208 (2d Cir. 1985).....................................................................9

*Time Inc. Magazine Co. v. Glove Communications Corp.*,
712 F. Supp. 1103, 1108 (S.D.N.Y. 1989)..................................................14

*Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*,
60 F.3d 27 (2d Cir.1995)......................................................................18

*Tough Traveler, Ltd. v. Outbound Products*,
60 F.3d 964 (2d Cir. 1995).................................................................19, 20

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
505 U.S. 763 (1992)...........................................................................2

*Wal-mart Stores, Inc. v. Samara Bros., Inc.*,
529 U.S. 205 (2000).....................................................................1, 2, 4, 5

*Warner Brothers Inc. v. American Broadcasting Cos.*,
720 F.2d 231 (2d Cir. 1983).................................................................17

*Weight Watchers International, Inc. v. Luigino's, Inc.*,
423 F.3d 137 (2d Cir. 2005).................................................................18

*Yamaha International Corp. v. Hoshino Gakki Co.*,
840 F.2d 1572 (Fed. Cir. 1988)..............................................................15

## SUPPLEMENTAL AUTHORITIES

Louis Altman & Malla Pollack, 3 *Callmann on Unfair Competition, Trademarks and Monopolies* § 20:29 (4th ed. 2007) ..................................................................................13

Sandra Edelman, *Delay in Filing Preliminary Injunction Motions: Update 2002*, 92 Trademark Rep. 647 (May-June 2002) ...........................................................................19

J. Thomas McCarthy, 1 *McCarthy on Trademarks and Unfair Competition* § 8:12.50 (4th ed. 2004) ...................................................................1

I.      **INTRODUCTION**

Following the preliminary injunction hearing on September 27, 2007, the

Court requested further submissions from the parties on particular issues.  Specifically,

the Court asked plaintiff, Myron Corp. ("Myron"), to address how the Myron Trade

Dress is protectable.  The Court asked defendant to respond to its concern regarding

defendant's "brazen and open" copying of the Myron Trade Dress.  Finally, both parties'

submissions are to consider the timing of Myron's application for a preliminary

injunction.

II.     **THE MYRON TRADE DRESS, AS THE COVER OF A CALENDAR, IS
        PACKAGING, AND, THEREFORE, PROTECTED BECAUSE IT IS
        INHERENTLY DISTINCTIVE**

The Supreme Court decision in *Wal-Mart* adopted a bright-line test

regarding the protectability of trade dress.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,

529 U.S. 205 (2000).  Packaging, as opposed to the product's configuration or design,

may be inherently distinctive and, consequently, protectable without the need to prove

secondary meaning.  *Id.* at 212-13.  Product configuration, on the other hand, will only be

protectable trade dress with proof of secondary meaning and can never be inherently

distinctive.  *Id.* at 216.

Where it is reasonable to assume consumer predisposition to take

packaging as an indication of source, then the packaging will be deemed inherently

distinctive.  *See Wal-Mart*, 529 U.S. at 212-13; J. Thomas McCarthy, 1 *McCarthy on*

*Trademarks and Unfair Competition* § 8:12.50 (4th ed. 2004).  The Supreme Court's

rationale was that "[t]he attribution of inherent distinctiveness to certain . . . product

packaging derives from the fact that the very purpose of . . . encasing it in a distinctive

packaging is most often to identify the source of the product." *Wal-Mart*, 529 U.S. at

212. As the Court stated in *Two Pesos*, what is critical for evaluating a claim under

Section 43(a) of the Lanham Act is not whether a trade dress has in fact come to identify

a specific producer but whether it is "capable of identifying a particular source of the

product." *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 771 (1992); *see also*

*Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 582-83 (2d Cir. 1993).

Because the choices that a producer has for packaging its products are nearly unlimited,

typically the packaging of trade dress will be arbitrary or fanciful and thus inherently

distinctive. *Paddington*, 996 F.2d at 583. In addition, although the identity of that single

source need not be known, in Myron's case the source is evident because of the

prominence of the Trade Dress when Myron distributes samples, as well as in Myron's

catalog.

### A.   The Myron Trade Dress is Both Aesthically Pleasing and Source-Identifying

Defendant emphasizes the appealing nature of the Myron Trade Dress in

the hopes of diverting the Court's attention from the dual function of trade dress: (1)

aesthetically enhancing a product, and (2) acting as a source identifier. From a business

perspective, products are formulated and created to attract customers. Defendant relies

heavily on the *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996 (2d Cir. 1995), yet the

Second Circuit subsequently criticized *Knitwaves* by acknowledging that "trade dress is

usually meant to please" and that "[i]f *Knitwaves* forced courts to decide whether a

manufacturer's purpose was to create either something of beauty or something indicative

of source, we agree the task would often prove impossible." *Landscape Forms, Inc. v.*

*Columbia Cascade Co.*, 113 F.3d 373, 378 n.3 (2d Cir. 1997).  Therefore, defendant's

assertion that *Knitwaves* precludes any finding that the Myron Trade Dress is protectable

must fail.

