UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                          :

MYRON CORP.,                 :

           Plaintiff      :    Case No. 07-CV-6877 (PAC)

          v.            :

                         :

HOLLAND USA, INC D/B/A AMSTERDAM  :
PRINTING,
          Defendants.    :

                         :
------------------------------------------------------------x


**DEFENDANT'S POST-HEARING MEMORANDUM OF LAW IN FURTHER
OPPOSITION TO PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION**

Mario Aieta (MA 2228)
Betsy C. Judelson (BJ 1107)
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, New York 10017
Tel.:  (212) 813-5900
Fax:  (212) 813-5901
Attorneys for Defendant
Holland USA d/b/a/ Amsterdam Printing

{F0111934.2 }

# TABLE OF CONTENTS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................................1

I.    MYRON HAS INEXCUSABLY DELAYED ITS REQUEST FOR A PRELIMINARY INJUNCTION ..................................................................................2

II.    MYRON'S ALLEGED TRADE DRESS DOES NOT SERVE AS A SOURCE INDICATOR ...............................................................................................5

    A.    Myron Claims Trade Dress In a Product Design .................................................6

    B.    Myron's Product Design Is Not Protectable as Trade Dress Because Source Identification Is Not The Primary Purpose Of That Design ................................7

III.    A DESIGN THAT IS NOT PROTECTABLE MAY BE FREELY COPIED BY A COMPETITOR ....................................................................................................10

IV.    MYRON CANNOT SHOW THAT ITS TEAMWORK PEAK THEME HAS ACQUIRED SECONDARY MEANING ....................................................................13

V.    MYRON HAS FAILED TO SHOW THAT HOLLAND'S PRODUCT DESIGN IS LIKELY TO CAUSE CONFUSION AMONG CONSUMERS ..................................15

VI.    THE BALANCE OF THE HARDSHIPS TIPS DECIDEDLY IN FAVOR OF HOLLAND ............................................................................................................17

CONCLUSION ..........................................................................................................................18

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976) .................................4

*Banff Ltd. v. Express, Inc.*, 921 F. Supp. 1065 (S.D.N.Y. 1996) .................................8, 12

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033 (2d Cir. 1992) .................. *passim*

*Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217 (2d Cir. 1987) .................................................................................................................14

*Citibank N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985) ....................................................5

*Duraco Products v. Joy Plastic Enterprises,* 40 F.3d 1431 (3d Cir. 1994) ....................................12

*First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378 (9th Cir. 1987) .........................................14

*Gillette Co. v. Ed Pinaud, Inc.*, 178 F. Supp. 618 (S.D.N.Y. 1959) ....................................4

*Grupke v. Linda Lori Sportswear, Inc.*, 921 F. Supp. 987 (E.D.N.Y. 1996)....................................8

*Herbko International, Inc. v. Gemmy Industries Corp.*, 916 F. Supp. 322 (S.D.N.Y. 1996) .....9, 15

*Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111 (1938) .............................................11

*Knitwaves Inc. v. Lollytogs, Ltd.*, 71 F.3d 996 (2d Cir. 1995).......................................6, 11

*Landscape Forms v. Columbia Cascade Co.*, 113 F.3d 373 (2d Cir. 1997).................10, 11, 12, 16

*Lucien Lelong, Inc. v. Lander Co.*, 164 F.2d 395 (2d Cir. 1947) .....................................11

*McKernan v. Burek*, 118 F. Supp. 2d 119 (D. Mass. 2000)............................................12

*Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65 (2d Cir. 1994) ....................................17

*Nina Ricci, S.A.R.L. v. Gemcraft, Ltd.*, 612 F. Supp. 1520 (S.D.N.Y. 1985) ....................................5

*Plasmart, Inc. v. Wincell International Inc.*, 442 F. Supp. 2d 53 (S.D.N.Y. 2006)....................5, 13

*Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739 (2d Cir. 1998) .............................................11

*Traffix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001) ..........................................11

*Versa Products Company, Inc. v. Bifold Company (Manufacturing) Ltd.*, 50 F.3d 189 (3rd Cir. 1995) ................................................................................................................16

*Walker & Zanger, Inc. v. Paragon Industries, Inc.*, 465 F. Supp. 2d 956 (N.D. Cal. 2007) ....12, 15

*Wal-Mart Stores, Inc. v. Samara Brothers*, 529 U.S. 205 (2000)...........................................6, 7, 15

*Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25 (1st Cir. 2001) ...........................13, 14

## PRELIMINARY STATEMENT

Defendant Holland USA, Inc. d/b/a Amsterdam Printing ("Holland" or "Amsterdam Printing"), respectfully submits this post-hearing memorandum of law in further opposition to Plaintiff Myron Corp.'s ("Myron") request for a preliminary injunction.