Defendant contends that the beneficial message and attractiveness of the

Myron Trade Dress, along with the invocation of a "commitment to teamwork" in

collateral marketing materials, render the Trade Dress devoid of any source-identifying

function.  Defendant's extreme position would require the owner of a trade dress to strip

away the attractive attributes of a trade dress to foreclose any possibility that consumers

buy the product on which the trade dress appears for any reason other than the trade

dress itself and not because it is also aesthetically pleasing or serves some ancillary

purpose.

Similarly, defendant presupposes that Myron's advertising — which in

nearly all cases includes the distribution to a consumer of the actual product bearing the

Myron Trade Dress — should have pointed out the Trade Dress.  Yet, defendant ignores

the unique method that the parties use to attract new customers, which is by distributing

free samples.  (Pl. Ex. 7).  What better "look for" advertising of the Myron Trade Dress

exists than to actually send the Myron Trade Dress to the consumer?

Defendant's attempt to utilize Myron's confidential focus group study

(Def. Ex. AJ) to draw a negative inference of the Myron Trade Dress' lack of source-

identifying function flouts the tenets of trade dress law and common sense.  Myron's

focus group was conducted for the purpose of creating a business and marketing strategy

for future development.  This focus group report does not constitute a professional

survey assessing customers' perceived association between the Myron Trade Dress and

Myron. Myron's continued use of the Trade Dress in consistent fashion, as well as its brief and unsuccessful tests of alternative designs, reinforces the notion that consumers perceive and have come to expect the Myron Trade Dress to be displayed in a consistent fashion. Even if Myron used alternative packaging, it nonetheless may seek trade dress protection for the packaging at issue. *See Rose Art Indus., Inc. v. Swanson,* 235 F.3d 165, 174 (3d Cir. 2000) ("[T]he fact that [a company] packages the same product in several different types of packaging does not prevent [the company] from seeking trade dress protection for one of these packaging designs.")

Defendant erroneously asserts that Myron relies upon *Paddington* and ignores *Knitwaves* to avoid an "unwelcome result." (Def.'s Reply Mem. at 5). Defendant's reasoning is flawed because both decisions are easily reconciled. *Paddington* provides that the traditional *Abercrombie* hierarchy of categories should be used to analyze the distinctiveness of packaging trade dress. *Paddington*, 996 F.2d at 583. The Second Circuit's decision in *Knitwaves*, somewhat presciently anticipating the Supreme Court's decision in *Wal-Mart v. Samara Bros.*, simply states that the analysis of *Paddington* was not appropriate where the trade dress consisted of the product's configuration rather than the product's packaging. *Knitwaves*, 71 F.3d at 1007. The reason is because the "competitive interest in copying product designs is more substantial than in the case of packaging, containers, labels, and related subject matter." *Id.* at 1008. *Paddington* remains good law and is instructive regarding the proceedings before the Court. Thus, in the case of product packaging, the *Abercrombie* factors continue to be the first step in an analysis of distinctiveness. *See Fruit-Ices Corp. v. Coolbrands Int'l Inc.*, 335 F. Supp. 2d 412, 419 (S.D.N.Y. 2004). On the other hand, the reasoning of

*Knitwaves* has been called into doubt. *See Krueger Int'l, Inc. v. Nightingale Inc.*, 915 F. Supp. 595, 606 (S.D.N.Y. 1996) ("*Knitwaves* seems to instruct that a design can serve only one primary purpose: either aesthetic or source-identifying, but not both. . . . In the instant case, it would force me to determine whether the plaintiff chose its chair design because it was attractive or because it was meant to serve as a trademark (i.e., a source identifier). The likely answer is, both.") (internal citations omitted), *overruled on other grounds by Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 378 n.3 (2d Cir. 1997).

The quintessential example of product configuration, Justice Scalia's penguin-shaped cocktail shaker, illustrates that Myron's calendar cover falls squarely on the packaging side of the dividing line because, unlike the cocktail shaker, which is the thing itself, the Myron Trade Dress is only the cover of the calendar. *See Wal-Mart*, 529 U.S. at 213; *compare Nova Wines, Inc. v. Adler Fels Winery LLC*, 467 F. Supp. 2d 965, 977-78 (N.D. Cal. 2006) (images of Marilyn Monroe placed on wine labels are inherently distinctive packaging); *Paddington*, 996 F.2d at 584 (shape of ouzo bottle with label deemed inherently distinctive packaging), *and Masterfoods USA v. Arcor USA, Inc.*, 230 F. Supp. 2d 302, 309-10 (W.D.N.Y. 2002) (M&M's candy wrappers comprised "packaging" trade dress); *with Wal-Mart*, 529 U.S. at 207 ("line of spring/summer one-piece seersucker [children's] outfits decorated with appliqués of hearts, flowers, fruits, and the like" is product design), *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 241 (S.D.N.Y. 2004) (four lines of designer watches held to be product design), *and Malaco Leaf, AB v. Promotion in Motion, Inc.*,

287 F. Supp. 2d 355, 365 (S.D.N.Y. 2003) (shape of Swedish fish candy a product design that was "unprotectable due to its generic shape and extensive third-party use").