Myron learned (or should have known) of Holland's allegedly infringing United Teamwork Pocket Calendar and Achieve Teamwork Pocket Calendar no later than June 18, 2007.[1]  It did nothing at that time to notify Holland that it believed that Holland's products infringed Myron's trademark rights.  Six weeks later Myron filed the complaint in this action, alleging causes of action for infringement of its registered trademark TOGETHER WE ACHIEVE THE EXTRAORDINARY, its alleged common law trademark TEAMWORK, and its trade dress as embodied in Myron's Teamwork Peak design.  Six weeks after filing its complaint, Myron advised the Court that it intended to move for a preliminary injunction as to its trademarks and trade dress against both of Holland's accused products.  Myron's preliminary injunction motion was presented to the court on September 27.  Shortly before the hearing on that date, Myron dropped its request for a preliminary injunction as to Holland's United Teamwork Pocket Calendar and also dropped claims for preliminary relief based on its registered mark TOGETHER WE ACHIEVE THE EXTRAORDINARY and its alleged common law mark TEAMWORK.  Plaintiff's Memorandum of Law In Support of Its Motion for Preliminary Injunction ("Pl. Mem) at 1, n.1.

At the preliminary injunction hearing on September 27, Myron presented no evidence of actual confusion, no evidence that the elements of its claimed trade dress were distinctive in the

---

[1] Holland contends that Myron should have known of the Holland's allegedly infringing products in May 2007, when Myron's Vice President of Customer Relations Management and Marketing received a catalog from Amsterdam Printing featuring those products in a full-page advertisement.

{F0111934.2 }

field, no evidence that it designed or developed its claimed trade dress to function as an indicator of the source of the products bearing that trade dress, no evidence that it promoted its claimed trade dress with "look for" advertising, and no survey evidence showing that its claimed trade dress was recognized by consumers as an indicator of source.  Transcript of Hearing Sept. 27, 2007 ("Hearing Tr.") at ___.[2]

Myron's request for a preliminary injunction must be denied because Myron's inexplicable delay in bringing this motion demonstrates that there is no urgency to Myron's claims; if Myron did not believe it was necessary to take action to prevent consumer confusion before its selling season got underway, there is no reason for this court to preliminarily enjoin Holland now that the selling season is winding down.  Furthermore, Myron has failed to carry its burden of proving that the design of its Teamwork Peak pocket calendar serves primarily as an indicator of source.  Therefore, the Myron design is not protectable.  Myron also has failed to show that Holland's design is likely to cause consumer confusion.  Finally, Myron has failed to prove that the balance of the hardships tips in its favor.

I.    MYRON HAS INEXCUSABLY DELAYED ITS REQUEST FOR
      A PRELIMINARY INJUNCTION.

Myron admits that it received a sample of Amsterdam Printing's United Teamwork Pocket Calendar – which incorporates the word TEAMWORK and the phrase TOGETHER WE CAN ACHIEVE THE IMPOSSIBLE with an image of geese flying in formation – on June 18, 2007.  Although this Holland design was, according to Myron's counsel, "identical in form and presentation to [Myron's] TEAMWORK line of dated products," Pl. Mem. at 4, it seems that no

---

[2] As of 3PM on Monday, October 1, the transcript of the hearing was not available from the Southern District Court Reporters.  Defendants will submit a revised version of this brief if the transcript becomes available before the hearing.

one at Myron bothered to browse over to Amsterdam Printing's website until five days later, at which time Myron's manager for its calendar products confirmed that Amsterdam Printing was offering the Achieve Teamwork Pocket Calendar which incorporates the word TEAMWORK and the phrase TOGETHER WE CAN ACHIEVE THE IMPOSSIBLE with an image of two mountain climbers.  The product manager brought the Holland products to the attention of Patrick Caillat, Myron's Vice President of Customer Relationship Management and Marketing on June 23, and Myron's management contacted counsel about the Holland products some days or weeks later.  Myron's counsel claims that Myron and its counsel "investigated" the Holland products for the next six weeks, before filing the complaint on July 31. Myron's witness at the hearing did not explain what was investigated or why the investigation took six weeks.  During those six weeks neither Myron nor its counsel contacted Holland to object to the Holland products.  Myron did not request a preliminary injunction until nearly three months after the day on which it admits knowing about the Holland products.  Again, no Myron witness explained why Myron waited that long before deciding that it needed a preliminary injunction to protect its interests.