The objective of fostering vigorous competition is not undone by classifying the Myron Trade Dress as packaging rather than product configuration because of the limitless possibilities available to defendant and all other competitors to create their own trade dress for calendar covers. Granting protection to the Myron Trade Dress would not create a monopoly for Myron in mountain-climbing themed pocket calendars. On the contrary, protecting Myron's longtime and continuous use of its inherently distinctive Trade Dress provides assurances to businesses that years of investment in the look and feel of a particular line of product packaging will not be tossed aside. Moreover, the decision will benefit consumers by avoiding confusion in the marketplace and ensuring vigorous and fair competition through the offering of different varieties of calendars. Otherwise, the outcome would merely reward defendant for riding on the coattails of Myron's goodwill in its Trade Dress.

There is no risk here that trade dress protection for Myron's Teamwork Peak calendar cover design would hamper efforts to market competitive goods. Indeed, defendant's president, Kevin Kirbey, testified that he had dozens of existing calendar styles from which he could have chosen to "compete with Myron" by modifying the product to include a pen sleeve. Yet, defendant did not select any of these existing styles. Instead, it willfully and intentionally co-opted the Myron Trade Dress because it recognized the inherent distinctiveness of the combination of protectable elements that had been in the marketplace since 1998. Rather than endeavoring to compete with Myron by making a better product, as defendant purports to have done, defendant,

6

instead, copied nearly every element of the Myron Trade Dress. The implication, of course, is that since Myron had been successful with its Trade Dress, defendant climbed aboard for a free ride.

Myron does not assert it has exclusive rights to use TEAMWORK as a word in conjunction with the marketing and sale of motivational calendars, and it does not seek to prevent defendant from the use of motivational themes and imagery in general. Indeed, Myron articulated its Trade Dress quite narrowly to avoid any implication that it sought an over-expansive level of protection. (Compl., ¶ 21). What is at issue is not simply the use of TEAMWORK or two silhouetted mountain climbers or even Myron's registered trademark. Rather, it is defendant's use of the combination and distinct arrangement of these elements on calendars through which Myron has created a recognizable trade dress for dated products. *See Nova Wines*, 467 F. Supp. 2d at 977 (consistent and repeated use of Marilyn Monroe image on a wine label in a specific manner constitutes the trade dress).

Therefore, to pigeon-hole the Myron Trade Dress as a product configuration is an erroneous characterization because it misstates the fundamental principles of the item itself. Defendant's president Kirbey testified that the paper insert to the pocket calendar is easily removable from the cover bearing the imprinted trade dress. Consequently, the Myron Trade Dress consists of packaging and may be protected upon a showing of inherent distinctiveness.

### B.     The Unique Composition of Arbitrary Elements Renders the Myron Trade Dress Inherently Distinctive

The distinctiveness of a trade dress is classified pursuant to four recognized categories, labeled in ascending order, that reflect the eligibility of the trade

dress for protection (also known as the *Abercrombie & Fitch* categories): (1) generic, (2)

descriptive; (3) suggestive, and (4) arbitrary or fanciful. *Fruit-Ices Corp. v. Coolbrands

Int'l Inc.*, 335 F. Supp. 2d 412, 419 (S.D.N.Y. 2004) ("[T]he Second Circuit has noted

that the *Abercrombie & Fitch* categories should also inform trade dress classifications.")

(citation omitted); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d

Cir. 1976). The distinctiveness of a trade dress is evaluated "by looking at all its

elements and considering the total impression given to the observer." *Fruit-Ices*, 335 F.

Supp. at 419 (quoting *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993,

1001 (2d Cir. 1997)). This Circuit has also remarked that a trade dress will typically be

arbitrary or fanciful, and thus inherently distinctive, by virtue of the endless varieties of

packaging available to producers of goods. *Id.* (citing *Paddington Corp. v. Attiki Imps.

& Distribs., Inc.*, 996 F.2d 577, 583 (2d Cir. 1993)).

   The focus of a trade dress analysis is the overall impression projected by

the combination of elements, not the individual elements viewed in isolation. *Id.* ("[I]f

the overall dress is arbitrary, fanciful, or suggestive, it is inherently distinctive despite its

incorporation of generic or descriptive elements.)" (citation omitted). Under this

guidance set forth by the Second Circuit, the Myron Trade Dress is inherently distinctive

because it incorporates a unique and arbitrary combination of visual elements and

wording that, together, serve to create a distinct overall impression. (Pl. Exs. 5, 16).