Pocket calendars, of course, "are dated products with a finite end to their usefulness." Caillat Declaration ¶ 7.  Mr. Caillat testified that Myron begins to sell its pocket calendars in July and that its "peak selling season is coming to a close."  Caillat Declaration ¶ 20.  On the date when Myron claims to have first learned of the accused Holland products, Myron's selling season had not yet started.  Declaration of Mario Aieta dated September 27, 2007 ("Aieta Declaration") Ex. L at 59:14 to 59:23.  That Myron, learning of its competitor's products before its selling season began, should wait to bring this preliminary injunction motion until its selling

season is "coming to a close," is completely inexplicable if, in fact, the marketing of Holland's products would cause irreparable harm to Myron.

Myron's delay is especially puzzling in light of the fact that Myron knew that Holland would be marketing its pocket calendars and sending samples of those pocket calendars to customers and prospects in the weeks following Myron's discovery of the alleged infringements. Not only was this timing consistent with Myron's own practices, Mr. Caillat himself had received sample pocket calendars from Amsterdam Printing in August 2006 and had retained Amsterdam's marketing materials from those samples in his own file. Testimony of P. Caillat, Hearing Tr. at ___; Hearing Ex. I6-I10, I11-I16. Therefore, Myron knew, from the Amsterdam Printing sample it received in June 2007, from the samples that Caillat had received in August the previous year, and from its own practice with similar products, that Holland was actively promoting its dated calendar products in June, July and August. Yet, it appears that Myron did not think that prompt action was necessary.

"A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action and cannot complain of the delay involved pending any final relief to which it may be entitled after a trial of all the issues." *Gillette Co. v. Ed Pinaud, Inc.* 178 F. Supp. 618, 622 (S.D.N.Y. 1959) (citations omitted). Myron claims that it will be irreparably harmed if a preliminary injunction issues because a large number of prospects will be exposed to Holland's competing product and will be confused into thinking that Holland, not Myron, is the source of pocket calendars bearing the word TEAMWORK, a motivational phrase like TOGETHER WE ACHIEVE THE EXRAORDINARY, and an image of two mountain climbers. It is obvious, however, that if Myron had an urgent need to protect its rights, it would have acted

to stop Holland from sending out samples of the products that Myron feared would cause that confusion.  Instead, Myron waited until the "peak selling season is at a close."

"Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement."  *Citibank N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).  Here, the delay is particularly significant because Myron did not act  (and did not even send a demand letter) in order to stop Holland's seasonal promotional activities, activities which Mryon knew were taking place.  *Nina Ricci, S.A.R.L. v. Gemcraft, Ltd.,* 612 F. Supp. 1520, 1531 (S.D.N.Y. 1985) (plaintiffs' six week delay during a "high volume sales period" for the product at issue "and their nonchalant reaction to the presence of [the accused product] in the marketplace indicate that even plaintiffs felt there was little real likelihood that consumers would be confused between the products.")

Myron's unexplained delay in seeking injunctive relief – in light of the time-sensitive nature of the calendar products and Myron's admitted awareness of Holland's marketing efforts at the very beginning of the most important sales period – demonstrates that Myron is not entitled to a preliminary injunction.

II.     MYRON'S ALLEGED TRADE DRESS DOES NOT SERVE AS
           A SOURCE INDICATOR

Because Myron's claimed trade dress is the design of the Myron product itself, and not the packaging of that product, Myron's trade dress is protectable only if the primary purpose of the Teamwork Peak design is to identify the product's source.  *Plasmart, Inc. v. Wincell Int'l*

*Inc.*, 442 F. Supp. 2d 53, 59 (S.D.N.Y. 2006), *citing Walmart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 211 (2000).

**A. Myron Claims Trade Dress In a Product Design**

At the preliminary injunction hearing Myron's counsel argued that the trade dress at issue is more akin to product packaging than to product design, attempting to avoid the "primary purpose" hurdle created by *Wal-Mart* and *Knitwaves*. *Knitwaves Inc. v. Lollytogs, Ltd.,* 71 F.3d 996, 1008-09 (2d Cir. 1995) (despite finding similarity sufficient to constitute copyright infringement of squirrel and leaf sweater pattern, court found no trade dress infringement because plaintiff's designs "were not primarily intended as source identification.")   The case law and the facts establish beyond question that the trade dress at issue should be judged under the standards applicable to product design or configuration, rather than product packaging.