   Since the Myron Trade Dress is inherently distinctive, the secondary

meaning analysis is unnecessary; however, because defendant contends that the Myron

Trade Dress falls into the second category of trade dress commonly referred to as

"product configuration" (notwithstanding defendant's use of the ambiguous term

"product design"), Myron will demonstrate that its Trade Dress also has acquired distinctiveness, or secondary meaning, as an alternative means for according protection to the Trade Dress.

### C. Even if the Myron Trade Dress Falls Within the Product Configuration Classification, the Myron Trade Dress Has Acquired Secondary Meaning

The Second Circuit has consistently applied six elements to assess whether a product has acquired distinctiveness through secondary meaning. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 117 F. Supp. 2d 360, 365 (S.D.N.Y. 2000) (citing *Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985)). These elements are: (1) the length and exclusivity of use of the product; (2) advertising expenditures; (3) the sales success of the product; (4) attempts to plagiarize the product; (5) evidence that consumers link the trade dress to a particular source; and (6) unsolicited media coverage of the product. *Id.* at 366. None of the elements is dispositive, and not all of them must be proved to show that secondary meaning exists. *Id.* Whether a trade dress has acquired secondary meaning is a question of *fact*, which cannot be reversed on appeal unless that finding was "clearly erroneous." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir. 1992).

For purposes of applying the secondary meaning test to the Myron Trade Dress, the relevant customers are the small to medium-sized businesses that both parties target with their marketing, rather than the ultimate recipient of the calendar. *PAF S.r.l. v. Lisa Lighting Co., Ltd.*, 712 F. Supp. 394, 402 (S.D.N.Y. 1989) ("[I]t is the consuming public which, in effect, determines whether [the effort to create a secondary meaning] has succeeded. . . . [I]t is not always the general public's understanding but — depending

upon the product — often only a segment of consumers that need be examined.")
(citation omitted); *Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*, 808 F. Supp. 952, 960
(E.D.N.Y. 1992) (holding that nail polish manufacturer's "relevant consumers" for
purposes of secondary meaning were the salons that purchased and placed their own
name on plaintiff's distinctive bottles of polish, rather than the end-users who viewed the
private-label bottles in the salons).  As long as a significant portion of the relevant
customer base understands that the product emanates from one particular source, the
name of the source need not even be known to merit trade dress protection. *PAF S.r.l.*,
712 F. Supp. at 402.

      1.      **Length and Exclusivity of Use**

      There is no absolute yardstick by which secondary meaning can be
measured.  *See Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1225
(2d Cir. 1987) (finding secondary meaning for plaintiff who used its mark continuously
and exclusively for eight years).  Rather, this element is reviewed in light of the product
and its consumers.  *Id.*

      Myron has presented ample, and undisputed, evidence of its continuous
and exclusive use of the Myron Trade Dress in its present format since 1998.  The fact
that no other competitor, until now, has so boldly and blatantly copied the Myron Trade
Dress down to the very last detail provides strong circumstantial proof of its
distinctiveness.  Indeed, defendant offered no evidence of any other company that has
used all the elements of the Myron Trade Dress for any goods, let alone dated products.
Currently, the Myron Trade Dress is embodied on the covers of approximately thirty

SKUs and it is the focus of several pages, including the cover, of Myron's printed catalog. (Pl. Exs. 1, 6).

2.    **Advertising Expenditures**

Advertising expenditures include a wide variety of means of publicizing and introducing a product to the relevant market, all of which are ultimately intended to attract the target customer to the source providing the promoted product. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 117 F. Supp. 2d 360, 366 (S.D.N.Y. 2000); *see also Centaur Commc'ns*, 830 F.2d at 1222 (holding that trips taken to the United States by the plaintiff-magazine publisher, even if undertaken for the purpose of selling advertising space, nevertheless constituted advertising expenditures because the sales presentations "served to put [plaintiff's magazine] before the relevant group of consumers"). Examples of advertising include trade show exhibitions, product catalogs, and even promotional giveaway bags featuring a picture of the product, printed together with the name of the source. *PAF S.r.l. v. Lisa Lighting Co., Ltd.*, 712 F.Supp. 394, 404 (S.D.N.Y. 1989).

The amount of money spent on advertising, as well as the means, is relevant to the finding of secondary meaning. *Landscape Forms*, 117 F. Supp. 2d at 366 n.6 (secondary meaning established through hundreds of thousands of dollars spent on advertising and promoting the plaintiff's product"); *PAF S.r.l.*, 712 F. Supp. at 404 (secondary meaning based on over $2 million in advertising); *see also Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 640 (S.D.N.Y. 2001) (advertising expenditures over $323,000 deemed "substantial" for purpose of establishing secondary meaning). Most importantly, the overall advertising expenditures are evaluated for their

*effectiveness* in causing the consumers to associate the source with the product being marketed. *Centaur Commc'ns*, 830 F.2d at 1222–23 (citing *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987)) (emphasis added).