The cover of Myron's Teamwork Peak products, which embodies the claimed trade dress, is precisely the item that Myron is selling to its customers; therefore, the trade dress at issue here concerns product design, not product packaging.   Myron promotes itself as "The Leader in Personalized Business Gifts."[3]   The "personalized" part of the Teamwork Peak product is the cover.   The consumer for Myron's product – the medium and small business seeking to give the pocket calendar away to its own customers – never uses the calendar as a calendar; the consumer of Myron's product uses the calendar only as a promotional device because of the personalized content on the cover of the calendar.   For Myron's customers, therefore, the cover is the focal point and entire purpose of the product that Myron sells; it is simply ridiculous for Myron now to argue that the cover is merely packaging for a calendar that will be used by the people who

---

[3] Unlike TEAMWORK or the claimed trade dress, Myron actually promotes this phrase as a source identifier, printing the TM symbol after the phrase on its promotional letters.  Hearing Ex. A-1.

receive the product from Myron's customers.  *See Wal-Mart*, 529 U.S. at 215 (noting that

packaging is typically discarded).  The people who use the pocket calendars given away by

Myron's customers do not pay for the calendars, do not select the calendars, and are not the

objects of Myron's marketing efforts  For the consumer who selects the calendar and pays for the

calendar, the cover **is** the product.  Therefore, Myron must meet the burden of proof applicable in

product design cases.

Moreover, the Supreme Court in *Wal-Mart* made it very clear that when presented with a

close case, the trial court should treat the claimed trade dress as product design rather than

product packaging: "To the extent there are close cases, we believe that courts should err on the

side of caution and classify ambiguous trade dress as product design, thereby requiring

secondary meaning."  *Wal-Mart, 529 U.S. at 215.*


### B. Myron's Product Design Is Not Protectable as Trade Dress Because Source Identification Is Not The Primary Purpose Of That Design

"Before we will address whether an allegedly infringing mark is likely to cause consumer

confusion, the plaintiff must show that its trademark or trade dress is of the type that deserves

protection under section 43(a)."  *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,* 973 F.2d

1033, 1039 (2d Cir. 1992) (citation omitted).  At the hearing Myron failed to proffer any

evidence at all to support the contention that the primary purpose of the Teamwork Peak design

is to designate source.

> *Knitwaves* makes it clear that, in order to prevail on a claim for trade dress
> infringement, a plaintiff must do more than demonstrate that the appearance of its
> product serves some source identifying function. It must demonstrate that the
> primary purpose behind the design was to identify its product's source. In the case

at hand, there is absolutely no evidence that [plaintiff] chose its design primarily to identify the source of its product. In fact, it is clear that [plaintiff], like the plaintiff in *Knitwaves*, chose its design primarily for aesthetic reasons.

*Banff Ltd. v. Express, Inc.,* 921 F. Supp. 1065, 1071 (S.D.N.Y. 1996) (directing verdict in favor of defendant); *Grupke v. Linda Lori Sportswear, Inc.*, 921 F. Supp. 987, 996 (E.D.N.Y. 1996) (granting defendant summary judgment on trade dress claim where "there is no evidence that plaintiffs intended their design to identify the source" of their product); *see also Bristol-Myers Squibb Co.,* 973 F.2d at 1042 (Plaintiff "must show that the primary significance of its . . . trade dress is to identify the source of the product rather than the product itself.")

The record demonstrates, in fact, that Myron's Teamwork Peak design is not a source indicator. Myron promotes the design because it conveys a message that Myron's customers want to associate with their own businesses. As Patrick Caillat, Myron's executive in charge of marketing, explained:

> A.  [Customers] like our product for many reasons. . . .We
> haven't done specifically a survey on
> teamwork . . . .
> We've done surveys from our customers in
> general, you know, people might like this
> because they think it's a good message and
> they like to keep that message, they
> associate with that message, and they are
> customers themselves to which they give the
> product associated with that message, so
> they fell that it represents their company
> well, for example.

Hearing Tr. at ____, Aieta Declaration Ex. L at 67:14-68:3 (read into the record at hearing).

Myron's marketing materials continuously reinforce the idea that the design of Myron's Teamwork Peak products communicates a message about the company that buys that product from Myron and gives it away:

> "As your customers, prospects, employees and associates record appointments, jot down frequently called numbers or check the atlas, your company's name and address, imprinted in gold, will be seen time and again, and your commitment to teamwork will be reinforced every day." Hearing Ex. 7-1.