Between 2002 and 2006, Myron engaged in the most effective form of advertising utilized in the promotional products industry – it literally distributed millions of free samples of its products bearing the Myron Trade Dress to a selective group of its existing and prospective customers. Each of these mailings consisted not just of a promotional offer inside a flat envelope. On the contrary, each envelope, which bore the Myron name in the upper left corner and on the letter itself, included an actual sample of the Teamwork Peak calendar featuring the Trade Dress that Myron has used consistently since at least 1998. (Pl. Ex. 7). Thus, the customer who handles the calendar knows immediately upon receipt that the item originates with Myron and thereby links the design of the calendar cover to Myron as its source.

Defendant's attempt to distance the connection between Myron and the Myron Trade Dress falls flat. The reference to the "commitment to teamwork" in the advertising copy that accompanies the sample calendars is merely a descriptive use of an important business concept—one that comprises an element of the Myron Trade Dress— but by no means undercuts the significance of the trade dress.[1] The individual who receives the product sample knows immediately that the envelope is not the typical advertising solicitation because the recipient perceives something thick inside the envelope before it is opened. The calendar arrives in the mail with no obligation to purchase or return it. Long after the envelope and offer letter are discarded, the recipient

---

[1]     *See Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*, 808 F. Supp. 952, 955 (E.D.N.Y. 1992) (preliminary injunction granted to protect the trade dress of private label nail polish bottles marketed to salons with the slogan "For the salon whose own name is enough").

may keep the calendar and use it for the upcoming year.  If the individual ever fails to recall the name of the source of this item, Myron's name is printed on the first page of the insert inside the cover.  (Pl. Ex. 16).  During both the moment of receiving the calendar and the year-long use of the sample, the customer or prospective customer clearly associates the Trade Dress with a particular source due to Myron's effective advertising effort.

### 3.     Sales Success of the Myron Trade Dress

Secondary meaning may be inferred from voluminous sales, relative to the amount of time the product has been available.  A high volume of sales exposes more consumers more frequently to the trade dress and thus increases the opportunity for the public to make a mental connection between the trade dress and a single source of the item that features the trade dress.  Louis Altman & Malla Pollack, 3 *Callmann on Unfair Competition, Trademarks and Monopolies* § 20:29 (4th ed. 2007).  Sales that range from hundreds of thousands to millions of units sold, as well as sales figures that exceed millions of dollars, are strong indicators of source recognition.  *Pfizer Inc. v. Perrigo Co.*, 988 F. Supp. 686, 697 (S.D.N.Y. 1997) ("[s]ales have been highly successful, as millions of bottles have been sold" in five years); *PAF S.r.l.*, 712 F. Supp. at 403 (over 200,000 lamps sold in less than four years); *Metrokane*, 160 F. Supp. 2d at 640 (indicating the "indisputable sales success" of 115,867 units sold and sales of over $3 million); *Landscape Forms*, 117 F. Supp. 2d. at 366 ("[T]he Petoskey Collection was a substantial sales success, accumulating gross sales of approximately five million dollars [in 5 years].").

Myron's sales success resulting from the Myron Trade Dress, with over 38 million units sold and revenues exceeding $77 million dollars since 1998, is undeniably an overwhelming indicator of source identification. (Caillat Decl. ¶ 15)

**4.    Defendant Intentionally and Willfully Copied the Myron Trade Dress**

Perhaps the most potent indicator of secondary meaning is defendant's own replica of the Myron Trade Dress. (Compare Pl. Exs. 16 and 17); *see Pfizer Inc. v. Perrigo Co.*, 988 F. Supp. 686, 697 (S.D.N.Y. 1997) ("This effort to mimic Advanced Formula PLAX ® is strong evidence of secondary meaning, for if the trade dress had not acquired secondary meaning, there would have been little reason for Perrigo to plagiarize it."); *Harlequin Enters. Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 (2d Cir. 1981) ("Perhaps the most significant evidence of secondary meaning in this case, however, was the attempt by [defendant] to capitalize on the Harlequin Presents cover when it introduced its own romance series."); *Time Inc. Magazine Co. v. Glove Commc'ns Corp.*, 712 F. Supp. 1103, 1108 (S.D.N.Y. 1989) ("Finally, in light of the prior *Celebrity* covers, which used an entirely different type, creating a very different cover format, one must ask why *Celebrity* changed its cover format to one that is virtually the same as that of *People*'s. . . . Such imitation warrants a finding of intentional copying of trade dress.").

The evidence before this Court, including defendant's own testimony, establishes that defendant's designer, marketing executive, and manufacturer obtained a sample of the Myron Trade Dress, which they each relied on and referred to during the development and production of the Infringing Trade Dress. This evidently was done with the full intention of gaining an unfair advantage by riding the coattails of defendant's highly successful competitor. (Pl. Ex. 18).