> "With themes that match your company's character, from Teamwork to World of Thanks." Hearing Ex. L-1.

> "Take [name of customer redacted] who told us 'I've used Myron products for years to get many different promotional messages across….' " Hearing Ex. A-11.

> "Teambuilding motivates employees and moves your business forward. It's our most popular theme. We've supplied thousands of companies with teamwork-building tools. They're given out at new employee orientations to establish corporate culture from day one. . . .Our exclusive designs send the right message about the quality and endurance of your commitment to teamwork." Hearing Ex. B-40.

By contrast, there is nothing in the record to suggest that Myron promotes its Teamwork Peak design as source-identifying. Myron presented no evidence of "look for" advertising. Myron's director of marketing did not testify to any efforts by Myron to promote its Teamwork Peak design as source-identifying. Myron's promotional letters and catalogs **never** refer to the Teamwork Peak design in a manner suggesting that the design is a source-identifier. Hearing Exs. A, B, and 7. And Myron recently conducted a focus group contemplating the modification of the cover of its Teamwork pocket calendars during which the supposed source-identifying purpose of the Teamwork Peak design is never mentioned. Hearing Ex. AJ.

"[I]t is no longer enough for a plaintiff to demonstrate that the appearance of its product serves some source identifying function; rather, the plaintiff must show that the primary purpose behind the design was to identify its product's source. In determining the producer's intent, it is helpful to look at the standards of the industry in order to determine whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicium of origin." *Herbko Int'l, Inc. v. Gemmy Indus. Corp.*, 916 F. Supp. 322, 328 (S.D.N.Y. 1996) (internal

quotations and citations omitted) (denying plaintiff's motion for a preliminary injunction because "the product configuration. . .appears to enhance the product's aesthetic value, rather than identify the source of the product.")   Myron did not introduce any evidence at the preliminary injunction hearing tending to show that its Teamwork Peak "is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicium of origin."   In fact, exactly the opposite is apparent from the record on this motion.   Myron's own counsel characterized the claimed trade dress as a combination of common elements.   Documents in the record demonstrate that the trade dress at issue cannot possibly be considered "so unique" as to "automatically be perceived as an indicium of origin."[4] Hearing Exs. B-9, B-18, B-43, B-70, Ex. 0-14, N-16, Aieta Declaration Exs. E and F.   *See Landscape Forms v. Columbia Cascade Co*., 113 F.3d 373, 376 (2nd Cir. 1997) (holding plaintiff's designs not entitled to trade dress protection because they are not "likely to serve primarily as source designators.")

### III.    A DESIGN THAT IS NOT PROTECTABLE MAY BE FREELY COPIED BY A COMPETITOR.

"Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying. As the Court has explained, copying is not always discouraged or disfavored by the laws which preserve our

---

[4] Had Myron not dropped its claims based on TEAMWORK and TOGETHER WE CAN ACHIEVE THE EXTRAORDINARY prior to the hearing, Holland was prepared to show that those elements of the trade dress, as well as the mountain climbers, are common in the motivational products industry.  That evidence was not submitted at the hearing but was included as exhibits E and F to the Aieta Declaration in Support of Defendant's Memorandum of Law in Opposition to Plaintiff's Request for a Preliminary Injunction and was not contradicted in Myron's reply papers.

competitive economy." *Traffix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001) (citation omitted).  In *Traffix*, the Supreme Court denied trade dress protection to plaintiff's design even though the defendant "[w]hen [it] started in business. . .sent [plaintiff's] product abroad to have it reverse engineered, that is to say copied."  *Id.* at 26.

The Second Circuit has often recognized the fact that copying, per se, is competitive and is not prohibited by law absent a relevant patent, copyright or trademark right.  "Competitors, by copying and underselling a product's originator, enjoy a 'free ride' on an originator's efforts. Yet, since the common law favors competition, unless a plaintiff can establish that the defendant encroached on its trademark or copyright, the law will tolerate such conduct."  *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 741 (2d Cir. 1998) (dismissing the complaint); *Landscape Forms*, 113 F.3d at 380 ("A similar concern for the protection of competition informs the initial stage of the analysis of a claim of trademark or trade dress infringement, i.e., determination of whether a mark, packaging or product design qualifies for protection"); *Lucien Lelong, Inc. v. Lander Co.,* 164 F.2d 395, 397 (2d Cir. 1947) (" Under the circumstances here present, plaintiff may prevail only if it proves that its style of bottle has acquired a secondary meaning. Without that it was not unfair competition for the defendant to copy it") (citation omitted).