14

5. **Circumstantial Evidence Establishes that Customers Link the Myron Trade Dress to Myron, and No Survey is Required in Light of Other Evidence Supporting the Existence of Secondary Meaning**

Although consumer surveys are one method of proving secondary meaning, survey evidence is not required, and injunctive relief will not be denied where there is other evidence of secondary meaning. *PAF S.r.l.*, 712 F.Supp. at 406.; *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1583 (Fed. Cir. 1988) (consumer survey not necessary to prove "acquired distinctiveness"). Linkage arises from the unique marketing model through which advertising is accompanied by the actual product. There is no stronger means of priming the customer to make a connection between a product and its source than to place a physical specimen into the palm of the customer's hand. Any attempt to undermine that connection by defendant's parsing of advertising copy from the correspondence sent with the calendar to consumers cannot succeed.

Furthermore, reference in the advertising touting the benefits of the product does not diminish the link that the recipient of the sample makes to Myron as the source.

6. **Unsolicited Media Coverage of the Myron Trade Dress is Not Expected for a Niche Market**

Myron is a market leader for personalized, dated products, and recognized as such both by the industry as well as its customers. Given that this industry of personalized, dated products is a small sector, the fact that the Myron Trade Dress has not been the subject of unsolicited media coverage is inconsequential. *See Landscape Forms, Inc. v. Columbia Cascade Co.*, 117 F. Supp. 2d 360, 366 (S.D.N.Y. 2000) (holding that the "insularity" of the landscape furniture industry likely explained the insubstantial

amount of unsolicited media coverage).  Common sense dictates, however, that much of

Myron's success and recognition is derived from the quality and success of its line of

products bearing the Myron Trade Dress.

> ### 7.    Summary of Secondary Meaning Factors

While sales and advertising expenditures, by themselves, may be

sufficient to establish secondary meaning, Myron also has provided evidence of

significant sales and advertising figures, and demonstrated that its primary form of

advertising literally places the Trade Dress in its customers' hands.  These factors, in

addition to defendant's brazen copying of the Trade Dress that Myron has used

exclusively since at least 1998, demonstrate that the proof of secondary meaning is

overwhelming.

### III.    REGARDLESS OF WHETHER THE MYRON TRADE DRESS IS INHERENTLY DISTINCTIVE OR HAS ACQUIRED SECONDARY MEANING, DEFENDANT'S BRAZEN COPYING CREATES A STRONG LIKELIHOOD OF CONFUSION

Application of the *Polaroid* factors for evaluating the likelihood of

confusion indicates that: (1) the Myron Trade Dress is extremely strong by virtue of its

arbitrary compilation of elements, as well as its sales success and longevity; (2) the

Infringing Trade Dress and the Myron Trade Dress are virtually identical in overall

appearance; (3) both parties use their respective trade dresses on identical goods; (4)

actual confusion has not occurred, which is a neutral factor; (5) there is no need for

Myron to bridge the gap; (6) defendant's admitted use of the Myron Trade Dress in

designing the Infringing Trade Dress indicates bad faith; (7) Myron is unable to control

the quality of defendant's products, which plaintiff testified are inferior; (8) and the

relatively inexpensive nature of the parties' products suggest a low level of sophistication or care in the purchasing decision. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961); (Pl. Mem. at 21). Myron should be deemed likely to prevail on its claim for trade dress infringement, and thereby entitled to preliminary injunctive relief against defendant.

        One of the most persuasive indicators of a likelihood of confusion in this Circuit is the junior user's bad faith and intent to copy a rival's successful product. *Centaur Commc'ns*, 830 F.2d at 1228 ("We have recognized that evidence of intentional copying raises a presumption that a second comer intended to create a confusing similarity of appearance and succeeded. . . .") (quoting *Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 246-47 (2d Cir. 1983)). Moreover, some courts have recognized an affirmative duty for the second comer "'to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer.'" *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987) (quoting *Harold F. Ritchie, Inc. v. Chesebrough-Ponds, Inc.*, 281 F.2d 755, 758 (2d Cir. 1960); *see also Readers Digest v. Conservative Digest, Inc.*, 821 F.2d 800, 804 (D.C. Cir. 1987) (striking similarity between trade dress of plaintiff's product and defendant's product is itself probative of intentional copying).

        As previously discussed, defendant's bad faith and intent to copy the Myron Trade Dress is apparent and confirmed by defendant's testimony. This intentional copying runs counter to this Circuit's longstanding principles of fair competition, and plaintiff is entitled to a presumption of likelihood of confusion in support of its motion for a preliminary injunction.

IV.    **THE LIKELIHOOD OF CONFUSION CAUSED BY DEFENDANT'S INFRINGING TRADE DRESS CREATES A PRESUMPTION OF IRREPARABLE HARM THAT IS NOT REBUTTED BY THE TIMING OF MYRON'S MOTION**

A plaintiff who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury. *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005). Defendant, however, contends that Myron unreasonably delayed in seeking relief and argues that the presumption is inapplicable.