Myron does not have a design patent or copyright in the Teamwork Peak design. Therefore, absent consumer confusion, Holland has every right to compete with Myron by coping Myron's products.[5]  "[E]xploiting the 'goodwill of the article,' *Kellogg Co.* [*v. National Biscuit Co.*], 305 U.S. [111], 121, 59 S. Ct. at 115 -- the attractive features, of whatever nature,

---

[5] At the preliminary injunction hearing and in its pre-hearing briefs, Myron presented testimony and argument in support of the contention that its trade dress is not "functional" because it was possible for Holland to compete without using the same or similar design elements.  As in *Knitwaves*, the "functionality" of Myron's design is not at issue at this point (although Holland reserves the right to argue functionality should Myron ever resurrect its claims relating to its alleged common law mark TEAMWORK).  *Knitwaves*, 71 F.3d at 1006.  The possibility of using alternative designs is simply not relevant; the design at issue is not protectable.

that the product holds for consumers -- is robust competition; only deceiving consumers, or exploiting the good will of another producer, is unfair competition." *Duraco Prods. v. Joy Plastic Enters,* 40 F.3d 1431, 1445 (3d Cir. 1994).  In *Knitwaves*, for example, defendant admitted copying plaintiff's sweater, and the court concluded the two designs were "substantially similar" to plaintiff's sweater.  71 F.3d at 999, 1005.  Nonetheless, the Second Circuit rejected plaintiff's trade dress claim because the designs at issue did not function primarily as indicators of source.  *See also Wal-Mart*, 529 U.S. at 207-08 (finding for defendants despite the fact that garments were "copied, with only minor modifications"); *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 465 F. Supp. 2d 956, 968 (N.D. Cal. 2007) (rejecting trade dress claim despite "striking similarity" and admission of defendant that he took plaintiff's product to China to have it copied); *accord Banff Ltd,* 921 F. Supp. at 1071 (where defendant's design was "substantially similar" to plaintiff's design, defendant entitled to verdict in its favor on plaintiff's trade dress claim because "there is absolutely no evidence that [plaintiff] chose its design primarily to identify the source of its product"); *McKernan v. Burek*, 118 F. Supp. 2d 119, 122 (D. Mass. 2000) (dismissing trade dress claim based on "strikingly similar" products).  In *Landscape Forms* the Second Circuit noted: "simulating the design of a competitor's successful products is not bad faith, unless there is reason to draw an inference of an intention to deceive."  113 F.3d at 383.  The record in this case does not contain even one iota of evidence suggesting that Holland intended to deceive consumers with the design of its Achieve Teamwork Pocket Calendar. Therefore, evidence that Holland may have copied some aspects of Myron's Teamwork Peak design does not support Myron's application for a preliminary injunction.

IV.    MYRON CANNOT SHOW THAT ITS TEAMWORK PEAK
THEME HAS ACQUIRED SECONDARY MEANING

"To prove secondary meaning, a plaintiff must meet 'vigorous evidentiary requirements.'"  *Plasmart, Inc.,* 442 F. Supp. 2d at  59 (internal citations omitted).  At the preliminary injunction hearing, Myron proffered only circumstantial evidence in support of its contention that the Teamwork Peak design has acquired secondary meaning:  Myron's use of the design since 1995, the amount of money that Myron spent on mailing samples of its products bearing the design to customers and prospects, and Holland's alleged "copying" of the design. This circumstantial evidence is not probative of the alleged secondary meaning of Myron's claimed trade dress.

The First Circuit's decision in *The Yankee Candle Company, Inc. v. The Bridgewater Candle Company, LLC*, 259 F.3d 25 (1st Cir. 2001), is precisely on point.  There, plaintiff introduced evidence showing that its products were "in circulation since 1995," that plaintiff "spends significant resources advertising" its products, and that sales of the products bearing the alleged trade dress "have been extremely successful."  259 F.3d at 44.  The court held that plaintiff's circumstantial evidence was not adequate to prove the alleged trade dress has acquired secondary meaning:

> Proof of secondary meaning requires at least some evidence that consumers associate the trade dress with the source. Although evidence of the pervasiveness of the trade dress may support the conclusion that a mark has acquired secondary meaning, it cannot stand alone. To find otherwise would provide trade dress protection for any successful product, or for the packaging of any successful product. Such an open standard hardly comports with the "vigorous" evidentiary showing required by this Court, nor does it comport with the purposes of trade dress protection, namely to protect that which identifies a product's source. In the absence of *any* evidence that the claimed trade dress actually *does* identify a product's source, the trade dress should not be entitled to protection.