A short delay does not rebut the presumption of irreparable harm where there is a good reason for it, such as when a plaintiff is not certain of the infringing activity or has taken additional time to investigate or examine the infringing product. *See, e.g., Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 39-40 (2d Cir.1995) (delay of four months from the time plaintiff first heard of defendant's possibly infringing activity and three weeks after learning definitively of an objectionable act not unreasonable); *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 125 (2d Cir. 1994) (six-month delay before suing for injunction was reasonable while trying to obtain sample of infringing doll and determining extent of infringement); *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir.1992) (author's eight-month delay in filing claim did not rebut presumption of irreparable harm because he spent that time trying to obtain a copy of the infringing screenplay and movie); *see also Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 79 (2d Cir.1988) (delay not unreasonable where plaintiff brought an action seven months after infringing product was released to the market); *cf. First Jewellery Co. of Canada Inc. v. Internet Shopping Network LLC*, 53 U.S.P.Q.2d 1838, 1845 (S.D.N.Y. 2000) (waiting less than nine weeks to obtain order to show cause after sending cease and

desist letter not unreasonable delay); *see generally* Sandra Edelman, *Delay in Filing Preliminary Injunction Motions: Update 2002*, 92 Trademark Rep. 647, 650 (May-June 2002) (within the Second Circuit, a delay of less than three months is usually acceptable). Moreover, laches is not a defense against injunctive relief where the defendant intended the infringement. *Harlequin Enters. Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 (2d Cir. 1981).

Defendant relies on *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985), as holding that a ten-week delay undercut the plaintiff's assertion of irreparable harm, but the Court's denial of injunctive relief hung not just on the delay, but also the minimal likelihood of confusion since the defendant had increased its advertising in the plaintiff's territory two years beforehand, and the plaintiff sought permission to operate in the defendant's home state years earlier. *Id.* at 277. In contrast, Myron has established a strong likelihood of confusion as well as intentional and deliberate copying, which should override any concerns over the timing of the motion because when a defendant has acted intentionally, the court is likely to de-emphasize the timing issue. Edelman, *supra*, at 649. Likewise, defendant's reliance on *Majorica, S.A. v. R.H. Macy & Co., Inc.*, 762 F.2d 7, 8 (2d Cir. 1985), is misplaced because the plaintiff had been aware of the defendant's conduct for *several years* prior to moving for a preliminary injunction.

Furthermore, even an unexplained delay does not preclude the grant of a preliminary injunction. *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 969 (2d Cir. 1995) (Jacobs, J., concurring) ("Delay is just one of several factors to consider."); *Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F. Supp. 896, 910 (S.D.N.Y. 1995). Though *Citibank* held that the presumption of irreparable injury does

not automatically apply in the case of unexcused delay, the Court by no means has taken the position that a preliminary injunction cannot be issued.

Certainly, Myron's actions stand in stark contrast to the delay in *Tough Traveler*, where the plaintiff did not file suit until nine months after becoming aware of the infringement and waited another four months to move for a preliminary injunction. 60 F.3d at 968. *Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989), also is distinguishable because the plaintiff took no action for three months before commencing litigation, despite exchanging correspondence with the defendant during the preceding four-month period. Here, Myron did not lull defendant into a false sense of security after an initial exchange of correspondence.

Myron acknowledges that it first learned that defendant was offering the "Achieve Teamwork" calendar featuring the Infringing Trade Dress when Michael Probert, the product manager for dated products, saw the item on defendant's website on Saturday, June 23, 2007. As Mr. Caillat testified, senior management was alerted the following week and the matter was referred to counsel. Myron first conducted an investigation and carefully explored its options before commencing the litigation. The decision to bring claims against defendant was not undertaken lightly or hastily. In fact, prudence dictated that Myron first obtain an actual sample of the Achieve Teamwork calendar before filing suit. *See National Football League v. Coors Brewing Co.*, 205 F.3d 1324 (2d Cir. 1999) (unpublished) (filing suit based only on limited information "would have been reckless, indeed perhaps abusive."). Myron could not obtain a sample of defendant's "Achieve Teamwork" dated product until July 30, 2007, and it filed the complaint the very next day, thereby placing defendant on notice of Myron's claims.

(Jacobson Reply Decl., ¶ 13). Thus, the timing between Myron's knowledge of the infringement as seen online until it filed the complaint was thirty-one days.

Once defendant's counsel entered the case on August 23, 2007 with the filing of its answer, and confirmed that defendant refused to stop selling the Infringing Trade Dress, Myron advised defendant's counsel less than a week later of its intention to move for a preliminary injunction. (*Id.*, ¶ 14) Only twenty-nine days had elapsed since Myron had filed the complaint. Thereafter, Myron continued to gather information and documentation, which it had already begun doing, for the preparation of its papers, culminating in the formal request to the Court at the initial pretrial conference after having so advised the Court the preceding week in the parties' joint letter of its intention to move for a preliminary injunction. The time between the filing of the complaint on July 31, 2007 and when Myron formally asked the Court for a preliminary injunction on September 10, 2007, was only forty-one days. This is not an unreasonable delay under the law of the Second Circuit as the cases described above demonstrate.