259 F.3d at 44 (internal citations and quotations omitted).   The *Yankee Candle* court also

explained why plaintiff's evidence of advertising expenditures did not suffice to establish

secondary meaning:

> "Look-for" advertising is such that encourages consumers to identify the claimed
> trade dress with the particular producer. In other words, it is advertising that
> specifically directs a consumer's attention to a particular aspect of the product. To
> be probative of secondary meaning, the advertising must direct the consumer to
> those features claimed as trade dress. Merely "featuring" the relevant aspect of the
> product in advertising is no more probative of secondary meaning than are strong
> sales; again, to provide protection based on extensive advertising would extend
> trade dress protection to the label (or to the combination claim) without any
> showing that the consumer associated the dress with the product's source. The
> district court found that Yankee's advertising did not emphasize any particular
> element of its trade dress, and thus could not be probative of secondary meaning.
> We agree.

*Id.*   The *Yankee Candle* court also found that plaintiff's evidence of intentional copying of its

design by defendant was not probative of secondary meaning. "[I]ntent plays a particularly minor

role in product design/configuration cases;" "the relevant intent is not just the intent to copy, but

to "pass off" one's goods as those of another."   259 F.3d at 44-45; *see supra at* Point II.   *First*

*Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383 (9th Cir. 1987) (plaintiff's "extensive

advertising budget" failed to establish secondary meaning); *accord Centaur Communications,*

*Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987).

   Each of the sample mailings that account for all of the $19 million that Myron claims to

have spent promoting its Teamwork Peak design is accompanied by a letter from Myron to the

customer or prospect receiving the sample.   Hearing Exs. 7 and A.   Those letters **never** suggest

that the claimed trade dress is a source indicator.   One reviews Myron's letters in vain for some

statement encouraging the customer or prospect to "look for the mountain climbers" or

suggesting "when you see Teamwork Peak, you know you are getting Myron quality!"

Consequently, the amount of money spent by Myron to send samples of products to prospects and customers has no relevance at all to the issue of secondary meaning because it did not involve any effort to promote the Myron design as a source identifier. *Herbko Int'l* 916 F. Supp. at 329 (evidence of advertising expenditures failed to show secondary meaning where plaintiff "did not present any evidence to show that these advertisements encouraged consumers to associate the design. . .with its source"); *Walker & Zanger, Inc.,* 465 F. Supp. 2d at 966.

Myron has not provided the court with any direct evidence of secondary meaning such as consumer surveys or testimonials. The circumstantial evidence of secondary meaning proffered by Myron is unavailing because there is no evidence that the claimed trade dress actually identifies source. Myron's sample mailings do not direct consumers to the Teamwork Peak design as a source-identifier. There is no evidence to suggest that Holland copied Myron's design in order to pass off its products as Myron's. Therefore, Myron's indirect evidence of secondary meaning is not probative and Myron has failed to demonstrate that its design has achieved secondary meaning in the relevant marketplace.

V.    MYRON HAS FAILED TO SHOW THAT HOLLAND'S
       PRODUCT DESIGN IS LIKELY TO CAUSE CONFUSION
       AMONG CONSUMERS

Myron has the burden of proving that the accused Holland design is likely to cause confusion among the relevant consumer group. "Consumers are aware of the reality that, almost invariably, even the most unusual of product designs. . . is intended not to identify the source, but to render the product itself more useful or appealing." *Wal-Mart,* 529 U.S. at 213. Because

consumers do not look to the design as a designator of source, similar designs do not cause confusion as to source.

The situation presented here is unique.  The intended consumer for the pocket calendars at issue is the small or medium sized business buying the personalized product for distribution to its own clients.  The consumer is buying the product from a catalog that very clearly announces the source of the product, *compare* Hearing Ex. 1 with Hearing Ex. O, or from a sample mailing that clearly identifies the source of the product.  Hearing Ex. A and Hearing Ex. 7.  Considered in their real world contexts, the designs of the Myron and Holland products are not likely to result in consumer confusion.