In any event, defendant would not have altered its conduct. Defendant's president, Kevin Kirbey, acknowledged on the witness stand that he saw no reason to stop selling the Infringing Trade Dress as a result of the lawsuit. Likewise, he did not direct defendant to stop selling calendars with the covers in question after Myron advised it would be moving for a preliminary injunction. Consequently, defendant cannot credibly criticize Myron for not sending a cease and desist letter, when the far more detailed allegations in the complaint, initially, and, now, in the motion for preliminary injunction, apparently, had no impact on defendant's decision to continue selling the infringing products.

Contrary to defendant's reply memorandum, Myron has not waived any of its claims, but merely has framed the issues for the Court to address during the preliminary injunction the most egregious of the defendant's acts. *See MetLife, Inc. v. Metropolitan Nat'l Bank*, 388 F. Supp. 2d 223, 226 (S.D.N.Y. 2005) (recognizing plaintiff's motion for preliminary injunction seeks relief that is considerably narrower in scope than the allegations in its complaint). Myron's narrowly tailored request acknowledges the seriousness of a preliminary injunction and seeks to halt the most debilitating and devastating – in other words, irreparable – harm resulting from defendant's copying of the overall impression of the Myron Trade Dress.

Defendant's complaint that the preliminary injunction motion arises during its busy season rings hollow. First, defendant obviously had already placed its orders for the Infringing Trade Dress and would have taken possession of the merchandise regardless of whether Myron had brought the motion in August or September. Second, since defendant instructed its factory and approved the design of the Infringing Trade Dress, defendant cannot state it would have returned the goods to its vendor or factory. Third, and most importantly, defendant intentionally copied the Myron Trade Dress, and this egregious conduct cannot be immunized; if Myron has to await a full trial on the merits, defendant then will have prevailed by being permitted to sell through the infringing products for the remaining lifetime of the dated products. The brief period of time between Myron's filing of the lawsuit and defendant's apparent rejection of Myron's claims should not cause the Court to hesitate granting the relief that is necessary and appropriate in the face of the blatant copying of the Myron Trade Dress.

Defendant has not and cannot assert any prejudice as a result of the brief period of time between Myron's commencement of the lawsuit and the notice of the preliminary injunction motion. Clearly, defendant's marketing plans were well underway as were its orders for product from its supplier. Furthermore, defendant apparently has had the opportunity to generate and fulfill sales as a result of its marketing activities.

Defendant offers dozens of different pocket calendar styles. (Def. Ex. O). The paper inserts to its pocket calendars are interchangeable with other non-infringing calendar covers. An injunction would merely preclude defendant from selling calendars with the covers featuring the Infringing Trade Dress. As the Court saw during the hearing, defendant could easily remove the inserts from the infringing covers and utilize them with any one of its other non-infringing designs.

The Myron Trade Dress, on the other hand, is Myron's best selling branded line and is embodied in thirty SKUs. Myron acted responsibly, not rashly. It is not a litigious company and acted reasonably in bringing this motion accusing one of its main competitors of blatant copying. Defendant not only admits to the brazen copying, it further asserts that Myron cannot do anything about it. The law in this Court is not nearly as restrictive as defendant tries to characterize it.

The undeniable fact is that the concept embodied in the Myron Trade Dress could have been rendered in an infinite number of alternative iterations. Defendant knowingly and intentionally mimicked one of its chief rivals' most successful lines, admits it referred to the Myron Trade Dress during the development, design and production of the Infringing Trade Dress, acknowledges it is aware of no other dated

23

product that embodies all the elements of the Myron Trade Dress and offered no proof that it obtained legal clearance of the product before bringing it to market despite taking nearly two years to develop the item. To excuse such a blatant act of willful and intentional trade dress infringement would reverberate throughout the multi-billion dollar advertising specialty industry and directly impact and undermine legitimate competition in all areas involving trade dress.

Therefore, the need for a preliminary injunction is essential not only to stop the actions of defendant this time around but also to deter future acts of infringement by defendant as well as by other competitors who attempt to compete not by making a better product and fostering legitimate competition but instead by engaging in unfair competition.

## V.    CONCLUSION

For all of the foregoing reasons, Myron respectfully requests that the Court grant its motion for a preliminary injunction.

Dated:        New York, New York
              October 1, 2007

Respectfully submitted,

COLUCCI & UMANS

By: _Frank J. Colucci_____
   Frank J. Colucci (FC-8441)
   Richard P. Jacobson (RJ-2843)
   218 East 50th Street
   New York, New York 10022
   Telephone: (212) 935-5700
   Facsimile:  (212) 935-5728
   Email: email@colucci-umans.com

*Attorneys for Plaintiff, Myron Corp.*

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the foregoing "Plaintiff's Post-Hearing Memorandum of Law in Support of Its Motion for a Preliminary Injunction" has been served by email on defendant's attorney, Mario Aieta, Fross Zelnick Lehrman & Zissu, P.C., 866 United Nations Plaza, New York, New York 10017, on this 1st day of October, 2007.