> In a product configuration trade dress infringement case. . .consumers do not have to rely on a potentially distinctive configuration to identify the source of the product; rather, they can generally look to the packaging, trademarks, and advertising used to market the product, which are typically much less ambiguous. Consumers therefore have less need, and so are much less likely, to rely on a product configuration as an indicator of the product's source. Accordingly, they are less likely to be confused as to the sources of two products with substantially similar configurations. Thus, in trade dress infringement suits where the dress inheres in a product configuration, the primary factors to be considered in assessing likelihood of confusion are the product's labeling, packaging, and advertisements.

*Versa Prods. Co., v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 202-03 (3rd Cir. 1995); *Bristol-Myers*, 973 F.2d at 1046 ("The presence and prominence of markings tending to dispel confusion as to the origin, sponsorship or approval of the goods in question is highly relevant to an inquiry concerning the similarity of the two dresses");  *see Landscape* 113 F.3d at 382 ("These marketplace realities make confusion improbable, even though the two product lines compete in the same market," noting sale of products through catalogs that identify the manufacturer).

As Kevin Kirbey, Holland's president, explained at the hearing, Holland goes to great lengths to ensure that its customers and prospects know that the samples and catalogs are from Amsterdam, prominently displaying the name on all materials. Testimony of K. Kirbey, Hearing Tr. at ___. He explained that because the company makes considerable profit on reorders, it is essential that customers are aware of the source of the products. Testimony of K. Kirbey, Hearing Tr. at ___. Moreover, Myron and Amsterdam Printing are both well-known names in the personalized business products industry. Testimony of K. Kirbey, Hearing Tr. at ___. The promotion of the Myron and Holland products in connection with well-recognized brand names diminishes the possibility of consumer confusion resulting from similar product designs. *Bristol Myers*, at 1047; *Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 71 (2d Cir. 1994) ("The conspicuous use of very different logos and of the names of the publishers significantly distinguishes the two trade dresses").

Myron has failed to show that the designs at issue are likely to cause confusion among the consumers to whom they are directed: the small and medium sized business that purchase the products from catalogs or sample mailings that clearly identify the source of the products. Therefore, Myron's request for a preliminary injunction must be denied.

## VI.  THE BALANCE OF THE HARDSHIPS TIPS DECIDEDLY IN FAVOR OF HOLLAND

Holland has promoted is Achieve Teamwork Pocket Calendar to its customers and is now in the process of filing those orders. Declaration of Kevin Kirbey ¶ 6. Myron argues that it will be irreparably harmed by the sale of Holland's Achieve Teamwork Calendars because customers for pocket calendars tend to reorder. The greatest difficulty with this argument is, of course, the

fact that Myron had the option of seeking a preliminary injunction in June, at a time when very

few potential customers had received Holland's promotions and before Holland had accepted

many orders for its product. Myron did not do so, choosing to wait until Holland had completed

most of its promotional efforts (for a product that Myron claims is identical to its own).

Myron's delay rebuts any argument made by Myron concerning the harm that it will suffer if an

injunction is not issued. *See supra* at 2-5.

   In addition, the testimony at the hearing makes it clear that the harm Myron imagines is,

in fact, illusory. Myron fears that Holland will succeed in attracting new customers who will

then continue to order from Holland for years. Testimony of P. Caillat, Hearing Tr. at ___.

Holland's president, however, testified that sample mailings of the Achieve Teamwork Pocket

Calendar were sent only to existing Holland customers, not to prospects. Testimony of K.

Kirbey, Hearing Tr. at ___. Since existing Holland customers, like existing Myron customers,

are likely to place repeat orders, Testimony of K. Kirbey, Hearing Tr. at ___, the possibility that

Holland has somehow confused a potential Myron customer by marketing Holland's own

Achieve Teamwork Pocket Calendar to existing Holland customers (who are familiar with

Holland and are likely to repeat orders with Holland) is simply preposterous.

   The evidence before the court clearly demonstrates a real injury to Holland should an

injunction issue: Holland will not be able to fill orders made by its existing customers. By

contrast, the harm alleged by Myron – that an existing Holland customer will be confused as to

the source of a design promoted to it by Holland – is illusory. Myron's request for a preliminary

injunction must be denied because the hardships tip decidedly in Holland's favor.

<u>CONCLUSION</u>

For all of the foregoing reasons, Myron's request for a preliminary injunction should be denied.

Dated: October 1, 2007

Respectfully submitted,

FROSS ZELNICK LEHRMAN & ZISSU, P.C.

By:_____

Mario Aieta
Betsy C. Judelson
866 United Nations Plaza
Tel: (212) 813-5900
Fax: (212) 813-5901

Attorneys for Defendant